BID PROTEST

No. 12-852, -853, -862, -864, -869C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CMS CONTRACT MANAGEMENT
SERVICES, et al.,

Plaintiffs,

v.

THE UNITED STATES.

Defendant.

DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE,
MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

STUART F. DELERY
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KIRK T. MANHARDT
Assistant Director

OF COUNSEL:

JOSEPH A. PIXLEY
Trial Attorney
Civil Division
Commercial Litigation Branch
United States Department of Justice

DORIE FINNERMAN
KATHIE SOROKA
KASEY M. PODZIUS
Office of General Counsel
U.S. Department of Housing and
  Urban Development
Washington, D.C.

DOUGLAS K. MICKLE
Senior Trial Counsel
Civil Division
Commercial Litigation Branch
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel:  (202) 307-0383
Fax:  (202) 353-7988

Attorneys for Defendant

January 4, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... iii

STATEMENT OF THE ISSUES.................................................................................................... 4

STATEMENT OF THE CASE....................................................................................................... 5

I.  Nature Of The Case ................................................................................................... 5

II.  Statement Of Facts And Statutory Background ........................................................ 6

    A.  Overview Of The Section 8 Programs ............................................................ 6

    B.  Statutory History Of The Project-Based Section 8 Program ......................... 8

        1.  1937 – 1974:  The Statutory Precursors To Section 8 –
            HUD Implements Policy Through The States ................................. 8

        2.  1974:  Enactment of Section 8 – Congress Gives Primary
            Responsibility To PHAs For Assistance To Existing
            Dwellings And Independent Authority To HUD For
            Assistance To Newly Constructed And Substantially
            Rehabilitated Housing...................................................................... 9

        3.  1983: -- Repeal of HUD's Authority Granted By Section
            8(b)(2) -- Congress Effectively Precludes HUD From
            Directly Entering Into HAP Contracts With Owners .................... 10

        4.  1997: – Statutory Authority For Renewals Of Project-
            Based Section 8 Contracts Clarified – No Authority For
            New Contracts However................................................................ 12

        5.  1998:  Amendment Of Declaration Of Policy In 1937
            Act – Congress Emphasizes State Involvement............................. 14

    C.  1999: Competition Expands PHA Administration To A
        Statewide Basis And Incorporates New Congressional
        Emphasis On Performance-Based Fee Structure ......................................... 15

    D.  The 2011 Competition – HUD Acknowledges Need For
        Clarification In Evaluation Process But Maintains Consistent
        Position That ACCs Are Not Procurement Contracts................................. 17

    E.  The 2012 GAO Protest: GAO Ignores Statutory Authority
        And Misunderstands The Benefit Provided To PHAs................................. 19

F.  HUD's Use Of ACCS Is Long-Standing – HUD Has Never Awarded An ACC Under CICA Or The FAR .........................................20

SUMMARY OF THE ARGUMENT ......................................................................21

ARGUMENT...............................................................................................................22

I.  The Court Lacks Subject Matter Jurisdiction Because This Is Not A Procurement.................................................................................................22

A.  The Court's Bid Protest Jurisdiction Is Limited To Entertaining Challenges To Procurements ......................................................22

B.  Grants And Cooperative Agreements Are Not Procurements ...................23

II.  HUD's Long-Standing Practice Of Awarding ACCs As Cooperative Agreements Is Supported By Statute And Is Reasonable ......................................26

III.  The United States Housing Act of 1937, As Amended, Provides Express Statutory Authority For HUD To Enter Into Assistance Relationships With PHAs .....................................................................................31

IV.  The United States Housing Act of 1937, As Amended, Demonstrates That HUD Does Not Receive A Direct Benefit From The ACCs .........................36

V.  In The Alternative, The Record Demonstrates That HUD's 38-Year Practice Of Awarding ACCs To PHAs Using Cooperative Agreements Is Supported By Law And Is Rational ..................................................................38

CONCLUSION..............................................................................................................42

## TABLE OF AUTHORITIES

### CASES

*360 Training.com, Inc. v. United States,*
    104 Fed. Cl. 575 (2012) ............................................................................................ passim

*Bennett v. Ky. Dep't of Educ.,*
    470 U.S. 656 (U.S. 1985)..................................................................................................29

*Bowman Transp., Inc., v. Arkansas-Best Freight Sys., Inc.,*
    419 U.S. 281 (1974)..........................................................................................................39

*Comsat Corp. v. Nat'l Sci. Found.,*
    190 F.3d 269 (4th Cir. 1999) ...........................................................................................24

*Distributed Solutions, Inc. v. United States,*
    104 Fed. Cl. 368 (2012) ..............................................................................................23, 24

*Distributed Solutions, Inc. v. United States,*
    539 F.3d 1340 (Fed. Cir. 2008)........................................................................................23

*Electro-Methods, Inc. v. United States,*
    7 Cl. Ct. 755, 762 (1985) .................................................................................................39

*Forsham v. Harris,*
    445 U.S. 169 (1980)..........................................................................................................24

*Gov't Technical Services LLC v. United States,*
    90 Fed. Cl. 522 (2009) .....................................................................................................23

*Grigsby Brandford & Co. v. United States,*
    869 F.Supp. 984 (D.D.C. 1994)........................................................................................39

*ICP Northwest LLC v. United States,*
    98 Fed. Cl. 29 (2011) .......................................................................................................36

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
    238 F.3d 1324 (Fed. Cir. 2001)........................................................................................38

*Institut Pasteur v. United States,*
    814 F.2d 624 (Fed. Cir. 1987)..........................................................................................25

*Int'l Genomics Consortium v. United States,*
    104 Fed. Cl. 669 (2012) ...................................................................................................23

*JWK Int'l Corp. v. United States,*
  52 Fed. Cl. 650 (2002), *aff'd,* 56 Fed. Appx. 474 (Fed. Cir. 2003) ...................................39

*Kania v. United States,*
  227 Ct. Cl. 458, 650 F.2d 264 (1981) ...............................................................................23

*Lauderhill Housing Authority v. Donovan,*
  818 F. Supp. 2d 185 (D.D.C. 2011) ..................................................................................40

*Micron Tech., Inc. v. United States,*
  243 F.3d 1301 (Fed. Cir. 2001)...........................................................................................3

*New Era Constr. v. United States,*
  890 F.2d 1152 (Fed. Cir. 1989)..........................................................................................25

*PlanetSpace Inc. v. United States,*
  96 Fed. Cl. 119 (2010) .......................................................................................................38

*R & D Dynamics Corp. v. United States,*
  80 Fed. Cl. 715 (2007), aff'd, 309 Fed. Appx. 388 (Fed. Cir. 2009) ..............................8, 36

*Rapides Reg'l Med. Ctr. v. Sec'y, Dept. of Veterans Affairs,*
  974 F.2d 565 (5th Cir. 1992) ..............................................................................................39

*Res. Conservation Group, LLC v. United States,*
  597 F.3d 1238 (Fed. Cir. 2010)..........................................................................................23

*Rick's Mushroom Service, Inc. v. United States,*
  76 Fed. Cl. 250 (2007), *aff'd* 521 F.3d 1338 (Fed. Cir. 2008) ...........................................25

*San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n,*
  161 F.3d 1347 (Fed. Cir. 1998)............................................................................................3

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)..............................................................................................................22

*United States v. Am. Trucking Ass'ns,*
  310 U.S. 534 (1940).............................................................................................................3

*United States v. Citizens & S. Nat'l Bank,*
  889 F.2d 1067 (Fed.Cir.1989).............................................................................................39

*United States v. Midwest Oil Co.,*
  236 U.S. 459 (1915)..............................................................................................................3

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2) ...........................................................................................................38

14 U.S.C. § 1437f. .........................................................................................................13

28 U.S.C. § 1491(b) ................................................................................................ passim

31 U.S.C. § 6301 ......................................................................................................24, 26

31 U.S.C. § 6302 ................................................................................................24, 25, 26

31 U.S.C. § 6303 ................................................................................................24, 25, 26

31 U.S.C. § 6304 ................................................................................................24, 26, 27

31 U.S.C. § 6305 ...................................................................................................... passim

31 U.S.C. §§ 6306-6308 .........................................................................................24, 26

41 U.S.C. § 111 ......................................................................................................23, 24

41 U.S.C. § 3301 .................................................................................................2, 4, 39

41 U.S.C. § 6305 ...........................................................................................................2

41 U.S.C. § 7101 ...........................................................................................................8

42 U.S.C. § 1437 ...................................................................................................... passim

24 C.F.R. § 5.403 ...........................................................................................................7

24 C.F.R. § 5.801(d)(1)................................................................................................20

24 C.F.R. § 880.201 ......................................................................................................7

24 C.F.R. § 982.1(b)(1)..................................................................................................6

43 Fed. Reg. 36860 (Aug. 18, 1978)...................................................................27, 32

64 Fed. Reg. 27358 (May 19, 1999) ....................................................................15, 16

76 Fed. Reg. 56227 (Sept. 12, 2011) ............................................................................36

## MISCELLANEOUS

*Council on Environmental Quality and Office of Environmental Quality--Cooperative Agreement with National Academy of Sciences,*
B-218816, 65 Comp. Gen. 605 (June 2, 1986) ............................................................27, 30

*Environmental Protection Agency Public Participation Program,*
B-197100, 59 Comp. Gen. 424 (April 24, 1980) ..............................................................29

*Interpretation of Federal Grant and Cooperative Agreement Act of 1977*, B-196872-O.M., 1980 U.S. Comp. Gen. LEXIS 3894 11 (March 12, 1980) ................................28, 29

Multifamily Assisted Housing Reform and Affordability Act of 1997,
Pub. L. 105-65, Title V, § 524, 111 Stat. 1384 (1997), 42 U.S.C. § 1437f.............. passim

Consolidated and Further Continuing Appropriations Act, 2012,
Pub. L. 112-55, 125 Stat. 552 (2011)..........................................................................19, 21

Quality Housing and Work Responsibility Act of 1998,
Pub. L. No. 105-276, § 505,112 Stat. 2461 (1998) .....................................................15, 17

Balance Budget Downpayment Act, I
Pub. L. 104-99, Title IV, § 405, 110 Stat. 44 (1996)........................................................12
Pub. L. 104-120, § 2(a), 110 Stat. 834 (1996) ..................................................................12
Pub. L. 104-204, Title II, § 211, 110 Stat. 2895 (1996) ...................................................12

