# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## BID PROTEST

CMS CONTRACT MGMT. SVCS., ET AL.,

                Plaintiff,

     v.

THE UNITED STATES,

                Defendant.

Case Nos. 12-852C, 12-853C, 12-862C, 12-864C, and 12-869C

Judge Wheeler

---

## CORRECTED PLAINTIFF SOUTHWEST HOUSING COMPLIANCE CORPORATION'S: (1) REPLY IN SUPPORT OF ITS CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD; (2) OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD; AND (3) RESPONSE TO THE BRIEFS FILED BY INTERVENOR MASSHOUSING AND *AMICUS CURIAE* NATIONAL COUNCIL OF STATE HOUSING AGENCIES

Plaintiff Southwest Housing Compliance Corporation ("SHCC"), through undersigned counsel, hereby submits this reply in support of its cross-motion for judgment on the administrative record, and response to the briefs filed by the United States, the Intervenor Massachusetts Housing Finance Agency ("MassHousing") and *Amicus Curiae* National Council of State Housing Agencies ("NCSHA") on January 30, 2013.

Richard J. Vacura
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA  22102
(703) 760-7764
(703) 760-7349 (fax)
*Counsel of Record for Plaintiff Southwest Housing Compliance Corporation*

Of Counsel:
Tina D. Reynolds
K. Alyse Latour
MORRISON & FOERSTER LLP
Dated: February 13, 2013

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

ARGUMENT ...................................................................................................... 2

I.  HUD DOES NOT HAVE A STATUTORY MANDATE TO ENTER INTO HAP
    CONTRACTS WITH PHAs. ........................................................................ 2

    A.  HUD Has The Statutory Authority To Directly Administer The HAP
        Contracts At Issue.................................................................................. 2

        1.  The Government Has Not Provided Any Evidence That Authority
            For The HAP Contracts At Issue Was Transferred To Section
            8(b)(1). ........................................................................................ 4

        2.  HUD's Own Public Record Confirms That It Is Not Statutorily
            Required To Outsource The Administration Of The HAP Contracts
            At Issue ........................................................................................ 6

        3.  HUD's Own Regulations and Guidance Confirm That It Is Not
            Statutorily Required To Outsource The Administration Of The
            HAP Contracts At Issue. ............................................................... 9

    B.  The Principal Purpose Of The PBCA ACCs Is To Procure The Services Of
        The PHA To Administer The HAP Contracts And To Act As A Conduit
        For The Assistance Payments .............................................................. 11

    C.  In the History Of The PBCA Program, HUD Has Never Properly Awarded
        An ACC As A Cooperative Agreement............................................... 14

II.  THE OUT-OF-STATE RESTRICTIONS IN THE NOFA CANNOT WITHSTAND
     SCRUTINY ................................................................................................ 15

    A.  The Competition Requirements Of CICA And The FGCAA Apply To The
        Out-of-State Restrictions Contained In The NOFA............................. 15

        1.  This Court Has Jurisdiction to Consider the Propriety of the Out-
            of-State Restrictions in the NOFA... ..........................................16

    B.  The Out-of-State Restrictions In The NOFA Are Arbitrary And
        Capricious. ......................................................................................... 17

CONCLUSION ................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*360Training.com, Inc. v. United States,*
    104 Fed. Cl. 575 (2012) ..............................................................................11, 16, 17

*Advanced Data Concepts, Inc. v. United States,*
    216 F.3d 1054 (Fed. Cir. 2000).................................................................................18

*Arlington Housing Partners, Inc. v. Ohio Housing Finance Agency,*
    2012 WL 1078835 (Ohio App. 10 Dist.) ..................................................................10

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,*
    419 U.S. 281 (1974)..................................................................................................18

*Burlington Truck Lines v. United States,*
    371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) .................................................19

*First Enterprise v. United States,*
    61 Fed.Cl. 109 (2004) ..............................................................................................17

*Motor Vehicle Manufacturers Assoc. of the United States v. State Farm Mutual*
    *Automobile Ins. Co.,*
    463 U.S. 29 (1983)....................................................................................................19

*Normandy Apartments, Ltd. v. United States,*
    100 Fed. Cl. 247 (2011) .........................................................................................9, 10

**STATUTES**

Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No. 105-
    65, 111 Stat. 1344 (1997) (codified at 42 U.S.C. § 1437f note) ("MAHRA")............... passim

28 U.S.C. § 1491 .........................................................................................................16

31 U.S.C. § 6301(3) .....................................................................................................16

Housing Act of 1937, as amended (currently 42 U.S.C. § 1437f *et seq.*) (the "Housing
    Act")........................................................................................................................ passim

Housing Act, 42 U.S.C. §1437f(b)(1) ("Section 8(b)(1)") ................................................3, 4, 5, 17

Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88
    Stat. 633, 662 (1974) ("Section 8(b)(2)") .................................................................3, 4, 5, 6

Housing and Urban Recovery Act of 1983, Pub. L. No. 98-181, § 209(a)(2), 97 Stat.
    1153, 1183 (1983)........................................................................................................3