Housing and Community Development Act of 1992,
Pub. L. No. 102-550, § 146, 106 Stat. 3672 (1992) .........................................................11

Housing and Urban-Rural Recovery Act of 1983,
Pub. L. 98-181, § 209, 97 Stat. 1153 (1983)...............................................................10, 11

Housing and Community Development Act of 1974
Pub. L. No. 93-383, § 201(a), 88 Stat. 633 (1974) ........................................................9, 12

Housing and Urban Development Act of 1965
Pub. L. No. 89-117, § 103(a), 79 Stat. 451 (1965) .............................................................9

United States Housing Act of 1937
Pub. L. No. 75-412, 50 Stat. 888 (1937).......................................................................8, 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## BID PROTEST

| | | |
|---|---|---|
| **CMS CONTRACT MANAGEMENT** | ) | |
| **SERVICES, et al.,** | ) | |
| | ) **Nos.** | **12-852C** |
| **Plaintiffs,** | ) | **12-853C** |
| | ) | **12-862C** |
| **v.** | ) | **12-864C** |
| | ) | **12-869C** |
| **THE UNITED STATES.** | ) | |
| | ) | **Judge Wheeler** |
| **Defendant.** | ) | |

### DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to this Court's December 13, 2012, order (Docket # 15), and Rules 12(b)(1) and

52.1 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United

States, respectfully moves this Court to dismiss the challenges by all plaintiffs in this

consolidated bid protest.[1]  The protestors challenge the actions and decisions of the Department

of the Housing and Urban Development (HUD) to use cooperative agreements, referred to as

Annual Contribution Contracts (ACCs), when transferring program administration authority and

distributing funds to Public Housing Agencies (PHAs) so these PHAs can "engage in or assist in

the development or operation of public housing" as mandated by law.  *See* 42 U.S.C.

---

1 On December 13, 2012, with the concurrence of all parties, the Court consolidated five
separate challenges to HUD's action and decision associated with HUD's decision to award
Annual Contributions Contracts (ACCs) pursuant to a March 9, 2012 Notice of Funding
Availability (NOFA).  The five cases involved the following plaintiffs:  1) CMS Contract
Management Services and the Housing Authority of the City of Bremerton (Fed. Cl. No. 12-
852C); 2) National Housing Compliance (Fed. Cl. No. 12-853C); 3) Assisted Housing Services
Corp., North Tampa Housing Development Corp., and California Affordable Housing Initiatives,
Inc. (Fed. Cl. 12-862C); 4) Jefferson County Assisted Housing Corp. (Fed. Cl. 12-864C); and, 5)
Southwest Housing Compliance Corp. (Fed. Cl. No. 12-869C).  In the brief we will refer
collectively to these plaintiffs as the "protestors."

§§ 1437f(b)(1), 1437a(b)(6)(A).  HUD's implementation of the project-based rental assistance programs at issue is grounded in statutory authorities governing our nation's public and low-income housing assistance programs.  For the 38-year history of the project-based rental assistance programs, HUD's structure of these programs has been consistent with HUD's structure of other programs authorized by the United States Housing Act of 1937 Act (42 USC § 1437 *et seq.*) (1937 Act).

In its August 15, 2012 recommendations, the procurement arm of the Government Accountability Office (GAO) opined for the first time that these ACCs were "procurements" that must be awarded pursuant to the Competition in Contracting Act (CICA), 41 U.S.C. § 3301 *et. seq.*, and the Federal Acquisition Regulation (FAR).  GAO erred in this conclusion, primarily because GAO misconstrued the enabling statute, the 1937 Act, including the specific provision in the 1937 Act that authorizes the project-based rental assistance programs.[2] *See*  42 U.S.C. § 1437f(b)(1).  GAO's failure to consider the full statutory mandate under which the ACCs are issued caused GAO to conclude erroneously that HUD entered into agreements with the PHAs merely to acquire "contract administration services" from those entities and, thus, was the primary beneficiary of the ACCs.  As we show below, under the congressional design, HUD was not acquiring services but was simply implementing our nation's housing assistance laws in HUD's sovereign capacity.

---

2 Critically, as we explain in detail below, since 1983, the 1937 Act, in almost all circumstances except for a few not relevant here, has barred HUD from directly entering into any Housing Assistance Payment (HAP) contracts with a property owner. 42 U.S.C. § 1437f(b)(1). Such authority only lies with a PHA operating with Federal assistance – the very essence of a cooperative agreement defined by the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA). 41 U.S.C. § 6305.

Despite GAO's conclusions, we demonstrate below that the ACCs are not services contracts set up to ease HUD's work load by outsourcing ministerial tasks. The ACCs at issue, just like the ACCs used in all other 1937 Act programs, are statutorily mandated vehicles for transferring program administration authority and distributing funds to state actors. In this way, through the ACC, the project-based rental assistance programs are part of the greater Federal-state cooperative scheme set up by the 1937 Act as the framework for the nation's low-income housing programs.

GAO's decision also failed to recognize Congress's role in supporting this framework. Since 1937 (and with regard to the project-based rental assistance programs since 1974) Congress has annually funded, frequently amended, and continuously overseen the programs. One might expect Congress during such regular oversight to question why a $300 million "procurement" in a $9 billion program did not include any FAR-required provisions, if, in fact, the ACCs are merely service contracts set up for HUD's benefit.[3]  Similarly, several GAO reports over the years have analyzed many aspects of the project-based rental assistance programs, with full knowledge of HUD's partnership with PHAs.  At no time prior to its August

---

3 The Supreme Court and Federal Circuit have repeatedly held that congressional inaction in the face of long-standing agency practice can rise to the level of implied adoption. *See e.g., United States v. Midwest Oil Co.,* 236 U.S. 459, 481 (1915) (holding that congressional silence in the face of a long-standing Executive practice of temporarily withdrawing public land from private acquisition was "equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress." ); *United States v. Am. Trucking Ass'ns,* 310 U.S. 534, 549-50 (1940); *Micron Tech., Inc. v. United States,* 243 F.3d 1301, 1312 n. 10 (Fed. Cir. 2001) (collecting cases); *San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n,* 161 F.3d 1347, 1355 (Fed. Cir. 1998) (noting that Congress ratifies agency practice when it legislates in that area of law covered by practice, with full awareness of agency's practice, and does not change or refer to that practice). Here, the long-standing agency practice, awarding ACCs to PHAs as cooperative agreements, is recognized both in the text of section 1437f(b)(1) and annual appropriations.

3

15, 2012 recommendation has GAO or any other arm of Congress ever suggested that HUD was illegally awarding the ACCs, flouting the CICA, and ignoring the FAR.

We demonstrate below that HUD's actions and decisions in administering the ACCs as cooperative agreements have been consistent and in accordance with the law. HUD's use of ACCs and the manner of their award was reasonable because they are financial assistance instruments and not procurement contracts. Because HUD was providing Federal assistance in accordance with an authorizing statute to state sanctioned entities, the PHAs, this matter is not a procurement. Accordingly this Court lacks jurisdiction to entertain this challenge and the consolidated protests of plaintiffs must be dismissed.

Finally, even assuming jurisdiction, this Court should in the alternative grant judgment in favor of the United States upon the basis of the administrative record. The record here shows that that HUD's implementation of the project-based rental assistance programs through competitively awarded ACCs is not subject to the CICA or the FAR. The administrative record demonstrates that HUD's 38-year practice at issue was not contrary to law. Indeed, to the contrary, HUD was following the Congressional mandate in 42 U.S.C. § 1437f(b)(1) and 41 U.S.C. § 6305 when it awarded ACCs using cooperative agreements. Thus, the CICA does not apply here because HUD was awarding ACCs using "procurement procedures otherwise expressly authorized by statute." 41 U.S.C. § 3301(a).

## STATEMENT OF THE ISSUES

1.      Whether the Court possesses jurisdiction to entertain the protestors' complaints pursuant to the Tucker Act, 28 U.S.C. § 1491(b), when HUD's award of ACCs to PHAs is not a "procurement" under the Tucker Act but rather a vehicle to implement project-based rental

4

assistance programs, and thus HUD simply is carrying out its sovereign role and not acquiring services.

2.      Whether the Court should dismiss the protestors' complaint because the administrative record shows that HUD's award of ACCs to PHAs is consistent with governing Federal housing laws that require HUD to enter into ACCs with PHAs as the vehicle to implement project-based rental assistance programs.

## STATEMENT OF THE CASE

## I.      Nature Of The Case

In the 1937 Act, Congress charges HUD with implementing the statutes and regulations that establish the seven Section 8 project-based rental assistance programs that are at issue.[4] HUD has been implementing and funding these Section 8 programs through PHAs for 38 years. Although only the project-based program is at issue, the statutory authority for the project-based program does not exist in a vacuum. Nor was it created out of whole cloth. Rather, the program evolved as one constituent part of the framework of housing assistance programs created by the

---

4 Those seven Section 8 programs, sometimes referred to collectively as the "project-based program," for which HUD's Office of Housing has oversight responsibility, are: (1) the Housing Assistance Payments (HAPs) Program for New Construction (24 C.F.R. Part 880), (2) the HAPs Program for Substantial Rehabilitation (24 C.F.R. Part 881), (3) the HAPs Program for State Housing Agencies (24 C.F.R. Part 883), (4) the HAPs Program for New Construction Set-Aside for Section 515 Rural Rental Housing Projects (24 C.F.R. Part 884), (5) the Loan Management Set-Aside Program (24 C.F.R. Part 886 Subpart A), (6) the Housing Assistance Program for the Disposition of HUD-Owned Projects (24 C.F.R. Part 886 Subpart C), and (7) the Housing Assistance Payments Program for Section 202 Projects (24 C.F.R. Part 891).

The remaining project-based Section 8 programs, which are not the subject of, but may be affected by, this protest, are: (i) the Moderate Rehabilitation Program (24 C.F.R. Part 882 Subparts A – G), which is administered by HUD's Office of Public and Indian Housing, and (ii) the Moderate Rehabilitation Single Room Occupancy Program for Homeless Individuals (24 C.F.R. Part 882 Subpart H), which is administered by HUD's Office of Community and Planning Development.

1937 Act. We set forth below the relevant statutes and regulations from the past 85 years that form the basis for HUD's position here.