**OTHER AUTHORITIES**

24 C.F.R. § 5.403 .................................................................................................17

24 C.F.R. § 402.3 ..................................................................................................9

24 C.F.R. § 880.501 *et seq*. ...............................................................................12

24 C.F.R. § 880.505(a)........................................................................................8, 9

24 C.F.R. § 982.1 ................................................................................................12

24 C.F.R. § 982.201 ............................................................................................12

*HUD Guidebook for Section 8 Contract Administration Initiative*, Mar. 15, 2001,
  Glossary available at
  http://portal.hud.gov/hudportal/documents/huddoc?id=guidebk_ca_init.pdf..........................10

HUD OIG Audit Report 2010-LA-0001, *HUD's Performance-Based Contract
  Administration Contract Was Not Cost Effective* Nov. 21, 2009, available at
  http://www.hud.gov/offices/oig/reports/files/ig1090001.pdf ................................................. 6-8

HUD Renewal Policy Guide, Feb. 15, 2008, at 9, available at
  http://portal.hud.gov/hudportal/documents/huddoc?id=Sec_9_Renewal_Policy_Guide
  .pdf ...................................................................................................................10

U.S. GAO, Report to Congressional Committees, *Project-Based Rental Assistance: HUD
  Should Update Its Policies and Procedures to Keep Pace with the Changing Housing
  Market*, Apr. 2007..................................................................................................8

U.S. GAO, Testimony Before the Subcommittee on Housing Opportunity and
  Community Development, *et al.*, *Comments on HUD's Fiscal Year 2000 Budget
  Request*, Mar. 3, 1999 ...........................................................................................8

U.S. GAO, Testimony Before the Subcommittee on Housing Opportunity and
  Community Development, *et al.*, *HUD Management: Information and Issues
  Concerning HUD's Management Reform Efforts*, May 7, 1998 ..............................................8

With its 2012 Notice of Funding Availability ("NOFA"), HUD initiated an abrupt change to the fundamental nature of the Performance-Based Contract Administration ("PBCA") program. SHCC's protest is a reflection of its desire to continue to participate as a highly qualified PBCA, providing HUD, as well as the owners and agents whose property is subject to housing assistance payment ("HAP") contracts with the best value for the Government's money. The changes incorporated into the 2012 NOFA not only have no statutory basis, but also impose inappropriate restrictions on public housing agencies ("PHAs"), like SHCC, that seek to perform work in multiple states. HUD is not statutorily required to enter into cooperative agreements with PHAs, and it is has provided no rationale for the restrictions on out-of-state PHAs contained in the NOFA.

In its January 30, 2013 Reply ("Govt. Reply"), Defendant the United States, acting through HUD (hereinafter, "Defendant" or the "Government"), engages in revisionist history, adopting a statutory interpretation it has not asserted in the nearly fifteen year history of the PBCA program. Defendant relies on this *post hoc* justification to claim that it is statutorily required to enter into cooperative agreements with PHAs for contract administration services for project-based Section 8 HAP contracts, and that it does so through the PBCA program. The Government's rationale, however, is simply not supported by the record. Quite the opposite, the record confirms that HUD has a statutory mandate pursuant to the Housing Act of 1937, as amended, currently 42 U.S.C. § 1437f *et seq.* (the "Housing Act"), to administer the HAP contracts at issue in this case. The record also confirms that HUD outsourced the contract administration services to the PHAs under the PBCA program for reasons other than any purported statutory shift. In addition, the true nature of the services being provided requires a finding by this Court that the principal purpose of the PBCA Annual Contribution Contracts

("ACCs") is to procure a service for the direct benefit of the Government, and thus the PBCA

ACCs are procurement contracts.

The Government's reliance on *post hoc* rationalizations also extends to the issue of the

appropriateness of the restrictions contained in the NOFA. The administrative record is devoid

of any indicia of contemporaneous consideration by HUD of the NOFA's restrictions on out-of-

state PHAs. Under applicable standards of review, the restrictions thus must be deemed arbitrary

and capricious.

## ARGUMENT[1]

### I.   HUD DOES NOT HAVE A STATUTORY MANDATE TO ENTER INTO HAP CONTRACTS WITH PHAs.

While inventive, the Government's statutory mandate argument is supported neither by

the language of the Housing Act and its various amendments, nor by the actions of HUD

undertaken prior to this litigation. Careful examination of the applicable statutes makes clear

that HUD is required to administer the PBCA program itself, although it is permitted to use

PHAs to perform these duties. HUD's own words and actions support this interpretation. In

contrast, the Government has no support for its proffered interpretation of the applicable statutes.

### A. HUD Has The Statutory Authority To Directly Administer The HAP Contracts.

The Government labels the protesters' explanation of why HUD has the authority to

administer the HAP contracts "tortured" and "confusing," *see* Govt. Reply at 7, but the

Government's argument truly forces the reader to run in circles. The Government jumps

---

[1] For the convenience of the Court, we do not address herein arguments in the Govt. Reply that
are specific to arguments raised by other protesters in this case. Instead, we focus on the issues
applicable to all protesters, and those related specifically to SHCC's prior arguments.

between various statutes and amendments, creating a makeshift path to the purported "statutory mandate" that PHAs must administer the HAP contracts.

SHCC's position, on the other hand, is rather simple. The basis of every HAP contract at issue in this case is the statutory authorization given to HUD to provide housing assistance for new construction or substantial rehabilitation projects under the original Section 8(b)(2), enacted under the Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974) ("Section 8(b)(2)").