## II.    Statement Of Facts And Statutory Background

### A.    Overview Of The Section 8 Programs

Pursuant to Section 8 of the United States Housing Act of 1937, as amended (42 U.S.C. § 1437f), the United States, acting through HUD, subsidizes the rents of low-income tenants of privately owned dwellings. The rent subsidy is provided in one of two ways: project-based assistance and tenant-based assistance. Project-based assistance is dedicated to specific units in privately-owned, multifamily residential rental buildings. When a Section 8-eligible tenant vacates a unit that is subsidized by project-based assistance, the subsidy remains available for the next eligible tenant to occupy the unit. *See* 42 U.S.C. § 1437f (f)(6). Tenant-based assistance comes in the form of a voucher (known as a "Housing Choice Voucher"), which is given to eligible tenants by PHAs. These vouchers are "portable," which means that the subsidy stays with the tenants who may use them to move to any acceptable rental unit (*i.e.*, a unit meeting HUD-established standards for decent, safe, and sanitary housing and owned by a landlord willing to accept the voucher). *See* 42 U.S.C. §§ 1437f(f)(7) and (o); 24 CFR § 982.1(b)(1).

All Section 8 programs are implemented through two contracts: the Annual Contributions Contract (ACC) and the Housing Assistance Payment (HAP) contract. The ACC is a financial assistance instrument that HUD enters into with the PHA. In turn, the PHA enters into a HAP contract with project owners, pursuant to which the rental subsidy is paid in exchange for, among other things, the owner's obligation to maintain the subsidized rental units

6

in decent, safe, and sanitary condition and to comply with applicable non-discrimination requirements.

The ACC between HUD and a PHA is used to implement almost all of the 1937 Act housing programs: it transfers funds and responsibilities to PHAs. Under the Section 8 programs, the ACC transfers responsibility to administer the HAP contracts to PHAs, provides funds to make rental subsidies to the private landlords (the HAP contract payments), and defrays the costs of PHAs in administering the program. Administrative Record (AR) 119, 125-26, 128-29. By law, HUD may only enter into an ACC with a legal entity that qualifies as a PHA, defined as a "State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing." 42 U.S.C. §§ 1437f(b)(1), 1437a(b)(6)(A).

Although the protestors have characterized the ACC as merely setting out ministerial tasks for the PHAs to perform, the purpose of the ACC is broader: it vests responsibility in the PHAs to administer the project-based Section 8 contracts, thereby ensuring that decent and affordable housing is available for low-income families. AR125. The PHAs have the responsibility and authority of contract administrators, which, by regulation, are defined as "[t]he entity which enters into the [HAP] Contract with the owner and is responsible for monitoring performance by the owner." 24 C.F.R. § 880.201. Further, the PHAs are responsible for ensuring compliance with program requirements, which are not limited to the specific provisions of the ACCs and the HAP contracts but are set forth in the 1937 Act and in HUD regulations, notices, and handbooks. *See* 24 C.F.R. § 5.403 ("Annual contributions contract (ACC) means the written contract between HUD and a PHA under which HUD agrees to provide funding for a

7

program under the 1937 Act, and the PHA agrees to comply with HUD requirements for the

program."). Finally, no ACC has ever included any FAR-required provisions.[5]   AR 2.

### B.    Statutory History Of The Project-Based Section 8 Program

#### 1.    1937 – 1974: The Statutory Precursors To Section 8 – HUD Implements Policy Through The States

Since 1937, it has been the policy of the United States Government to address the

shortage of affordable housing in partnership with state and local public housing agencies.

Specifically, Section 1, "Declaration of Policy," United States Housing Act of 1937, states:

> It is hereby declared to be the policy of the United States to
> promote the general welfare of the Nation by employing its funds
> and credit, as provided in this Act, to ***assist the several States and
> their political subdivisions*** to alleviate present and recurring
> unemployment and to remedy the unsafe and insanitary housing
> conditions and the acute shortage of decent, safe, and sanitary
> dwelling for families of low income, in rural or urban
> communities, that are injurious to the health, safety, and morals of
> the citizens of the Nation.

Pub. L. No. 75-412, 50 Stat. 888, 891 (1937) (emphasis added).

Significantly, the Preamble to the 1937 Act provides:  "To provide ***financial assistance***

to the States and political subdivisions thereof for the elimination of unsafe and insanitary

housing conditions, for the eradication of slums, for the provision of decent, safe, and sanitary

dwellings for families of low income, and for the reduction of unemployment and the stimulation

of business activity, to create a United States Housing Authority, and for other purposes." *Id.*

---

5 In addition to the FAR, the ACCs have also never referenced nor incorporated *any* standard
statutes and required clauses that govern Federal procurement contracts, including, *e.g.*, the
CICA, 41 U.S.C. § 3301 *et seq.*, the Contract Disputes Act, 41 U.S.C. § 7101 *et seq.*, the Davis-
Bacon Act, the Buy American Act, and other mandatory clauses.  The historical absence of any
reference in the ACCs to standard, mandatory procurement provisions further establishes that the
ACCs are not procurement contracts. *See, e.g, R & D Dynamics Corp. v. United States*, 80 Fed.
Cl. 715, 721-22 (2007), *aff'd*, 309 Fed. Appx. 388 (Fed. Cir. 2009).

(emphasis added).  Thus, Congress' intent to have state housing agencies be the primary
recipients and facilitators for distributing Section 8 funds at the local level was evident from the
outset.

The 1937 Act authorized the newly created United States Housing Authority to "make
***annual contributions*** to ***public housing agencie***s to assist in achieving and maintaining the low-
rent character of their housing projects. . . . ***The Authority shall embody the provisions for such***
***annual contributions in a contract*** guaranteeing their payment over such fixed period."  *Id.,*
§ 10(a) (emphasis added).  Further, "[a]nnual contributions shall be strictly limited to the
amounts and periods necessary, in the determination of the Authority, to assure the low-rent
character of the housing projects involved."  *Id.,* § 10(b).

In 1965, Congress added a precursor to today's Section 8 programs by authorizing HUD
to enter into ACCs with PHAs to provide subsidies to the private market to increase the stock of
affordable housing and to provide an administrative fee to the PHAs.  Housing and Urban
Development Act of 1965, Pub. L. No. 89-117, § 103(a), 79 Stat. 451, 455 (1965); *see also*
§ 103(a), 79 Stat. at 456 (requiring HUD to use "contracts for annual contributions" with the
PHA and defining "annual contributions" to include an allocation for the difference in rent and
also an administrative fee for reasonable and necessary expenses incurred by the PHAs).

>    **2.      1974: Enactment of Section 8 – Congress Gives Primary**
>             **Responsibility To PHAs For Assistance To Existing Dwellings And**
>             **Independent Authority To HUD For Assistance To Newly**
>             **Constructed And Substantially Rehabilitated Housing**

In 1974, Congress amended the 1937 Act by, among other things, establishing Section 8
authority for rental assistance programs.  Housing and Community Development Act of 1974,
Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974).

One of the fundamental features Congress carried over into Section 8 is the significant

role of PHAs as contract administrator. As enacted, Section 8 read, in part:

(a) For the purpose of aiding lower-income families in obtaining a
decent place to live and of promoting economically mixed housing,
assistance payments may be made with respect to **existing, newly
constructed, and substantially rehabilitated** housing in accordance with
the provisions of this section.

(b)(1) The Secretary is authorized to enter into annual contributions
contracts with public housing agencies pursuant to which such agencies
may enter into contracts to make assistance payments to owners of ***existing***
dwelling units in accordance with this section. In areas where no public
housing agency has been organized or where the Secretary determines that a
public housing agency is unable to implement the provisions of this section,
the Secretary is authorized to enter into such contracts and to perform the
other functions assigned to a public housing agency by this section.

(b)(2) To the extent of annual contributions authorizations under
section 5(c) of this Act, the Secretary is authorized to make assistance
payments to pursuant to contracts with owners or prospective owners ***who
agree to construct or substantially rehabilitate housing*** in which some or
all of the units shall be available for occupancy by lower-income families in
accordance with the provisions of this section. The Secretary may also
enter into annual contributions contracts with public housing agencies
pursuant to which such agencies may enter into contracts to make assistance
payments to owners or prospective owners.

*See* 88 Stat. 662-63 (emphasis added).

### 3.    1983: Repeal of HUD's Authority Granted By Section 8(b)(2) -- Congress Effectively Precludes HUD From Directly Entering Into HAP Contracts With Owners

In 1983, Congress repealed authority for new construction and substantial rehabilitation

programs. Section 8(b)(2), as well as the reference to "newly constructed, and substantially

rehabilitated" in subsection 8(a), was deleted. Housing and Urban-Rural Recovery Act of 1983,

Pub. L. No. 98-181, § 209, 97 Stat. 1153, 1183 (1983). However, the repealed provisions

*remained in effect* "with respect to any funds obligated for a viable project under section 8 of the

10

United States Housing Act of 1937 prior to January 1, 1984." *Id.* at § 209(b)(1). Accordingly, while funding for new HAP contracts associated with newly constructed or rehabilitated properties was substantially discontinued in 1983, HUD and PHAs under ACCs with HUD continued to have authority to administer existing HAP contracts that had been previously entered into for newly constructed and substantially rehabilitated housing.

However, Congress did not repeal Section 8(b)(1). Thus, HUD's authority to enter into ACCs with PHAs for existing housing under Section 8(b)(1) of the Act remained intact, for both project-based and tenant-based programs.[6] Housing and Community Development Act of 1992, Pub. L. 102-550, § 146, 106 Stat. 3672 (1992).

It is important to note, however, that the remaining Section 8(b)(1) has a different structure than Section 8(b)(2) had. Unlike the repealed Section 8(b)(2), section 8(b)(1) does not grant to HUD independent authority to enter into HAP contracts. The structure of Section 8(b)(1) provides that HUD enter into ACCs with PHAs, and that PHAs can then enter into HAP contracts with project owners: "The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners" Only when HUD determines that no PHA is able to implement the program does HUD have the authority to enter into HAP contracts: "In areas where no public housing agency has been organized or where the Secretary determines that a

---

6 If there was any doubt of this, Congress made this interpretation explicit in 1992 when Congress amended the 1937 Act by adding to the definitional section, 42 U.S.C. § 1437f(f), the following provisions: ... (6) the term 'project-based assistance' means rental assistance under subsection (b) that is attached to the structure pursuant to subsection (d)(2); and (7) the term 'tenant-based assistance' means rental assistance under subsection (b) or (o) that is not project-based assistance. Housing and Community Development Act of 1992, 102 Pub. L. No. 550, § 146; 106 Stat. 3672 (1992).

public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section." Section 8(b)(1) therefore sets up PHAs as the primary administrators of the rental assistance programs for existing housing.