In 1983, Section 8(b)(2) was repealed, taking away HUD's ability to enter into *new* HAP contracts for these types of projects. Housing and Urban Recovery Act of 1983, Pub. L. No. 98-181, § 209(a)(2), 97 Stat. 1153, 1183 (1983). The 1983 Act was silent as to the existing original contracts, and Congress did not address these contracts again until 1997 in the Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No. 105-65, 111 Stat. 1344 (1997) (codified at 42 U.S.C. § 1437f note) ("MAHRA"). At that time, Congress acknowledged that the twenty-year terms of the original HAP contracts would, in large part, soon be expiring. As a result, Congress enacted Section 524 of MAHRA, which granted HUD the authority to "renew" the original HAP contracts.

Thus, the HAP contracts at issue in this case are not -- contrary to the Government's argument (*see* Govt. Reply at 9) -- authorized under Section 8(b)(1) of the Housing Act, 42 U.S.C. §1437f(b)(1) ("Section 8(b)(1)"). Because the remainder of the Government's argument that HUD is statutorily prohibited from administering HAP contracts relies on Section 8(b)(1), the Government's argument is simply incorrect.

1.   **The Government Has Not Provided Any Evidence That Authority For The HAP Contracts At Issue Was Transferred To Section 8(b)(1) of the Housing Act.**

Notably, the Government has not pointed to a single statute, regulation, legislative interpretation, or any other document that expressly states that subsequent to the enactment of MAHRA, the HAP contracts previously authorized under Section 8(b)(2) were now to be considered "existing housing" under the meaning of Section 8(b)(1) or otherwise now statutorily authorized under Section 8(b)(1).  This is because Congress never reassigned this group of HAP contracts, nor did it need to.  Instead, Congress enacted MAHRA to address the then-impending expiration of many of the contracts for project-based assistance and authorized "expiring Section 8 contract[s] on an eligible multifamily housing project to be renewed with project based assistance."  MAHRA §§ 511(a)(6), 524(a)(1).

Further, the definitions of the terms "expiring contract" and "renewal" under MAHRA do not support the Government's position.  *See* Govt. Reply at 11-12.  MAHRA defines an "expiring contract" as "a project-based assistance contract attached to an eligible multifamily housing project which, under the terms of the contract, will expire."  MAHRA § 512(3).  An "eligible multifamily housing project" includes, among other things, a property "that is covered in whole or in part by a contract for project-based assistance under…the new construction or substantial rehabilitation program under section 8(b)(2) of the United States Housing Act of 1937 (as in effect before October 1, 1983)."  MAHRA § 512(2)(B)(i).  Clearly, MAHRA intended to cover the HAP contracts authorized by Section 8(b)(2) that are at issue in this case.  MAHRA also intended to renew these contracts.  As defined in MAHRA, "renewal" means "the replacement of an expiring Federal rental contract with a new contract under section 8 of the United States Housing Act of 1937."  MAHRA § 512(12).  The Government assumes that

because this definition uses the words "new contract," Congress stripped HUD's power to enter into these contracts and instead gave the sole authority to enter into HAP contracts to the PHAs. Govt. Reply at 7. But the Government does not and cannot explain why the statute does not state this.

MAHRA only states that "renewal" means the replacement of an expiring contract with a new contract under Section 8 of the Housing Act. MAHRA § 524(a)(1). Nowhere in MAHRA does Congress say that the expiring Section 8(b)(2) HAP contracts will be replaced with new contracts under Section 8(b)(1). Moreover, the authorizing provision of MAHRA merely provides for the renewal of the HAP contracts, and does not provide that only the PHAs may enter into these contracts. *See id.*

The basic renewal contract form for HAP contracts (referred to herein as the "basic renewal contract") confirms this. AR 2264-82 (Basic Renewal Contract). The basic renewal contract "is to be used for initial and subsequent renewals of an expiring Section 8 project-based HAP contract under the authority of Section 524(a)...of MAHRA for a term of two years or more," and ***must be entered before expiration of the Expiring Contract.***" AR 2281-82 (Basic Renewal Contract, endnotes 1, 6) (emphasis added). It is clear that the intent of the basic renewal contract is to renew the prior HAP contract. As with every other document cited by the Government, the basic renewal contract is devoid of any language declaring the renewed HAP contract to be authorized by a different statutory scheme in Section 8 (other than the renewal authority granted by MAHRA).

The bottom line is that the Government simply cannot show that it had a "statutory directive" to obtain the services of the PHAs for administration of the HAP contracts that were

created under the authority of the old Section 8(b)(2) and continue to exist today through the renewal authority granted by MAHRA.

### 2. HUD's Own Statements In the Public Record Confirm That It Is Not Statutorily Required To Outsource The Administration Of The HAP Contracts At Issue.

The Government's assertion that HUD is merely fulfilling its statutory duty when it contracts with the PHAs to perform contract administration services under the PBCA program is contradicted by HUD's own public record.  As recently as 2009, HUD contemplated in-sourcing the PBCA contract administration services again.  *See* HUD OIG Audit Report 2010-LA-0001, *HUD's Performance-Based Contract Administration Contract Was Not Cost Effective*, Nov. 21, 2009, available at http://www.hud.gov/offices/oig/reports/files/ig1090001.pdf.  The Government tries to downplay the true impetus for the PBCA program, but the evidence is overwhelming that HUD outsourced the PBCA contracts for reasons unrelated to any purported shift in statutory scheme.