### 4.    1997: Statutory Authority For Renewals Of Project-Based Section 8 Contracts Clarified – No Authority For New Contracts However

Pursuant to former Section 8(e)(1) of the 1937 Act, new construction and substantial rehabilitation HAP contracts were limited to terms of 20 to 40 years. Pub. L. No. 93-383, 88 Stat. 633, 665 (Aug. 22, 1974) (20 years unless owned by or financed by a state or local agency). Although some of these original contracts are still in existence, most began to expire in the mid- to late-1990s. To address this problem, Congress first authorized limited demonstration programs providing for renewal of some project-based HAP contracts beginning in 1996. *See* Pub. L. No. 104-99, Title IV, § 405, 110 Stat. 44 (1996); Pub. L. No. 104-120, § 2(a), 110 Stat. 834 (1996); Pub. L. No. 104-204, Title II, § 211, 110 Stat. 2895 (1996).

Then, in 1997, Congress more permanently authorized the renewal of project-based rental assistance. Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384 (1997), 42 U.S.C. § 1437f note (MAHRA). The structure Congress established through MAHRA provided for new Renewal Contracts to provide the Section 8 rental assistance upon the termination of the existing HAP contracts.[7]

---

7  Then-Section 524(a)(1) of MAHRA provided:

> (a) Section 8 Contract Renewal Authority. -- (1) In general.-- . . . for fiscal year 1999 and henceforth, the Secretary may use amounts available for the renewal of assistance under section 8 of the United States Housing Act of 1937, upon termination or expiration of a contract for assistance under

12

In accordance with this authority, Renewal Contracts issued pursuant to MAHRA expressly state that they are "entered pursuant to section 8 of the United States Housing Act of 1937" (14 U.S.C. 1437f). *See, e.g.*, AR 2264, 2270. Renewal Contracts also contain the following:

> Previously, the Contract Administrator and the Owner had entered into a HAP Contract ("expiring contract") to make Section 8 housing assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will end prior to the beginning of the term of the Renewal Contract.

AR 2270-71. This language, combined with the definition of "project-based assistance" in 42 U.S.C. § 1437f(f)(6), reflects the statutory scheme that project-based Section 8 HAP Renewal Contracts provide assistance for "existing housing," as that phrase is used in Section 8(a) and 8(b)(1).

The parties to the Renewal Contract are the owner and the contract administrator, which, in most cases, must be a PHA. HUD signs the Renewal Contract only for the limited purpose of authorizing the obligation of Federal funds, but it is not the contract administrator or a "party" to the contract. Thus, if HUD was the Contract Administrator under the original HAP (for example, because the HAP had been entered into pursuant to authority granted under then-Section 8(b)(2)), HUD will assign the Renewal Contract to a PHA, in which case the PHA becomes a party to and the Contract Administrator of the contract. *See, e.g.*, AR 2270.

---

> section 8 (other than a contract for tenant-based assistance and notwithstanding section 8(v) of such Act for loan management assistance), ***to provide assistance under section 8 of such Act*** at rent levels that do not exceed comparable market rents for the market area. The assistance shall be provided in accordance with terms and conditions prescribed by the Secretary.

42 U.S.C. § 1437f note (emphasis added).

13

### 5.   1998: Amendment Of Declaration Of Policy In 1937 Act – Congress Emphasizes State Involvement

In 1998, Congress amended the policy statement of the 1937 Act, further emphasizing the primary role the states and their political subdivisions are to play in administering the Section 8 assistance.   As amended, Section 2 of the 1937 Act now reads, in pertinent part:

(a) Declaration of Policy -- It is the policy of the United States --

(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this Act –

(A)  to *assist States and political subdivisions of States* to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

(B)  to *assist States and political subdivisions of States* to address the shortage of housing affordable to low-income families; and

(C)  *consistent* with the objectives of this title, to *vest in public housing agencies* that perform well, the *maximum amount of responsibility and flexibility in program administration*, with appropriate accountability to public housing residents, localities, and the general public.

Quality Housing and Work Responsibility Act of 1998, Pub. L. No.105-276, § 505, 112 Stat. 2461, 2522-23 (1998), codified at 42 U.S.C. § 1437 (emphasis added).  The amended declaration reaffirms Congress's intent for HUD to provide Federal funds to assist states and their political subdivisions to address the shortage of affordable housing to low-income families, and it reinforces the 1937 Act's policy to vest program administration primarily in PHAs.  The policy declaration also is consistent with the deletion of Section 8(b)(2), which, until repeal, had provided HUD independent authority to administer some project-based Section 8 programs directly or through a PHA.

14

**C.**    **1999: Competition Expands PHA Administration To A Statewide Basis And Incorporates New Congressional Emphasis On Performance-Based Fee Structure**

By 1997, when Congress, through the enactment of MAHRA, provided HUD with long-term authority to renew rental assistance under Section 8, and former Section 8(b)(2) had been repealed, the sole remaining authority for project-based Section 8 assistance was Section 8(b)(1). HUD was required to fund PHAs so that they could enter into and administer HAP contracts and renewals. HUD is statutorily precluded from administering HAP contracts unless there is no PHA able to do so.

Accordingly, in 1999, HUD held a nationwide competition to award an ACC in each of the 50 states (two ACCs were awarded in California), plus the District of Columbia and the Commonwealth of Puerto Rico. Prior to 1999, there were many circumstances under which PHAs were contract administrators pursuant to the various authorities described above, and the PHAs were already receiving fees as contract administrators. However, the 1999 competition was the first time that HUD held a competition to select PHAs as contract administrators on a *statewide* basis. The intent of the competition was to allow PHAs to "assume or enter into HAP Contracts with the owners of the Section 8 properties." *See* AR 428 (1999 Request for Proposal (RFP)); Fed. Reg. 27358 (May 19, 1999). With respect to existing HAP contracts, HUD would assign such contracts to the PHA, and "[u]pon such assignment, the PHA assumes all contractual rights and responsibilities of HUD pursuant to such HAP contracts." AR 449; 64 Fed. Reg. at 27379. This assumption of rights and responsibilities was expressly reflected in the ACC. *Id.* The 1999 RFP contained no FAR-required solicitation provisions and stated explicitly that it was not a procurement. AR 428; 64 Fed. Reg. at 27358 (Summary).

15

Among the tasks to be performed by the PHAs was the execution of Renewal Contracts, after the PHA received confirmation of funding for the renewal from HUD.  AR434; 64 Fed. Reg. at 27364.  In most cases, the PHA, not HUD, is the governmental entity party to the Renewal Contract, although HUD is also a signatory to the contract because only HUD can obligate the expenditure of Federal funds for the HAP payment.  *See* AR 2020-2021.  The PHA also was responsible for determining the proper rent adjustments owed to the owner, and for disbursing the Section 8 funds to the owners.  AR 430-432; 64 Fed. Reg. at 27361-62.  The ACC also required the PHA to comply "with the United States Housing Act of 1937, applicable Federal statutes, and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements."  AR 449; 64 Fed. Reg. at 27379 ("PHA Services").

At that time, HUD also changed the structure of the ACCs to a "performance-based" model, where the administrative fee provided to the PHAs would be based upon each PHA's performance.  The "performance-based" model resulted from the 1998 amendment to the 1937 Act, which established a national policy of "vest[ing] in public housing agencies *that perform well*, the maximum amount of responsibility and flexibility in program administration" 42 U.S.C. § 1437(a)(1)(C)(emphasis added).  This language emphasized the importance of federal partnerships with high-performing PHAs.  *See* Quality Housing and Work Responsibility Act of 1998, Pub. L. No. 105-276, § 505,112 Stat. 2461, 2520-21, 2523 (1998).

Prior to 1999, PHAs were already entering into ACCs with HUD and administering HAP contracts, but having been put in place prior to the 1998 amendment instilling the new "performance-based" emphasis, they were not called "Performance-Based" Contract Administrators.  Some of these PHAs are still administering their HAP contracts.

16

Currently, 42 ACCs associated with the 1999 competition remain in effect today.[8]

### D. The 2011 Competition: HUD Acknowledges Need For Clarification In Evaluation Process But Maintains Consistent Position That ACCs Are Not Procurement Contracts

On February 25, 2011, HUD held its second nationwide competition and issued an Invitation for Submission of Applications (2011 Invitation). Following HUD's award of 53 ACCs, protests were filed at GAO over the ACCs awarded in 42 states. The protests generally alleged that the ACCs were procurement contracts and not properly awarded in accordance with Federal procurement law, and that HUD's evaluation of the applications was flawed. HUD filed a motion to dismiss on the grounds that the ACCs were grants or cooperative agreements and not procurement contracts. HUD's motion was not ruled upon.

HUD maintained that the ACCs were not, and have never been, procurement contracts. AR 115. However, in response to the allegations that HUD's evaluation procedures were flawed, HUD recognized some areas in which the 2011 Invitation could have been improved. AR 1482. In some instances, descriptions of evaluation criteria were ambiguous and in some instances, the scoring framework used in evaluating certain criteria made consistent evaluation by multiple scoring teams challenging. In addition, HUD recognized that it had not been adequately transparent in its intended evaluation of applicants' proposed fee. HUD concluded that these imperfections failed to meet HUD's standards.

In states where there had only been one applicant, the impact of these imperfections was minimal. Therefore, on August 10, 2011, HUD announced that it would not award ACCs for the

---

8 HUD only awarded 37 ACCs under the 1999 competition. HUD held two additional competitions resulting in the award of 16 additional ACCs, so that there were PHAs in place in all 53 jurisdictions by 2005. AR 642.

states that had received more than one applicant, and that, after evaluating and revising its competitive award process, HUD would issue a NOFA for the selection of PHAs. *See* AR 1482. Based upon this information, GAO dismissed the protests. For the 11 states in which there was only one applicant, HUD awarded an ACC. These 11 ACCs are in effect today and are not subject to this protest.