The Government's statutory analysis is, in fact, simply a *post hoc* justification for the NOFA raised only now in the heat of litigation.  The Government asserts that "[p]art of the purpose of MAHRA and the reason why Congress created the structure that it did is because Congress believed such a structure was a more efficient use of federal funds than giving HUD a statutory obligation to administer HAP contracts."   Govt. Reply at 13.  While it may be that one of the goals of MAHRA was to achieve more efficient use of federal funds, this does not mean that HUD had a statutory mandate to use PHAs.  HUD did not believe it had such a mandate -- the PBCA program was not created until *two years* after the enactment of MAHRA.  *See* AR 930 (1999 Notice of Request for Proposals).

The Government has not described a single instance (prior to the current litigation) in which HUD has asserted that it is statutorily prohibited from administering HAP contracts.  In fact, HUD's own Office of the Inspector General ("HUD OIG") has refuted this position, asserting that "[w]hen HUD decided to contract out the administrative [*sic*] of project-based contracts it had little or no choice due to mandatory downsizing within the Federal Government during the Clinton Administration."  HUD OIG Audit Report 2010-LA-0001 at 35 (November 12, 2009).  This statements was part of a report in which HUD was discussing the findings of its audit of HUD's "annual contributions contract (contract) for performance-based Section 8 contract administrators (PBCA)."  *Id.* at 1.  The HUD OIG ultimately concluded that "HUD did not obtain the best value for the $291 million spent in 2008 on contract administration services." *Id.*

Consequently, the HUD OIG recommended "that the Deputy Assistance Secretary for Multifamily Housing perform a detailed analysis to determine the most cost-effective method of performing the contract administration task."  *Id.* at 2.  The report identified three possible options and courses of action for HUD to consider:  (1) HUD could serve as the contract administrator on all HAP contracts, (2) HUD could be the contract administrator, but contract out some of the administration activities, or (3) the PBCAs could continue to serve as contract administers, with new controls and oversight.  *Id.* at 16-19.  By suggesting that "HUD could increase its staffing levels and bring all of the contract administration functions back in house," it is clear that the HUD OIG never considered or adopted the Government's current theory that HUD is prohibited from administering the HAP contracts.[2]  *Id.* at 17.

---

[2] HUD did assert in its response to the audit that it could not outsource the contract administration services to third parties other than PHAs, due to statutory restrictions.  HUD OIG Audit Report 2010-LA-0001 at 30.  This is a reference to HUD's position at the time that only

Similarly, GAO never mentioned a purported statutory requirement to outsource the administration of HAP contracts when it reported to Congress HUD's efforts to fix the internal failures, billing problems, and staffing issues GAO had identified with respect to HUD's administration of the HAP contracts. *See* AR 233 (U.S. GAO, Report to Congressional Committees, *Project-Based Rental Assistance: HUD Should Update Its Policies and Procedures to Keep Pace with the Changing Housing Market*, Apr. 2007); AR 242-249 (U.S. GAO, Testimony Before the Subcommittee on Housing Opportunity and Community Development, *et al.*, *HUD Management: Information and Issues Concerning HUD's Management Reform Efforts*, May 7, 1998); AR 251-254 (U.S. GAO, Testimony Before the Subcommittee on Housing and Community Opportunity, *et al.*, *Comments on HUD's Fiscal Year 2000 Budget Request*, Mar. 3, 1999).

It is of little consequence that the Government's "statutory analysis is entirely consistent with the contemporary political paradigm of the day, to seek greater efficiency in Government." Govt. Reply at 13. The record demonstrates that HUD outsourced a function that it had been performing for more than twenty years (and for two years after then enactment of MAHRA) because of management deficiencies and staffing shortages, not because Congress instructed it to do so.

---

HUD or PHAs can administer the HAP contracts under Section 8; in other words, other non-PHA contractors cannot administer HAP contracts. AR 1162-63. The HUD OIG responded that no statutory change would be required because the non-PHA third parties would perform inherently governmental activities. HUD OIG Audit Report 2010-LA-0001 at 35; *see also* 24 C.F.R. § 880.505(a) ("The PHA or HUD may contract with another entity for the performance of some or all of its contract administration function.").

### 3. HUD's Own Regulations and Guidance Confirm That It Is Not Statutorily Required To Outsource The Administration Of The HAP Contracts At Issue.

The Government also cannot refute that HUD's regulations and guidance continue to describe HUD as having the ultimate authority to administer the HAP contracts. For HAP contracts, "HUD is responsible for the administration of the contract." 24 C.F.R. § 880.505(a). The Government asserts that this regulation is inapplicable and directs attention instead to 24 C.F.R. § 402.3, which provides: "The renewal HAP contract shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations and other requirements, including changes in HUD regulations and other requirements during the term of the renewal HAP contract, *unless the contract provides otherwise*." Govt. Reply at 18 (emphasis in original). Thus, the Government claims, "[b]ecause the Renewal HAP contract explicitly provides that the PHA, not HUD, is the contract administrator, any regulation to the contrary does not apply." *Id.* Essentially, the Government is claiming that the terms of the HAP contract can trump federal regulations.