Following this protest, HUD received letters from many State Attorneys General offering opinions as to whether their respective state law permits an out-of-State PHA to lawfully operate within their own state. These opinions asserted that their state laws regarding PHAs did not allow an out-of-state entity to act as a PHA within their state. *See*

*http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/PBCA%20NOFA.*

On March 9, 2012, HUD issued the current NOFA for the award of ACCs, which were expressly described as cooperative agreements, for the 42 remaining states. AR 1258, 1264 (HUD's Fiscal Year 2012 Notice of Funding Availability for the Performance-Based Contract Administrator (PBCA)[9] Program for the Administration of Project-Based Section 8 Housing Assistance Payments Contracts (2012 NOFA)). For fiscal year 2012, these ACCs were to transfer to PHAs authority over HAP contracts worth approximately $9 billion in HAP payments to be paid to project owners and up to approximately $289 million in administrative fees. Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. 112-55, Div. C, Title II, 125 Stat. 552 (2011).

The 2012 NOFA stated that, to the greatest extent possible, HUD intended to award an ACC for each state to a PHA acting pursuant to legal authority from the same state. AR 1261.

---

9 PBCA is the term HUD has used for the PHAs that HUD selected, first in 1999, in its nationwide competitions to select PHAs as contract administrators on a statewide basis.

With respect to each state, receipt by HUD of an application from a legally qualified, "in-State" applicant would result in the automatic rejection of any application from an "out-of-State" applicant. AR 1261.

The 2012 NOFA was reviewed and cleared by the Office of Management and Budget (OMB) prior to its publication. *See* AR 1480 (Email from Emily Askew, OMB). *See also* AR 1470, 1472 and 1478 (correspondence between HUD and OMB discussing various aspects of the NOFA and Section 8 programs and applicable requirements).

### E.     The 2012 GAO Protest:  GAO Ignores Statutory Authority And Misunderstands The Benefit Provided To PHAs

After HUD issued the 2012 NOFA, seven protestors filed bid protests at GAO, making substantially similar allegations as they make in the present case.[10]  On August 15, 2012, GAO sustained the protests and recommended that HUD cancel the 2012 NOFA, award ACCs through a procurement process, and consider the protestors' other concerns. AR 2838, 2852.

GAO's decision not only ignored statutory authority but mischaracterized the assistance being provided to the PHAs.[11]  In its recommendation, the GAO concluded that the principal purpose of the ACC was not to "assist" PHAs because, among other reasons, the PHAs were merely a "conduit" for the HAP payments to property owners. AR 2849 (GAO Decision at 12). Yet PHAs are also parties to and given the authority of contract administrators under the HAP

10  The seven protestors at GAO were:  (1) CMS Contract Management Services and the Housing Authority of the City of Bremerton; (2) National Housing Compliance; (3) Assisted Housing Services Corp., (4) North Tampa Housing Development Corp., (5) Jefferson County Assisted Housing Corp. (6) Southwest Housing Compliance Corp., and (7) Massachusetts Housing Finance Agency.  California Affordable Housing Initiatives, Inc. was not a protestor at GAO.

11  GAO concluded that it "need not decide whether HUD is otherwise authorized to enter into cooperative agreements with regard to the Project-Based Section 8 rental assistance program." AR 2851-2852 (GAO Decision at 14-15, n. 20).

contract. AR 2020. PHAs must comply with not only the ACC provisions, but also the provisions set forth in regulations, handbooks, and notices as well. As with the other 1937 Act programs, the authority given to these housing agencies is the authority to implement this housing program and to oversee this specific kind of affordable housing in their communities. This is one piece of the much larger scheme created by the 1937 Act. That the PHAs may be seen as "conduits" for HAP payments because they are bound to honor the terms of the HAP contracts, rather than to allow the PHAs to retain such funds or to use them for other purposes, does not negate the value of the program to a housing agency or a community participating in this program.

### F.   HUD's Use Of ACCS Is Long-Standing – HUD Has Never Awarded An ACC Under CICA Or The FAR

Since the inception of Section 8 in 1974, HUD has entered into ACCs with PHAs for both the project- and tenant-based programs and has treated those contracts as reflecting an assistance relationship. Thus, HUD has subjected PHAs to requirements that apply to grantees and awardees, such as the Single Audit Act and OMB Circulars A-87 and A-133 (*see* 24 C.F.R. § 5.801(d)(1)).

HUD has *never* awarded an ACC through the means of a procurement contract or applied the FAR to the selection of a PHA. AR 1154. The ACCs have never contained any contract clause required by the FAR. The program has been administered by a program office, not a contracting officer. Because the ACC obligates the PHAs to perform all of their responsibilities in accordance with Federal law, including any changes in the law, all statutory amendments and changes in policies or procedures have been implemented not through a FAR-mandated changes clause, but through notices, handbooks, and regulations.

20

Yet, during this time, both Congress and GAO have scrutinized this program without commenting on the complete lack of any procurement requirements. The GAO reports (that protestors cite) analyzed many of HUD's policies regarding project-based rental assistance, including HUD's oversight of the PHAs, *see* AR 264, but they did not comment on the complete lack of procurement protocols in the relationship between HUD and PHAs.

Similarly, Congress has scrutinized the 1937 Act and the project-based Section 8 program many times. Every year, Congress appropriates funds for HUD to fund Section 8 through ACCs to the PHAs. *See, e.g.*, Consolidated And Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat. 552, 686 (Nov. 18, 2011). Numerous statutory amendments have made several changes to the Section 8 program, the HAP contracts, appropriations, contract rents, and other provisions.[12] Yet, the complete lack of procurement protocols has never been cited. Congress has never indicated that the project-based Section 8 program was not being administered in accordance with congressional intent.

## SUMMARY OF THE ARGUMENT

The protestors' complaints should be dismissed. The protestors cannot establish jurisdiction pursuant to 28 U.S.C. § 1491(b) because HUD's award of a cooperative agreement in the form of ACCs is not a "procurement" within the meaning of the Tucker Act. The Tucker Act limits this Court's bid protest jurisdiction to actions "in connection with a procurement or a proposed procurement." Because these ACCs are neither, the Court lacks jurisdiction.

---

12 *See, e.g.,* Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384 (1997) (enacting MAHRA), Pub. L. No. 105-276, § 552, 112 Stat. 2461 (1998) (conditioning HAP payments on owners' consent to permit law enforcement officers in common areas); Pub. L. No. 106-74, § 531, 113 Stat. 1110 (1999) (amending MAHRA to require contract renewal at the request of the owner).

We show below that HUD's 38-year history in awarding ACCs pursuant to the Federal Grant and Cooperative Agreement Act is proper because HUD has not and is not acquiring any services when it grants administrative authority and transfers funds to PHAs via the ACCs. Rather, HUD is engaged in a core statutory duty of providing funding assistance to state-sponsored PHAs, a process that is fundamentally different from a procurement, which generally has as its purpose the acquisition of goods or services through purchase, lease or barter.

GAO erred because it failed to address the statutory authority for the Section 8 program, the statutory authority conferred upon the PHAs as contract administrators pursuant to the HAP contracts, and the benefit to the PHAs in participating in a housing program to promote and oversee exactly the kind of housing the PHAs were created to promote and oversee. In sum, GAO erred because it failed to consider the role Congress has established for local PHAs to assume in this important Government function.

## ARGUMENT

### I.   The Court Lacks Subject Matter Jurisdiction Because This Is Not A Procurement

#### A.   The Court's Bid Protest Jurisdiction Is Limited To Entertaining Challenges To Procurements

Jurisdiction must be established as a threshold matter before the Court may proceed with the merits of any action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). This Court's jurisdiction to entertain bid protests is defined by the Tucker Act, 28 U.S.C. § 1491(b). Specifically, the Court possesses "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*." 28 U.S.C.

§ 1491 (b)(1) (emphasis added); *Res. Conservation Group, LLC v. United States*, 597 F.3d 1238,

1242-45 (Fed. Cir. 2010).  HUD's 38-year practice of using ACCs to fund Section 8 housing

assistance through state and local PHAs is not a procurement, and thus this Court lacks

jurisdiction to entertain any challenge to HUD's practice.

### B.    Grants And Cooperative Agreements Are Not Procurements

The term "procurement" is not defined by the Tucker Act. 28 U.S.C. § 1491; *see also*

*Res. Conservation*, 597 F.3d at 1245.  However, the Federal Circuit has applied the definition of

"procurement" found in 41 U.S.C. § 111 (effective January 4, 2011) to the Tucker Act's use of

the term.[13]  In *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345-46 (Fed. Cir.

2008), the Federal Circuit held that the Tucker Act's dual waiver of sovereign immunity and

grant of subject matter jurisdiction for "procurement"-related protests begins with the initial

formulation of an agency need for property or services and ends with the completion of a

contract.  Therefore, under the Federal Circuit's broad interpretation, any perceived statutory or

regulatory misstep by an agency that has at least initiated a process for determining its own

"need for property or services" may be challenged in court.  *See id.*

However, the *Distributed Solutions* holding does not extend the jurisdiction of the Court

beyond challenges to an agency's initial determination of its own needs.[14]  *See id.* at 1346

---

13  Section 111 of title 41 defines the term "procurement" to include all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.  41 U.S.C. § 111.

14  Sensibly, and consistent with our position here, this Court has limited the scope of *Distributed Solutions*, citing concern that a broad reading would "unlock a veritable Pandora's box of bid protest challenges to many internal agency decisions that never ripen into government procurements," *see Int'l Genomics Consortium v. United States*, 104 Fed. Cl. 669, 676 (2012). The Court held that jurisdiction in *Distributed Solutions* turned on the fact that USAID initiated "a formal contracting process by issuing an RFI" rather than merely conceiving of a need

(Government solicited information from vendors to use in determining the scope of services that it required). *Distributed Solutions* also had no occasion to consider the distinctions between a procurement and cooperative agreement that Congress mandated in the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA). Reading the Tucker Act in conjunction with 41 U.S.C.A. § 111 and the FGCAA, 31 U.S.C. § 6301-08, which sheds some light on the meaning of "procurement," when an agency initiates a process to determine the needs of a third party as here, the agency is not engaged in a pre-procurement decision at all. *See* 31 U.S.C. §§ 6304(1), 6305(1).