Even if this were possible, however, the fact that the PHA is named as the contract administrator on a HAP contract means nothing more than that HUD outsourced its ultimate authority as the contract administrator to the PHA in accordance with applicable statutes and regulations.[3] The PHA's role as a contract administrator on a HAP contract does not relieve

---

[3] The Government devotes a significant number of paragraphs to *Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247 (2011), arguing that there is no privity of contract between HUD and the project owner. Govt. Reply at 16-17. This is irrelevant for our purposes. Plaintiffs have not asserted that HUD has privity with project owners, but that HUD is ultimately responsible for the assistance given to the project owner. In fact, the *Normandy* case recognized this fact in permitting the project owner to amend its complaint to assert a takings claim against HUD. *See id.* at 259. Similarly, in *Arlington Housing Partners, Inc. v. Ohio Housing Finance Agency*, 2012 WL 1078835 (Ohio App. 10 Dist.), the Court of Appeals of Ohio for the 10th Appellate

HUD of its obligation to administer the HAP contracts and provide project-based housing assistance.

HUD's internal Guidebook for Section 8 Contract Administration Initiative reinforces HUD's obligations. In the Guidebook, HUD defines an ACC as "the contract between HUD and the [contract administrator] that outlines the terms under which ***HUD will pay [contract administrators] to enter into HAP contracts with owners and monitor designated units*** under the contract." *HUD Guidebook for Section 8 Contract Administration Initiative*, Mar. 15, 2001, Glossary available at http://portal.hud.gov/hudportal/documents/huddoc?id=guidebk_ca_init.pdf (emphasis added). In other words, HUD has procured the services of the PHAs to act as contract administrators. This is the true purpose of the PBCA ACCs it is attempting to award under the NOFA.[4]

---

District found that the PHA could not be held liable for an alleged brief of the HAP contract between plaintiff property owner and the PHA because the PHA was merely implementing HUD's requirements and regulatory structure. *Id.* at *9.

In addition, the *Normandy* case is further distinguishable because unlike in *Normandy*, HUD currently signs all HAP renewal contracts that are entered into between SHCC and a project owner. HUD's Renewal Policy Guide states that "[w]hen a Renewal Contract is executed by HUD and a PHA...HUD is contractually bound by the Renewal Contract provisions that specify HUD's role in accordance to the Renewal Contract." *HUD Renewal Policy Guide*, Feb. 15, 2008, at 9, available at http://portal.hud.gov/hudportal/documents/huddoc?id=Sec_9_Renewal_Policy_Guide.pdf. The basic renewal contract provides that HUD has an obligation "to provide housing assistance payments." AR 2268 (Basic Renewal Contract).

[4] As discussed in more detail *infra* at 12-13, the Government has attempted to characterize all ACCs as the same, asserting that because the ACCs in one program have properly been awarded as cooperative agreements, all ACCs must be cooperative agreements. Govt. Reply at 19-21. We will demonstrate why this is not an accurate leap.

**B.**    **The Principal Purpose Of The PBCA ACCs Is To Procure The Services Of The PHAs To Administer The HAP Contracts And To Act As Conduits For The Assistance Payments.**

Evidence of a statutory mandate to provide a service is only one factor that the Court should consider in determining the principal purpose of an agreement. As this Court has stated, "the Court should look at the actual process that was used and the need that [the agency] was trying to satisfy." *360Training.com, Inc. v. United States*, 104 Fed. Cl. 575, 577-78 (2012). Even assuming, for the sake of argument, that HUD has the statutory authority to enter into a cooperative agreement, it has not done so here. The Court must look to the principal purpose of the agreement to determine whether it is a cooperative agreement or a procurement contract. *Id.* at 580. Factors that support a finding of a procurement contract include: the purpose is to "acquire...property or services for the direct benefit or use" of the Government, *id.* (citing FGCAA § 6303); an intermediary's services take the form of a service that is then delivered to an assistance recipient, *id.* (citing S. Rep. No. 97-180, at *5 (1981), 1982 U.S.C.C.A.N. 3; Pub. L. No. 97-162); the recipient of the contract "is not receiving assistance from the federal agency but is merely used to provide a service to another entity which is eligible for assistance," *id.*; and the agency would otherwise "have to use its own staff to provide to beneficiaries the services," *id.* (citing GAO Office of General Counsel, Principles of Federal Appropriations Law, Vol. 2, Ch. 10 (3d ed. Feb. 2006). Here, the principal purpose of the PBCA ACCs is not to enable the PHAs to carry out their individual purposes, but to assist HUD in meeting its obligation to administer HAP contracts.

The Government contends that since the ACCs for the Section 8 tenant-based program have been properly characterized as cooperative agreements, it must follow that the ACCs for the project-based program are also cooperative agreements. Govt. Reply at 21-22. The Government

fails to recognize the significantly different responsibilities the PHAs have under the tenant-based and project-based programs.  Under the tenant-based program, the PHAs have been entrusted with great discretion to administer and operate the program.  *See* Jan. 18, 2013 SHCC Opposition to the Government's Motion and Cross-Motion at 15-16.  Conversely, under the project-based program, the PHAs are required to transfer the assistance payments to the recipient selected by HUD and to monitor the program for compliance in strict conformity with HUD's regulations and guidelines.  *See id.* at 16-19.