When it enacted the FGCAA, Congress made a clear distinction between "procurement contracts" and other types of Federal assistance relationships, including grants, cooperative agreements, and technology investment agreements, all of which demonstrates that an award of a cooperative agreement is not a procurement. *See* 31 U.S.C. §§ 6303, 6305; *see also, e.g., Comsat Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 271 (4th Cir. 1999) (noting the distinction between "'procurement contracts' and 'cooperative agreements'" under the FGCAA); *Forsham*

---

internally. *See id.* at 677-78; *see also Distributed Solutions, Inc. v. United States*, 104 Fed. Cl. 368, 370-74 (2012) (on remand, stressing the formal procurement steps taken by USAID); *Gov't Technical Services LLC v. United States*, 90 Fed. Cl. 522, 528 (2009) (holding that *Distributed Solutions* does not extend bid protest jurisdiction to agency decisions not to exercise options on existing contracts). Here, HUD is simply administering a Congressional mandate as to how to fund PHAs. Indeed, HUD is entering into agreements in its capacity as our sovereign's lead agency for overseeing our nation's public housing portfolio rather than in a proprietary, commercial capacity, where courts usually abstain from entertaining challenges to those agreements pursuant to the Tucker Act. *See Kania v. United States*, 227 Ct. Cl. 458, 650 F.2d 264, 268 (1981) ("The Congress undoubtedly had in mind as the principal class of contract cases in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves.").

*v. Harris*, 445 U.S. 169, 180 (1980) (highlighting Congress's intent to distinguish between "procurement contracts" and "grant agreements" under the FGCAA).

Specifically, "[a]n executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government" and a recipient, when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit of the United States Government." 31 U.S.C. § 6303; *see also, e.g., New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989) ("'Procurement' is 'the acquisition by purchase, lease or barter, or property or services for the ***direct benefit or use*** of the Federal Government[.]'") (emphasis in original).

By contrast, an agency shall use a cooperative agreement when "the principal purpose of the relationship is to transfer a thing of value" to the recipient, "to carry out a public purpose of support or simulation . . . instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6305 (emphasis added); *see also, e.g., Rick's Mushroom Service, Inc. v. United States*, 76 Fed. Cl. 250, 258 (2007), *aff'd* 521 F.3d 1338, 1344 (Fed. Cir. 2008) (holding that a cost-sharing agreement between plaintiff and the Government was not a "procurement contract," and that, therefore, jurisdiction was lacking under the Contract Disputes Act, 41 U.S.C. § 609); *see also Institut Pasteur v. United States*, 814 F.2d 624, 628 (Fed. Cir. 1987).

In all cases however, it is of fundamental importance that the Court should look to the agency's enabling statute to decide whether an agency action constitutes a procurement. *See, e.g., 360Training.com, Inc. v. United* States, 104 Fed. Cl. 575, 577 (2012) ("Where an agency,

pursuant to statutory directive, is distributing funds or providing assistance to service providers to ensure a service's availability, it is not conducting a procurement").

In this case, the very purpose of the 1937 Act is "[t]o provide *financial assistance* to the States" and their political subdivisions. *See* Pub. L. No. 75-412, 50 Stat. 888, 891 (1937) (emphasis added). Here, under HUD's enabling statute, 42 U.S.C. § 1437 *et seq.*, HUD does not have a statutory mandate to provide a service. Rather, HUD's statutory purpose under Section 8 is to *distribute funds* to PHAs, so that those entities may carry out the public purpose of fostering safe and affordable housing. HUD's award of ACCs, therefore, is not a procurement, but rather HUD acting in its sovereign capacity to manage our nation's housing laws.

## II.    HUD's Long-Standing Practice Of Awarding ACCs As Cooperative Agreements Is Supported By Statute And Is Reasonable

Although Congress enacted the FGCAA, 31 U.S.C. §§ 6301-6308, to establish criteria for Federal agency use of grants, cooperative agreements, and procurement contracts, the decision as to which legal instrument is appropriate depends, in the initial analysis, on the agency's statutory authority. Once the agency's statutory authority is established, the agency's choice of legal instrument, if rational, should be entitled to deference. We respectfully disagree with the GAO's analysis because it failed to consider HUD's statutory authority.

As we explained above, the FGCAA provides that an agency shall use a procurement contract if "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6303(1). In contrast, grants or cooperative agreements *must* be used if "the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient

26

to carry out a public purpose of support or stimulation authorized by a law of the United States. .

. ." 31 U.S.C. §§ 6304(1), 6305(1) (emphasis added).[15]

Section 6307 of the FGCAA also directed the Office of Management and Budget (OMB)

to provide guidance to agencies to consider when determining the appropriateness of using a

grant or cooperative agreement, which it did.  In a section of OMB's implementing instructions

entitled "Agency Decision Structure For Selection Of Instruments," OMB states:

> The determination of whether a program is principally one of procurement
> or assistance, and whether substantial Federal involvement in performance
> will normally occur are basic agency policy decisions. . . .Congress
> intended the Act to allow agencies flexibility to select the instrument that
> best suits each transaction.

Implementation of Federal Grant and Cooperative Agreement Act of 1977 (Pub. L. No. 95-224),

43 Fed. Reg. 36860, 36863 (Aug. 18, 1978) (Final OMB Guidance).[16]

GAO also has provided guidance on the interpretation of the FGCAA.  Notably, the GAO

recognized that the agency's statutory authority, not the FGCAA, defined the relationship

between the parties.  "'[I]n each case, it will be the four corners of the enabling law, and not the

FGCAA, which will establish the parameters of the relationship between Federal and non-

---

15 It is customary to describe both grants and cooperative agreements as "assistance
relationships."  *Council on Environmental Quality and Office of Environmental Quality--
Cooperative Agreement with National Academy of Sciences*, B-218816, 65 Comp. Gen. 605
(1986).  As defined by the GAO, "a federal grant is a form of assistance authorized by statute in
which a federal agency (the grantor) transfers something of value to a party (the grantee) for a
purpose, undertaking, or activity of the grantee that the government has chosen to assist." 2
GENERAL ACCOUNTING OFFICE, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW
10-4 (3d Ed. 2004) (hereinafter GAO REDBOOK).  A cooperative agreement should be used
instead of a grant when "substantial involvement is expected between the executive agency and
the State, local government, or other recipient when carrying out the activity contemplated in the
agreement." 31 U.S.C. § 6305(2).

16 The GAO REDBOOK notes that the OMB guidance is still in effect.  GAO REDBOOK at 10-15.

27

Federal parties. The FGCAA may then be utilized so that the law can be implemented without regard to ill-defined nomenclature in the enabling law which may, for that reason alone, hamper an agency's ability to give effect to Congress' intent.'" *Interpretation of Federal Grant and Cooperative Agreement Act of 1977*, B-196872-O.M., 1980 U.S. Comp. Gen. LEXIS 3894 *11 (March 12, 1980) ("GAO Guidance") (citation omitted). In other words, "in order to find grant authority, the authorizing legislation must be examined to determine if a grant type of relationship was intended or permitted rather than simply looking for the word 'grant.'" *Id.* at *10.

GAO also wrote extensively about "agency discretion:"

> Where program authority can justify a choice of instruments and it is difficult to say that assistance or procurement is the principal purpose of the transaction, **agencies have discretion** and should exercise the discipline noted in the legislative history of the FGCA in their choice of instruments. Similar considerations must go into the choice of grant or cooperative agreement based on the extent of grantor involvement.

> It can be assumed that choices of instruments will be made that rest on considerations that include pre-FGCA grant assumptions and other considerations not explicitly recognized by the Act. **Where the recipient is a State or local government, there will be a tendency to use assistance instruments.**

> It should be kept in mind, however, that the first level analysis of agency authority to enter into the kind of transaction envisioned is not really a matter of discretion -- **the statutory authority is either there or is not there**, regardless of agency preference, although agency authority may be difficult to determine and require the exercise of a substantial amount of judgment (see DOE Acting General Counsel memorandum). Where called upon to decide questions of agency authority, normal statutory interpretation rules still apply, although in close cases **we would give considerable weight to the administering agency's interpretation of its own authority**. The net effect may be to greatly increase the number of grants made by agencies in close cases -- even in situations which traditionally had been handled as procurements.

28

*Id.* at \*20-\*21 (emphasis added). Contemporaneously with that interpretation, in reviewing an agency's choice of funding instrument, GAO has said:

> The [FGCAA] gives considerable weight to an agency's own characterization of the type of relationship it proposes to enter as a grant, cooperative agreement or contract (assuming, of course, that it has the underlying authority to engage in the activity involved in the first place). . . . While the agency must set forth its rationale for its particular characterization of the relationship, we will not question its determination unless it is clearly contrary to the statutory guidance in the Act.

*Environmental Protection Agency Public Participation Program*, B-197100, 59 Comp. Gen. 424 (April 24, 1980). GAO's own standards as set forth in these opinions should have led GAO to review HUD's statutory analysis, determine if its interpretation is reasonable, and defer to HUD's interpretation. Unfortunately, in this case, GAO erred in applying its own standards, and thus, erred in its recommendation.

Indeed, the most exhaustive discussion of the FGCAA is found in the GAO REDBOOK. As GAO notes, grants are a form of Federal financial assistance, 80 percent of which go to state and local governments, and "typically are governed by detailed legislation and even more detailed regulations." GAO REDBOOK at 10-3 – 10-5.

Regarding the significance of Congressional intent, GAO advised that:

> a grant is a form of assistance to a designated class of recipients authorized by statute to meet recognized needs. Grant needs, by definition, are not needs for goods or services required by the federal government itself. The needs are those of a nonfederal entity, whether public or private, which the Congress has decided to assist as being in the public interest. . . . 'Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.'

GAO REDBOOK at 10-9 -- 10-10 (3d Ed. 2004) (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (U.S. 1985)).

29

Accordingly, "[i]n determining the correct funding instrument to use, the threshold question to consider is whether the agency has statutory authority to engage in assistance transactions at all." GAO REDBOOK at 10-17; *see Council on Environmental Quality and Office of Environmental Quality--Cooperative Agreement with National Academy of Sciences*, B-218816, 65 Comp. Gen. 605 (1986) ("in order to provide assistance through a cooperative agreement there must be some affirmative legislative authorization"). The GAO REDBOOK explains this emphasis on statutory authority:

> While federal agencies generally have 'inherent' authority to enter into contracts to procure goods or services for their own use, there is no comparable inherent authority to enter into assistance relationships, that is, to give away the government's money or property, either directly or by the release of vested rights, to benefit someone other than the government. . . . . The analysis of the agency's program authority is not a matter of discretion; the requisite authority either is there or it is not. In this regard, however, the focus should be on the substance of an agency's program authority rather than the particular labels used or not used.