These differences stem from more than the "different characteristics of the programs and the fact that PHAs administering the project-based programs are subject to performance-based standards."  Govt. Reply at 23.  The Government attempts to liken the restrictions on the PHAs in the project-based program by explaining that the PHAs do not have unfettered discretion to approve a landlord in the tenant-based program, *id.*, but it has not explained how this is similar to the project-based program.  The housing assistance payment in the tenant-based program remains with the tenant, whom the PHA *does* have the discretion to approve.[5]  24 C.F.R. § 982.1; 24 C.F.R. § 982.201.  Conversely, the PHAs in the project-based program do not have any discretion – unfettered or otherwise – to approve the recipients of the housing assistance payments.  *See* 24 C.F.R. § 880.501 *et seq.*; *see also* AR 1353 (the "covered units" to be administered by the PHA under the ACC are defined as "Section 8 assisted units in the Service Area under Housing Assistance Payment Contracts assigned to the Public Housing Agency").

As a result, HUD has employed two different vehicles for its Section 8 programs.  Through a tenant-based program ACC, HUD transfers funds to the PHA to carry out the purpose

---

[5] The Government asserts that the "Protesters have identified no instance in which a PHA administering tenant-based funds has 'discretion' over those HAP funds."  Govt. Reply at 20.  The ability of a PHA to select a tenant for approval to receive HAP funds is a prime example of the PHAs' discretion over HAP funds in the tenant-based program.

of providing housing assistance to low-income residents, and thus can properly be performed as

a cooperative agreement. On the other hand, for the project-based program, HUD enters into

PBCA ACCs with the PHAs to acquire contract administration services (*i.e.*, transferring the

specific amount of funding designated by HUD to the recipient chosen by HUD within *one*

*business day*, and monitoring the contract) in order to assist HUD in providing housing

assistance to low-income residents. *See* AR 1385; AR 1353-1417. In other words, the PHA acts

as a conduit for HUD, and as such, the PBCA ACC can only be properly characterized as a

procurement contract.

Again, HUD's own guidebooks reinforce this view. HUD's Handbook 4350.3:

Occupancy Requirements of Subsidized Multifamily Housing Programs, describes the role of

contract administrators under the section 8 programs, including for the PBCA project-based

program. The Handbook provides that "HUD has primary responsibility for contract

administration but has assigned portions of these responsibilities to other organizations that act

as Contract Administrators for HUD." AR 2285 (HUD Handbook 4350.3). It also explains the

role of the PHAs under the PBCA project-based program:

> Performance-Based Contract Administrators (PBCAs). The use of
> PBCAs began as an initiative in 2000. Under a performance-based
> ACC, **the scope of responsibilities of a Contract Administrator**
> **is more limited than that of a Traditional Contract**
> **Administrator**. A PBCA's responsibilities focus on the day-to-
> day monitoring and servicing of Section 8 HAP contracts. PBCAs
> are generally required to administer contracts on a statewide basis
> and have strict performance and reporting requirements as outlined
> in their ACC.

*Id.* (emphasis added).

Finally, while the Government claims that the purpose of all ACCs "is to assist PHAs in

performing a public service," HUD's own written policies and procedures for performance of the

project-based Section 8 ACCs provide that that "[a]fter the execution of the ACC, the [contract

administrator] will act as an **agent** of HUD."  AR 2193 (Proposed Monitoring and Evaluation

Policies and Procedures, Aug. 2000) (emphasis added).  In other words, the PHAs are providing

the contract administration services under the PBCA program for the direct benefit of HUD.

Consequently, the ACCs fall within the definition of a procurement contract.

**C.     In the History Of The PBCA Program, HUD Has Never Properly
Awarded An ACC As A Cooperative Agreement.**

The Government maintains that "in the history of the 1937 Act, HUD has never awarded

an annual contributions contract as a procurement."  Govt. Reply at 24.  The only evidence the

Government has provided to support this assertion is that the 1999 competition was not

compliant with either CICA or the FAR.  *Id.* at 24-25.

At GAO, HUD asserted that "the NOFA was reviewed and cleared by the Office of

Management and Budget ("OMB") prior to its publication."  AR 1156.  The purpose of the OMB

approval process was to determine if the NOFA was a cooperative agreement.  *See* AR 1445-49.

But there is no evidence anywhere in the record that HUD previously sought OMB review and/or

clearance in connection with any of the prior PBCA ACCs.  This leads to the conclusion that this

NOFA is apparently the first time HUD has ever obtained approval related to ACCs under the

PBCA program from OMB.

Moreover, the scant record that is available regarding OMB's approval of this NOFA

provides little clarity regarding what information HUD provided to OMB during the review and

approval process.  *See, e.g.*, AR 1445-49.  For example, OMB sought to determine whether the

NOFA should be structured as a cooperative agreement or a procurement contract.  *Id.*  In

response, HUD provided a very broad portrayal of the nature of the services to be obtained.  *Id.*

14

There is no meaningful discussion or analysis of the specific nature of the services in the correspondence in the record between HUD and OMB during the review process. Thus, to the extent that OMB approved the NOFA as a cooperative agreement, it was based upon a very limited record and an incomplete understanding of the work contemplated under the PBCA ACCs. Given these circumstances, the fact that HUD received approval from OMB does little to support its position that the PBCA ACCs are cooperative agreements.