GAO REDBOOK at 10-17.

GAO's guidance also has been employed by this Court. In *360Training.com*, when determining whether a cooperative agreement awarded by OSHA was a procurement for purposes of the Tucker Act, the Court focused "[a]s a threshold matter" on "the statutory structure of the FGCAA and the Occupation Safety and Health Act of 1970." *360Training.com*, 104 Fed. Cl. at 579. The Court went on to note that the "Court's decision depends on the precise statutory obligation that OSHA has." *Id.*

Applying these standards should have led GAO to review the statutory authority for the project-based rental assistance programs. In this case, that is 42 U.S.C. §§ 1437, 1437f(b)(1).

However, GAO's recommendations lacked a full discussion of the programs' statutory authority, which may explain why GAO erred when it made its recommendation.

## III. The United States Housing Act of 1937, As Amended, Provides Express Statutory Authority For HUD To Enter Into Assistance Relationships With PHAs

The authority for HUD to treat the statutorily identified "annual contributions contract" as a cooperative agreement is found Sections 2 and 8(b)(1) of the 1937 Act, 42 U.S.C. §§ 1437, 1437f(b)(1). Section 2 of the 1937 Act sets forth the judgment of Congress that the policy of the United States shall be:

> to promote the general welfare of the Nation by employing the funds and credit of the Nation . . . to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families; and . . . to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration.

42 U.S.C. § 1437. Section 8(b)(1) of the 1937 Act unambiguously directs HUD "to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments [*i.e.,* HAP contracts] to owners of existing dwelling units," and it expressly limits HUD's authority to enter into HAP contracts to "areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section." 42 U.S.C. § 1437f(b)(1). These sections of the 1937 Act clearly authorize a form of assistance (the annual contributions contract) to a designated class of recipients (PHAs) to meet recognized needs (the administration of a program that addresses the shortage of affordable housing). As this Court recently observed, "Where an agency, pursuant to a statutory directive, is distributing funds or providing assistance to service providers to ensure a service's availability, it is not conducting a procurement." *360Training.com*, 104 Fed. Cl. at 577.

31

In this case, Federal financial assistance is provided to project owners pursuant to the terms of HAP contracts, but the statute specifically directs PHAs to enter into those HAP contracts. 42 U.S.C. § 1437f(b)(1). The ACC ensures that the project-based Section 8 program is administered properly and efficiently, and it provides funding to the PHAs not only for the required HAP payments but also for their costs to administer the program. These statutory provisions, taken together, support HUD's use of a cooperative agreement and demonstrate that the ACC is not a procurement contract.

To the extent that HUD has retained authority to make certain decisions or to control the administration of the program or to ensure that Federal funds are spent in strict accordance with the terms of the HAP contracts and Federal law, this oversight is consistent with the very definition of a cooperative agreement: "substantial involvement . . . between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." 31 U.S.C. § 6305(2). Pertinent to this case is an OMB example of "substantial involvement" -- where the relationship includes:

> [h]ighly prescriptive agency requirements prior to award limiting recipient discretion with respect to scope of services offered, organizational structure, staffing, mode of operation, and other management processes, coupled with close agency monitoring or operational involvement during performance over and above the normal exercise of Federal stewardship responsibilities to ensure compliance with these requirements.

Final OMB Guidance, 43 Fed. Reg. at 36863.[17]

The express limitation on HUD's authority to enter into HAP contracts with project owners of existing housing set forth in Section 8(b)(1) stands in contrast to HUD's authority

---

17 The GAO REDBOOK instructs that it will defer to the OMB guidance as to the meaning of substantial involvement. GAO REDBOOK at 10-16.

under former Section 8(b)(2), repealed in 1983, which authorized HUD to enter into HAP

contracts with project owners of newly constructed or substantially rehabilitated housing. That

former authority explains why, in 1998, HUD administered the majority of the project-based

portfolio.

However, when Congress authorized the renewal of project-based Section 8 HAP

contracts in 1997, and when it amended the policy of the 1937 Act in 1998 to vest the

responsibility for program administration in PHAs, Congress made clear that it was PHAs, not

HUD, that should enter into the renewal contracts and administer the project-based program, and

PHAs would be assisted with Federal funds.18

The GAO REDBOOK discusses this exact situation, when a Federal agency provides

assistance to specified recipients by using an intermediary.

> In these situations, it is necessary to examine the agency's program
> authority to determine the authorized forms of assistance. The agency's
> relationship with the intermediary should normally be a procurement
> contract if the intermediary is not itself a member of a class eligible to
> receive assistance from the government. . . .On the other hand, if the
> program purpose contemplates support to certain types of intermediaries to
> provide consultation or other specified services to third parties, the
> Comptroller General has approved the agency's choice of a grant rather
> than a contract as the preferred funding vehicle.

GAO REDBOOK at 10-19 – 10-20. The 1937 Act specifically identifies PHAs as a class eligible

to receive assistance from the Government. The ACC is the instrument that provides funding to

ensure affordable housing and to cover the reasonable and necessary expenses incurred by the

---

18  The GAO's failure to consider the repeal of Section (8)(b)(2), giving HUD authority to enter
into HAP contracts without regard to the ability of a PHA to do so, and it's failure to consider
Section 8(b)(1) as the sole remaining authority for PHAs and HUD to enter into HAPs, led the
GAO to wrongly conclude that HUD was "obligated" to administer HAP contracts. *See* AR
2850 (GAO Decision at 13).

PHA. *See 360Training.com*, 104 Fed. Cl. at 580 (an assistance agreement is appropriate when the agency's focus is on "assisting the intermediaries in providing a service."). Where the purpose of the program contemplates support to intermediaries, the fact that HUD "is legally obligated to pay the property owners" in the event that the PHA defaults in its contractual obligation to do so, as the GAO found, is irrelevant. *See* AR 2850 (GAO Decision at 13).[19]

Furthermore, the Housing authorities also receive less tangible benefits from the authority given them by the ACC. Housing authorities are mission-based entities created by state and local laws to promote affordable housing in their communities. The project-based rental assistance program helps them do so in partnership with the Federal government. By giving them oversight over this program, the ACC contributes to their overall mission of promoting affordable housing in their community.

For example, in its protest against the 2011 Invitation to GAO, the Connecticut Housing Finance Agency (CHFA) emphasized this point. AR 1432. CHFA asserts its exclusive authority in Connecticut to act on a statewide basis to "engage in or assist in the operation of public housing" and "granted governmental privileges and powers to carry out public purposes in the

---

19 The GAO mistakenly construed HUD's argument to be that PHAs were not "intermediaries." *See* AR 2848 (GAO Decision at 11, n. 17). Similarly, the GAO mistakenly characterized HUD's argument that the "thing of value" provided to the PHAs was the HAP payment to property owners. *Id.* at 12. Those were not and are not HUD's arguments. Rather, HUD contends that the fact that PHAs do, in fact, act as a "conduit" for the HAP payments is perfectly consistent with the use of a cooperative agreement where the purpose of the program is to support the intermediary (PHAs) in providing specified services to third parties (property owners). Here, the PHAs, among other things, enter into appropriate renewal contracts with property owners, determine what, if any, rent adjustments are owed, ensure that the families being assisted are eligible and that their share of the rent is properly computed, and inspect the properties to ensure that units meet the appropriate standards. That the PHAs are bound by "highly prescriptive agency requirements" is the essence of a cooperative agreement, not an argument for the use of procurement contracts.

public interest." *Id.* CHFA also emphasized its role in the community: "CHFA is currently

acting as the [contract administrator and] ... would bring its knowledge of the Connecticut real

estate markets, project owner/management agents, stakeholders and state and local financing

programs to assist HUD in its housing preservation goals." AR 1440, *see also* AR 1427 (2011

Protest of Colorado Housing Authority) ("[T]he loss of the annual revenue generated by the

contract will have wide repercussions for CHFA's other homeless and low-income assistance

programs."); Docket No. 1 (Complaint of CMS Contract Management Services, ¶ 31 (if CMS

loses its incumbency and the fees it has been receiving, CMS "will have to cut housing

services")).[20]

When the legislative history of the 1937 Act is considered along with the clear language

of the 1937 Act as amended, it is clear that the statute defines an assistance relationship between

HUD and PHAs.

Furthermore, HUD's interpretation of the 1937 Act is entitled to deference. As this Court

held in a similar challenge to an agency's use of a cooperative agreement:

> When evaluating an agency's construction of a statute, the court must first
> ask "whether Congress has directly spoken to the precise question at issue."
> If so, the Court gives effect to the express words of Congress. If, however,
> Congress is silent or has left the statute ambiguous with respect to the
> specific issue,' then the Court will examine 'whether the agency's answer is
> based on a permissible construction of the statute.' The Court will defer to
> the agency's construction if it 'reflects a plausible construction of the plain
> language of the statute and does not otherwise conflict with Congress'
> express intent.'

---

20 The GAO inexplicably concluded that the PHAs' mission of providing affordable housing in
their communities was not the primary purpose of the ACCs. AR 2851 (GAO Decision at 14).
This unexplained conclusion is inconsistent with express policy of the 1937 Act, which is to
assist the States and their political subdivisions to remedy the shortage of affordable housing and
to vest program administration in PHAs. 42 U.S.C. § 1437.

*ICP Northwest LLC v. United States*, 98 Fed. Cl. 29, 43 (2011) (finding statutory authority to enter into a cooperative agreement where it was "authorized to enter into a reciprocal agreement. . . for mutual aid"). In this case, the clear authority to provide assistance to local governments, the clear direction that PHAs should administer the program, and the clear mandate that PHAs, not HUD, should enter into HAP contracts provides an unambiguous expression of Congressional intent that the ACCs reflect an assistance relationship.

The obligations set forth in the ACCs also demonstrate that the ACC is not intended to be a procurement contract. The ACCs require that PHAs either enter into HAP contracts (Renewal Contracts) or to assume the contractual rights and responsibilities of HUD pursuant to such HAP contracts. This type of inherently governmental function could not be outsourced to a procurement contractor. *See* Publication of the Office of Federal Procurement Policy (OFPP) Policy Letter 11-01, *Performance of Inherently Governmental and Critical Functions*, 76 Fed. Reg. 56227 (Sept. 12, 2011).