## II.   THE OUT-OF-STATE RESTRICTIONS IN THE NOFA CANNOT WITHSTAND SCRUTINY

Here, the NOFA's restrictions on out-of-state PHAs unduly restrict and limit competition in a manner inconsistent with both the Competition in Contracting Act ("CICA") and the Federal Grants and Cooperative Agreement Act ("FGCAA"). Thus, even if this Court does not find that the NOFA contemplates a procurement contract to which CICA applies, the restrictions still must be rejected. The Court has jurisdiction to consider the restrictions regardless of its findings on the procurement contract versus cooperative agreement issue, and its review of the restrictions is subject to an arbitrary and capricious standard. Under applicable case law applying that standard, the restrictions must be deemed arbitrary and capricious.

### A.  The Competition Requirements Of CICA And The FGCAA Apply To The Out-of-State Restrictions Contained In The NOFA.

In the event this Court finds that the PBCA contracts are procurement contracts, it is undisputed that CICA applies and that the NOFA by its terms does not comply with CICA. *See* AR 2851-52 (at GAO HUD "admits that it did not follow the requirements in CICA or the FAR" in preparing the NOFA). CICA inarguably contains competition requirements; requirements HUD admits it has not followed here. Likewise, pursuant to the FGCAA, all grant and cooperative agreement programs involving discretionary recipients must provide for competition

among the prospective recipients whenever possible. *See* 31 U.S.C. § 6301(3) (the Act

"promote[s] increased discipline in selecting and using procurement contracts, grant agreements,

and cooperative agreements, maximize[s] competition in making procurement contracts, ***and***

***encourage[s] competition in making grants and cooperative agreements***.") (emphasis added).

### 1. This Court Has Jurisdiction to Consider the Propriety of the Out-of-State Restrictions in the NOFA.

HUD inarguably has Tucker Act jurisdiction if it finds a procurement contract. *See* 28

U.S.C. § 1491.  Even, however, if the Court determines it was proper for HUD to use a

cooperative agreement to procure the services at issue in this case, the Court clearly has

jurisdiction under the Tucker Act to determine whether HUD's actions regarding the NOFA are

proper.

In *360Training.com*, *supra*, this Court examined whether an Occupational Safety and

Health Administration ("OSHA") proposed contract to be awarded under 29 U.S.C. § 670(c)

(2006) to vendors providing outreach courses was a cooperative agreement or a procurement

contract.  The Court found that "where an agency has a statutory mandate to provide a service,

and the agency decides to use a cooperative agreement to obtain the provision of that service,

the agency has engaged in a procurement process under the Tucker Act and this Court has

jurisdiction over protests in connection with that process." *360Training.com*, 104 Fed. Cl. at

577-78.  In examining OSHA's statutory mandate, the Court noted that subsections (a) and (b) of

Section 670 of the relevant statute stated that OSHA shall provide training "directly or by

contracts and grants," and that subsection (d) provided that OSHA shall use cooperative

agreements. *Id.* at 584.  Subsection (c), however, left OSHA "flexibility in how to implement

the training program." *Id.*  Thus, the Court found that "OSHA could have chosen to provide the

training itself, it could have hired a contractor to provide the services, or it could have used an

assistance agreement." *Id.* Ultimately, the Court found that "OSHA was using the agreements to obtain the services of third parties," and therefore held that "OSHA was conducting a 'procurement' under the terminology of the Tucker Act." *Id.* at 585.

In this case, HUD is issuing the ACCs to the PHAs pursuant to the statutory mandate in Section 8(b)(1), similar to the situation *360Training.com*. Section 8(b)(1) gives HUD the flexibility to determine how to structure the ACC.[6] Section 8(b)(1) ("The Secretary is authorized to enter into annual contributions contracts with public housing agencies…"). Therefore even if one accepts that the NOFA is a cooperative agreement, HUD's issuance of the NOFA is a "procurement process" within the meaning of the Tucker Act, and this Court has the authority to consider the propriety of the NOFA as a cooperative agreement as well.

### B. The Out-of-State Restrictions In The NOFA Are Arbitrary And Capricious.

The out-of-state restrictions contained in the NOFA fly in the face of the competition requirements in CICA and the FGCAA. In assessing whether or not an agency decision withstands scrutiny under the Tucker Act, the applicable standard of review is whether or not the agency's actions were "arbitrary and capricious." *First Enterprise v. United States*, 61 Fed.Cl. 109, 112 (2004) (in a Tucker Act case, "[t]he standard of review is whether the procuring agency's conduct was arbitrary and capricious") (citing 28 U.S.C. §1491(b)(4) (2003)). The Supreme Court has described an arbitrary and capricious review as follows:

---

[6] If HUD has a "statutory directive," it is merely to "enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payment to owners of existing dwelling units…" 42 U.S.C. §1437f(b)(1). Section 8(b)(1) does not direct HUD to enter into a "grant" or "cooperative agreement" or even a "procurement contract." The definition of an "annual contributions contract" similarly provides little guidance. An ACC is defined as "the written contract between HUD and a PHA under which HUD agrees to provide funding for a program under the 1937 Act, and the PHA agrees to comply with HUD requirements for the program." 24 C.F.R. § 5.403.

> The reviewing court must 'consider whether the decision was
> based on a consideration of the relevant factors and whether there
> has been a clear error of judgment. . . . Although this inquiry into
> the facts is to be searching and careful, the ultimate standard of
> review is a narrow one. The court is not empowered to substitute
> its judgment for that of the agency.' *Citizens to Preserve Overton
> Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 824. The agency
> must articulate a 'rational connection between the facts found and
> the choice made.' *Burlington Truck Lines v. United States*, 371
> U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). While we
> may not supply a reasoned basis for the agency's action that the
> agency itself has not given, *SEC v. Chenery Corp.*, 332 U.S. 194,
> 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we will uphold a
> decision of less than ideal clarity if the agency's path may
> reasonably be discerned. *Colorado Interstate Gas Co. v. FPC*, 324
> U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945).