Finally, the 2012 NOFA expressly states that HUD will award ACCs as cooperative agreements. See AR 1258, 1264. The plain language in the NOFA further undermines a finding that HUD's award of an ACCs is a procurement. *See, e.g, R & D Dynamics Corp.*, 80 Fed. Cl. at 721-22 (holding that where the source selection plan stated "in plain language" that the "award program is not a procurement," it "undermines plaintiff's argument" that it was).

## IV.   The United States Housing Act of 1937, As Amended, Demonstrates That HUD Does Not Receive A Direct Benefit From The ACCs

In its recommendation, the GAO concluded that HUD entered into ACCs with PHAs for the primary purpose of obtaining "contract administration services" from those entities, and that the PHAs are merely a "conduit" for the HAP payments to property owners. AR 2849 (GAO

36

Decision at 12). Citing, among other cases, this Court's decision in *360Training*.com, the GAO specifically opined that HUD uses the PHAs, essentially, as intermediaries, "to retain through this NOFA, the services of PHAs to perform the HAP contract administration services." *See* AR 2847, 2850-51 (GAO decision at 10, 13, 14). GAO's conclusions are erroneous for several reasons.

First, unlike the agency at issue in *360Training.com*, which had the discretion to hire private contractors to provide online training services that the agency could have performed directly, HUD is statutorily required to enter into ACCs with the PHAs. A second key distinction that GAO missed is that HUD is statutorily precluded from administering HAP contracts directly (unless no PHA is available to do so). Indeed, under the 1983 amendment to the 1937 Act, the PHAs assumed the primary role of administering HAP contracts. Finally, although HUD pays fees to PHAs to administer HAP contracts (which fees are statutorily required to be paid), those fees represent but a portion of the total funding provided in an annual *contribution* contract, which serve primarily to provide Federal financial assistance to state and local agencies. Thus, the ACCs fall clearly within the ambit of a cooperative agreement, rather than a procurement.

In sum, if the Court were to determine HUDs award of an ACC is a procurement, the Court will have to first conclude that HUD has the responsibility to administer the HAPs. As we have demonstrated, however, HUD is, in most circumstances, statutorily barred from administering HAPs under a legislative scheme providing that HUD assist other entities, the PHAs, to discharge this responsibility. This legislative design defines an assistance agreement

37

and does not provide a direct benefit to HUD as that term has been applied in case law and by GAO in prior analyses.

## V.   In The Alternative, The Record Demonstrates That HUD's 38-Year Practice Of Awarding ACCs To PHAs Using Cooperative Agreements Is Supported By Law And Is Rational

If the Court determines that it possesses jurisdiction to review HUD's decision to award ACCs as cooperative agreements, then for the reasons expressed above, HUD's decision is supported by law and the administrative record.

Assuming jurisdiction, section 1491(b)(4) requires that the Court "review the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act (APA). *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In a protest, the Court must determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 124 (2010). A procurement decision may be set aside "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332 (citations omitted) . It is well settled that the APA does not permit the court to undertake a *de novo* review of agency action. Rather, it limits the Court to a consideration of whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," based solely upon the record before the agency. 5 U.S.C. § 706(2)(A); *see also id.* § 702.

Courts have recognized that contracting officials may properly exercise wide discretion in applying procurement regulations when making decisions. *See Impresa*, 238 F.3d at 1332;

*Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985). The arbitrary and capricious

standard, by definition, acknowledges a "zone of acceptable results in a particular case and

requires only that the final decision reached by an agency be the result of a process which

consider[s] the relevant factors and is within the bounds of reasoned decision making." *JWK*

*Int'l Corp. v. United States*, 52 Fed. Cl. 650, 654 n. 8 (2002), *aff'd*, 56 Fed. Appx. 474 (Fed. Cir.

2003) (citations omitted). In this regard, the Court cannot substitute its judgment for that of the

agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc., v.*

*Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285-86 (1974). Therefore, as long as a rational

basis is articulated and relevant factors are considered, the agency's action must be sustained. *Id.*

Protestors argue here that an ACC is a procurement contract that must be awarded

pursuant to the CICA and the FAR. However, the CICA does not apply here because there are

"procurement procedures otherwise expressly authorized by statute." 41 U.S.C. § 301(a); *see*

*e.g., Rapides Reg'l Med. Ctr. v. Sec'y, Dept. of Veterans Affairs,* 974 F.2d 565, 574-575 (5th Cir.

1992); *United States v. Citizens & S. Nat'l Bank,* 889 F.2d 1067, 1069 (Fed. Cir. 1989) ; *Grigsby*

*Brandford & Co. v. United States,* 869 F.Supp. 984, 997-998 (D.D.C. 1994).

HUD's decision to award ACCs to the PHAs is authorized by statute. Indeed, it is

mandated by the statutory framework set out for the project-based Section 8 program by Sections

2 and 8 of the 1937 Act. We showed above that section 1437f(b)(1) of title 42 expressly directs

HUD to enter into ACCs with PHAs, and the responsibility to administer the HAP contracts only

falls to HUD if a PHA is not available. Thus, Congress has mandated that HUD use ACCs as the

mechanism to assist states and political subdivisions of states in providing affordable housing to

low-income families. This mandate also requires HUD to provide PHAs with financial

39

assistance so that the PHAs can manage HAP contracts. Accordingly, HUD's actions were in direct compliance with section 6305 of the FGCAA. At bottom, the record demonstrates that HUD simply is exercising its role as the sovereign's agency for managing our nation's housing assistance programs. The record shows that HUD's actions here were consistent with a Congressional mandate, and thus, not subject to CICA.

Additionally, HUD's decision to give a preference for legally qualified, "in-State" applicants when awarding ACCs was also rational and consistent with the 1937 Act. HUD is authorized by the 1937 Act to enter into ACCs with PHAs. 42 U.S.C. § 1437f(b)(1). The 1937 Act expressly defines a PHA as a "State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing." 42 U.S.C. §1437a(b)(6)(A). Clearly, a PHA is an entity not only created by state law but also authorized by state law to engage in or assist in the development or operation of low-income housing. Accordingly, HUD has always taken the position that state, not federal, law governs the ability of a PHA to administer HUD programs. *See, e.g., Lauderhill Housing Authority v. Donovan,* 818 F. Supp. 2d 185 (D.D.C. 2011) (where there was a dispute over a PHA's jurisdiction, HUD maintained that the question must be resolved by the Florida Attorney General).

In this case, the 2011 Invitation did not give any preference for in-State applicants. In the GAO protests following the award of ACCs, several PHAs challenged this decision, arguing that out-of-state PHAs were not legally qualified to administer the Section 8 program in a different state. Immediately thereafter, HUD began to receive numerous opinions from State Attorneys General offering opinions as to whether their respective state law permits an out-of-

40

State PHA to operate lawfully within their own state. In every case, the Attorney General opined that out-of-state PHAs could not lawfully operate within their own state. *See*

*http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/PBCA%20NOFA*

(providing a link to each State Attorney General opinion received by HUD). Given this interpretation of state law, HUD concluded that the most reasonable course was to provide a preference for in-state applicants in the 2012 NOFA.

It is, and always has been, HUD's position that it is not legally required to interpret State law, but that it can and should defer to State authorities for such interpretations. Moreover, the publication of the 2011 Invitation created numerous disputes between in-state applicants and out-of-state applicants as to whether the law of the in-state applicant permitted the contractual relationship between HUD and the out-of state applicant. As a Federal actor, HUD has no intrinsic interest in these disputes beyond their ability to cause interruptions in the administration of the Section 8 program. In HUD's view, such interruptions are not acceptable.

Since 1999 (when HUD held its first competition allowing a single PHA to administer the program state-wide), PHAs have requested the ability to cross state lines, and they have been permitted to do so, but only when they have provided a legal opinion stating that they had the requisite authority. The 2012 NOFA, however, reflects the receipt by HUD of state Attorneys' General opinions, and HUD's attempt to reflect the existence of those opinions in its definition of eligible applicants. Permitting PHAs to cross state lines only where there is no legally eligible in-state applicant, as the 2012 NOFA provides, the likelihood of challenges based on State law challenges is significantly reduced, and the administration of the program can continue to operate without interruption.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our motion and dismiss the consolidated protests of the protestors. In the alternative, the Court should grant our motion for judgment upon the administrative record. Consistent with both the 1937 Act and the FGCAA, HUD seeks to enter into cooperative agreements with PHAs by which the PHAs administer HAP contracts, ensuring that property owners comply with both the terms of the HAP contract and HUD's regulations, so that they remain eligible to receive HAP contract payments. These activities are not primarily for the benefit of property owners, but ultimately are for the benefit of the PHAs constituents: eligible low-income families who need affordable, decent, safe, and sanitary housing. Accordingly, PHAs are not "procurement" contractors. They are state-created entities Congress designated to administer United States Housing Act programs for the benefit of low-income families.

HUD, acting in its sovereign role, has been awarding ACCs to PHAs for 38 years now. Congress has never challenged HUD's use of ACCs. Indeed, Congress funds them every year. The Court should reject protestors attempt to turn what HUD considers is its sovereign responsibility when managing our nation's housing rental assistance programs into a process the United States uses when it enters into the stream of commercial activity.

Respectfully Submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

42

 s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director


 s/ Douglas K. Mickle

OF COUNSEL:

JOSEPH A. PIXLEY
Trial Attorney
Civil Division
Commercial Litigation Branch
United States Department of Justice


DORIE FINNERMAN
Assistant General Counsel for Assisted
  Housing and Civil Rights
Office of General Counsel
U.S. Department of Housing and
  Urban Development
Washington, D.C.

KATHIE SOROKA
Special Assistant to the General Counsel
Office of General Counsel
U.S. Department of Housing and
  Urban Development
Washington, D.C.

KASEY M. PODZIUS
Trial Attorney
Office of General Counsel
U.S. Department of Housing and
  Urban Development
Washington, D.C.

DOUGLAS K. MICKLE
Senior Trial Counsel
Civil Division
Commercial Litigation Branch
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0383
Fax: (202) 353-7988

Attorneys for Defendant

43

## **CERTIFICATE OF FILING**

I hereby certify that on January 4, 2013, a copy of the foregoing " DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD " was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/ Douglas K. Mickle
Douglas K. Mickle

44