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974); *see*

*also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)

("The arbitrary and capricious standard applicable here is highly deferential.  This standard

requires a reviewing court to sustain an agency action *evincing rational reasoning and*

*consideration of relevant factors*.") (emphasis added).

Here, the Government states that "HUD's policy regarding crossing state lines as set forth

in the 2012 NOFA is reasonable:  *To avoid programmatic disruptions*, HUD decided to consider

out-of-State applicants only for States for which there was no qualified in-State applicant."

Govt. Reply Brief at 29 (citing AR 1261) (emphasis added).  But the single page of the NOFA

that the Government cites says nothing about a rationale for excluding out-of-State applicants

and certainly makes no mention of the goal of "avoid[ing] programmatic disruptions."  *See* AR

1261.  In fact, the rationale behind the restrictions appears *nowhere* in the administrative record.

Rather, it is only the government's lawyers' after-the-fact rationalization of purpose that appears

in the government's briefs.

As the record is devoid of ***any basis*** for the agency's decision to impose restrictions on

out-of-state PHAs, the decision is arbitrary and capricious on its face.  The government cannot

concoct a post-hoc rationale that has no basis in the administrative record whatsoever.  *See*

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962) ("The courts may not

accept appellate counsel's post hoc rationalizations for agency action. . . an agency's

discretionary order [can] be upheld, if at all, on the same basis articulated in the order by the

agency itself. . . . For the courts to substitute their or counsel's discretion for that of the [agency]

is incompatible with the orderly functioning of the process of judicial review.").  There is simply

no evidence here as to what consideration the agency gave to the out-of-state restrictions it has

imposed.  In the absence of such evidence, it is not possible for the Court to discern whether or

not the agency's actions were rational.

The Supreme Court faced a similar situation in *Motor Vehicle Manufacturers Assoc. of*

*the United States v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29 (1983).  That case

concerned the decision by the National Highway Traffic Safety Administration to rescind a prior

requirement for passive restraints in automobiles.  In finding that the decision to rescind was

arbitrary and capricious, the Court pointed to the agency's failure to consider alternative

possibilities, and its failure to give adequate reasons for its abandonment of the prior proposed

rule.  *Id.* at 47-48.  As the Court stated:  "There are no findings and no analysis here to justify the

choice made, no indication of the basis on which the [agency] exercised its expert discretion,"

*id.* at 48 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 167 (1962)), and "[w]e

have frequently reiterated that an agency must cogently explain why it has exercised its

discretion in a given manner," *id*.  Here, HUD offered no contemporaneous explanation to justify

the imposition of out-of-state restrictions in the NOFA.  There is no indication that HUD

considered any alternate possibilities, or that it undertook any reasoned analysis to come to its ultimate position. Under these circumstances, the decision by HUD to include the out-of-state restrictions in the NOFA was arbitrary and capricious.

Further, even the government's post-hoc explanation of the purpose of the out-of-state restrictions is less than credible. The Government claims that HUD imposed restrictions on out-of-State applicants as a means of avoiding litigation. Govt. Reply Brief at 29, 32. However, as these protests make clear, inclusion of these restrictions in the NOFA is just as likely to invite litigation as to discourage it. Thus, even if this Court were to believe that the basis for HUD's imposition of restrictions was the attempt to avoid possible litigation, this explanation lacks any credible basis.

Finally, it is noteworthy that the National Council of State Housing Agencies suggests a different reason for inclusion of the out-of-state restrictions in the NOFA, one that focuses on the PHAs as creatures of state law and on state law as determinative of which PHAs may operate in each state. NCSHA Brief at 13-18. Notably, the government *does not* claim that consideration of and deference to state law motivated HUD's decision. Govt. Reply Brief at 32 ("HUD is not trying to judge whose analysis of any particular state's law is superior; HUD simply is trying to avoid the programmatic delays that result when there is a conflict on the question."). Deference to state law thus cannot be deemed a credible rationale for HUD's actions given not only that there is no evidence in the record to support such a finding, but also the government's outright denial that such deference motivated HUD's decision.

In sum, HUD offered no explanation for its decision to include out-of-state restrictions in the NOFA and this decision is therefore arbitrary and capricious. This Court should direct HUD to remove the restrictions from the NOFA.

## CONCLUSION

For the foregoing reasons and those set forth in SHCC's prior briefing, SHCC requests that this Court deny the Government's January 4, 2013 Motion to Dismiss and Request for Judgment on the Administrative Record, grant SHCC's motion and permanently enjoin Defendant from making any awards under the NOFA, and grant SHCC its costs in connection with this Protest.

DATED:  February 13, 2013

Respectfully submitted,

s/ Richard J. Vacura
Richard J. Vacura
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA 22102
(703) 760-7764
(703) 760-7777 (fax)

*Counsel of Record for Plaintiff Southwest Housing
Compliance Corporation*

Of Counsel:

Tina D. Reynolds
K. Alyse Latour
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA 22102
(703) 760-7700

va-388118

21