IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Bid Protest

| | | |
|---|---|---|
| CMS CONTRACT MANAGEMENT SERVICES, et al. | ) ) ) ) | Case Nos.  12-852C<br>12-853C<br>12-862C<br>12-864C<br>12-869C |
| Plaintiffs. | ) ) | |
| v. | ) ) | Judge Thomas C. Wheeler |
| THE UNITED STATES, | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS AHSC, NTHDC AND CAHI'S REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**ROGERS JOSEPH O'DONNELL**

Neil H. O'Donnell (Counsel of Record)
Dennis J. Callahan
Jeffery M. Chiow

311 California Street, 10th Floor
San Francisco, CA 94104
Tele:  415-956-2828
Fax:  415-956-6457
Email:  nodonnell@rjo.com

Attorneys for AHSC, NTHDC and CAHI

February 13, 2013

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.  HUD IS NOT REQUIRED TO OBTAIN PBCA SERVICES
    THROUGH COOPERATIVE AGREEMENTS WITH PHAs ..................................... 3

    A.  The Projects In The NOFA Portfolio Were Chosen By HUD,
        Established With HUD-Supported Financing, And Had No PHA
        Involvement Before The PBCA Initiative ......................................................... 4

        1.  The NOFA Portfolio Projects Established Under Section
            8(b)(1) Have Always Been Exclusively HUD's ..................................... 4

        2.  The NOFA Portfolio Projects Established Under Section
            8(b)(2) Have Always Been Exclusively HUD's ..................................... 5

    B.  The Section 8(b)(2) Projects In The NOFA Portfolio Have Not
        Been Transformed Into Section 8(b)(1) "Existing Housing" ............................ 6

        1.  MAHRA Does Not Mandate that HUD Enter
            Cooperative Agreements with PHAs to Administer
            Project-Based HAP Contracts ............................................................. 7

            a.  HUD's reliance on MAHRA's definitions is
                misplaced .......................................................................... 7

            b.  The operative language of MAHRA does nothing
                more than authorize the Secretary to renew
                expiring HAP contracts ...................................................... 9

        2.  HUD's Argument for Transformation by Implication Is
            Undermined by Congress' Readiness to Make Its
            Intentions Clear Elsewhere in this Same Statutory
            Structure ........................................................................................... 11

        3.  HUD's Reliance on *360Training.com* Depends on a
            Statutory Mandate to Transfer Responsibility for HAP
            Contracts to PHAs ............................................................................. 12

    C.  The HAP Renewal Contracts Do Not Relieve HUD Of Its
        Primary Responsibility For Section 8 Project-Based Contracts ..................... 13

        1.  Contract Terms Cannot Override Regulations ..................................... 13

        2.  The Terms of HUD's Form Renewal Contract Are
            Consistent with HUD's Retention of Ultimate
            Responsibility for the Projects ......................................................... 15

TABLE OF CONTENTS
(continued)

Page

      3.   *Normandy Apartments* Is of No Assistance to HUD's
          Argument ........................................................................................... 16

  D.   The Terms of the P-B ACCs Indicate That They Are Routine
        Services Contracts .......................................................................................... 17

  E.   HUD's 2013 Budget Request Justification To Congress
        Confirms That P-B ACCs Should Be Procurement Contracts ........................ 18

II.     THE NOFA'S RESTRICTIONS ON COMPETITION ARE ILLEGAL ................... 19

TABLE OF AUTHORITIES

Page

CASES

*360Training.com, Inc. v. United States,*
   104 Fed. Cl. 575 (2012)..................................................................................12, 20

*Gold Line Refining, Ltd. v. United States,*
   54 Fed. Cl. 285 (2002)..................................................................................13, 14

*Normandy Apartments, Ltd v. United States,*
   100 Fed. Cl. 247 (2011)....................................................................................16

STATUTES

28 U.S.C. §1491 ............................................................................................20

31 U.S.C. §6301 ............................................................................................20

41 U.S.C. §3301 ............................................................................................19

42 U.S.C. §1437 ........................................................................................1, 20

REGULATIONS

24 C.F.R. Part 402 .....................................................................................10, 14

24 C.F.R. Part 880 .................................................................................... passim

24 C.F.R. Part 881 .....................................................................................14, 15

24 C.F.R. Part 884 .........................................................................................15

24 C.F.R. Part 886 ............................................................................4, 5, 6, 11, 15

24 C.F.R. Part 891 .....................................................................................15, 17

24 C.F.R. Part 982 .....................................................................................17, 18

24 C.F.R. Part 983 .........................................................................................18

OTHER AUTHORITIES

Multifamily Assisted Housing Reform and Affordability Act of 1997,
   Pub. L. No. 105-65, Title V, 111 Stat. 1384 (1997), 42 U.S.C. §1437f note.................passim

TABLE OF AUTHORITIES
(continued)

Page

Quality Housing and Work Responsibility Act of 1998,
    Pub. L. No. 105-276, 112 Stat. 2461 ........................................................................................11

40 Fed. Reg. 18902 (Apr. 30, 1975)..............................................................................................15

Federal Apopropriations Law, Vol. 2, (3d ed. Feb. 2006) ("GAO Redbook") .........................3, 18

## **INTRODUCTION**

In its Opposition HUD has honed a central theme. It claims that Congress' action in passing the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"), Pub.L. No. 105-65, Title V, 42 U.S.C. §1437f note, has obligated it to use cooperative agreements with Public Housing Agencies ("PHAs") for the effort sought here. HUD does not deny that virtually all of the projects included in the NOFA portfolio came into being through HUD's own direct action. HUD selected projects to which it wanted to provide support, provided or insured the mortgage, and entered into direct contracts with the owners of those projects, typically without any involvement of PHAs. And HUD does not deny that it performed the contract administration work for those projects with its own forces for more than 25 years. Instead, it now claims that, by passing MAHRA, Congress transformed what had been HUD's portion of the Section 8 housing program, its own portfolio of projects, and required HUD to transfer responsibility for those projects to PHAs. From that point, according to HUD, as the contracts supporting those projects were renewed, HUD was obliged to step away from a direct role and turn the projects over to PHAs. HUD argues that under the renewed contracts with the owners, HUD was limited to providing financial support to PHAs through annual contributions contracts ("ACCs") as the PHAs took over the responsibility for these projects.

This argument is in many ways an inventive attempt to deal with the problems that the GAO's decision exposed in HUD's earlier reliance on its claim that the principal purpose of its retaining Performance Based Contract Administrators ("PBCAs") was to provide valuable assistance to PHAs in carrying out their missions. But the argument fails for a simple reason – it is inconsistent with both the facts and the statutory language. This Reply focuses on this problem in HUD's core position. Other plaintiffs will devote more attention to other issues such as the NOPA's restrictions on competition.

1

HUD's own words and deeds until this litigation started provided no indication that it believed Congress required it to transfer primary responsibility for the project-based housing program or that PHAs had ever been given the central role. HUD has not provided a single contemporaneous source in support of its argument. HUD also cannot reconcile its litigation position with the language of its own authoritative Occupancy Handbook, updated as recently as 2009. There HUD identifies itself as having "primary responsibility for contract administration" for project-based housing and described PBCAs as having a "more limited" scope of responsibilities, "focus[ed] **on the day-to-day monitoring and servicing of Section 8 HAP contracts**" with **"**strict performance and reporting requirements as outlined in their ACC." AR 1704 (emphasis added). None of that is consistent with HUD's litigation position.

The language of the supposed statutory mandate in MAHRA provides HUD's litigation position no more support. Both the Housing Act itself and MAHRA contain examples of Congress clearly moving a program from one provision to another and mandating the use of cooperative agreements for particular activities. *See supra* Section I.B.2. But HUD cannot point to any such clear language here. Rather, it claims to find Congressional direction for this significant restructuring of project-based rental assistance programs in language that actually says nothing more than that HUD itself could renew the contracts in question. If Congress had intended to effect such a sweeping change in project-based programs that had been HUD's direct responsibility since they were established more than two decades before, surely it would have used some of the clear language that it used elsewhere in this statutory scheme.

HUD's argument also effectively ignores the structure and history of Section 8 Housing. Since Section 8 was first enacted in 1974, it has included two very different parts. The first is tenant-based rental assistance. This part of Section 8 belongs to the state and local PHAs. The

2

second part of Section 8, the project-based programs, has historically belonged almost entirely to HUD.[1]  Despite that history, in this litigation HUD asks the Court to assume that Congress would have required HUD to transfer its responsibility for the project-based programs to PHAs using little more than innuendo.  In fact, that is not what Congress did.  And HUD itself, both before and after the passage of MAHRA, has treated the project-based programs as its own direct part of Section 8 housing.

## ARGUMENT

**I.     HUD IS NOT REQUIRED TO OBTAIN PBCA SERVICES THROUGH COOPERATIVE AGREEMENTS WITH PHAs**

In this Court HUD has argued that it is statutorily required to enter into cooperative agreements with PHAs to administer the HAP contracts.  *See, e.g.,* Defendant's Reply in Support of its Motion to Dismiss ("HUD Reply") at 2; *id.* at 7 (Section I header).[2]  HUD has changed tack for the good reason that the contemporaneous record conclusively demonstrates that in 1999 HUD began to contract out certain HAP contract administration functions to deal with its own staffing shortages and management problems, not to assist PHAs.  But the historical record provides no more support for HUD's new position – that it instituted P-B ACCs because of a Congressional mandate to shift these programs to PHAs.  The record contains a HUD press release (AR 2766), HUD Budget Request (AR 258-59), HUD OIG audits (AR 268, AR 2764)

---

[1] A more complete description of these two parts of Section 8 is set out at AR 24-30.

[2] While HUD sometimes claims that at issue is its "authority" to award cooperative agreements to PHAs to obtain HAP contract administration services on its portfolio of project-based properties (*see, e.g.,*  HUD Reply at 1), really HUD must establish that it is required to use assistance agreements for this purpose.  If HUD only has the authority, but not a mandate, to use a cooperative agreement, the FGCAA's "principal purpose" determines which instrument is appropriate.  GAO Redbook at 10-17.  Although at GAO HUD's focus was on arguing that the P-B ACCs to be awarded are cooperative agreements under that test ( *see, e.g.,* AR 2610-13 (HUD's Supplemental Agency Report in the GAO proceedings)), in its latest filing HUD has effectively abandoned this claim.

329116.1

and GAO reports (AR 233, AR 244-47, AR 253), all of which indicate that staffing shortages,

HUD 2020 reforms, and expected efficiencies, not a Congressional mandate prompted the PBCA

initiative. The language of the statute on which HUD relies also does not support its argument.

> **A.** **The Projects In The NOFA Portfolio Were Chosen By HUD, Established With HUD-Supported Financing, And Had No PHA Involvement Before The PBCA Initiative**

HUD begins its argument by setting forth two propositions about Section 8, both of

which are misleading in that they have nothing to do with the projects at issue here.

> **1.** **The NOFA Portfolio Projects Established Under Section 8(b)(1) Have Always Been Exclusively HUD's**

HUD's first proposition is that Section 8(b)(1) "gave primary responsibility for

administration to PHAs." HUD Reply at 8. While that is true with respect to the tenant-based

program that originally was authorized by Section 8(b)(1), HUD's observation has no relevance

to the project-based projects at issue here. The Section 8(b)(1) projects in the NOFA portfolio

were established under programs that are exclusively HUD's, such as Loan Management Set-

Aside ("LMSA") and Property Disposition ("PD"). *See* AR 1801, ¶¶5, 6 and "Legal Authority";

AR 1702-03.

The LMSA Program is designed to reduce claims on HUD's insurance fund by providing

assistance to projects with HUD-insured or HUD-held mortgages "with immediate or potentially

serious financial difficulties," giving first priority to projects "with presently serious financial

problems, which are likely to result in a claim on the insurance fund in the near future." 24

C.F.R. §886.101(b). The PD Program provides assistance in connection with the sale or

foreclosure of HUD-owned projects or those with HUD-held mortgages. 24 C.F.R. §886.301.[3]

---

[3] As with LMSA refinancing, in the PD program the foreclosure or sale of a property was
supported with HAP contract payments that will serve as both rental assistance on behalf of low-
income tenants and as funds to service the new mortgage debt. *See* 24 C.F.R. §886.301.

329116.1

Simply, in LMSA the mortgages were HUD's, not a PHA's, to restructure, and the PD properties were HUD's, not a PHA's, to sell. Thus, before the PBCA initiative PHAs had no involvement with LMSA and PD projects established under Section 8(b)(1). HUD was, and is, the contract administrator for the HAP contracts it made directly with the owners who restructured their HUD-held or HUD-insured mortgages, or who entered such mortgages upon buying HUD properties. Indeed neither of the applicable "Responsibility for contract administration" regulations – 24 C.F.R. §886.120(a) for LMSA and 24 C.F.R. §886.319 for PD – even recognize the possibility of a private-owner/PHA project in these programs. And since there were no PHAs involved, there were no annual contributions contracts.

2.    **The NOFA Portfolio Projects Established Under Section 8(b)(2) Have Always Been Exclusively HUD's**

In its second misleading proposition, HUD states that Section 8(b)(2) "gave independent authority for administration to either HUD or a PHA." HUD Reply at 8. Though literally true, HUD fails to mention that nearly all of the New Construction (NC) or Substantial Rehabilitation (SR) projects under 8(b)(2) in the NOFA portfolio are either private-owner/HUD or PHA-owner/HUD projects established under the first sentence of that provision. These projects, like the LMSA and PD projects, involved only HAP contracts between HUD and the owner, where HUD was responsible for administration of the contract, and there were no annual contributions contracts. *See* 24 C.F.R. §880.[4] Accordingly, while under 24 C.F.R. §880.505(a) HUD may

---

[4] In its MJAR, AHSC explained how Section 8(b)(2) projects were established, including the role of Agreements to Enter into Housing Assistance Payment Contract ("Agreement"), which served as the prospective project owners collateral to secure financing, and the role of the HAP contract payments in servicing the owner's resulting debt. AHSC MJAR at 7; *see* 24 C.F.R. §880.308(c). Under the first sentence of the repealed Section 8(b)(2), HUD could enter the Agreement and the HAP contract directly with the project owner, making HUD responsible for administration under 24 C.F.R. §880.201 (definition of "Private-Owner/HUD Project").

329116.1

contract out performance of its contract administration function to another entity, it cannot shed its responsibility to administer contracts for the projects in the NOFA portfolio.[5]

In sum, the Government's opening propositions lack important specificity. All of the NOFA portfolio projects under Section 8(b)(1) were established under the second sentence of that provision, without any PHA involvement, and fall under the exception for projects where HUD has determined that "a [PHA] is unable to implement the provisions of [Section 8]." Therefore, the NOFA portfolio contains Section 8(b)(1) projects that are not embraced by the default rule that Section 8(b)(1) gives PHAs primary responsibility for HAP contract administration. *See* 24 C.F.R. §§886.120(a) and 886.319. By the same token, virtually all NOFA portfolio projects under Section 8(b)(2) were established under the first sentence of that provision, again without any PHA involvement.

**B.    The Section 8(b)(2) Projects In The NOFA Portfolio Have Not Been Transformed Into Section 8(b)(1) "Existing Housing"**

HUD asserts that, after the repeal of Section 8(b)(2) in 1983, "the sole remaining authority to provide rental assistance was section 8(b)(1)." HUD Reply at 8-9. HUD continues that, upon expiration and renewal of their original HAP contracts, HUD's Section 8(b)(2) New Construction and Substantial Rehabilitation projects became "existing housing" projects under Section 8(b)(1), with what HUD asserts was an accompanying vesting of responsibility in PHAs.

---

[5] "Second sentence" Section 8(b)(2) projects are where the owner and a PHA entered the Agreement and HAP contract pursuant to a true ACC between the PHA and HUD. *See* 24 C.F.R. §880.201 (definition of Private-Owner/PHA Project). In these projects of the PHAs themselves, the PHA was, understandably, always the contact administrator – the so-called "Traditional Contractor Administrator" ("TCA") that the HUD Occupancy Handbook identifies as having broader authority than PBCAs. AR 1704. In large part these projects remain outside the NOFA portfolio because in this situation the PHA is responsible for contract administration. *See* 24 C.F.R. §880.201 (definition of Contract Administrator).

329116.1

HUD Reply at 8-9. HUD relies on MAHRA to explain this supposed statutory transformation. *Id.* at 10-15.[6]

MAHRA did not effect a transformation of projects established under Section 8(b)(2) into "existing housing" under Section 8(b)(1). Nor did that the legislation otherwise compel HUD to solicit cooperative agreements to obtain HAP contract administration services. To the contrary, HUD remained responsible for ensuring that HAP contract administration was performed, either by itself or by contracting with a third party. MAHRA itself, not Section 8(b)(1), authorized the renewal of expiring project-based HAP contracts that were established under Section 8(b)(2).

      **1.**      **MAHRA Does Not Mandate that HUD Enter Cooperative Agreements with PHAs to Administer Project-Based HAP Contracts**

          a.      HUD's reliance on MAHRA's definitions is misplaced

HUD argues that MAHRA's definitions of "Renewal" and "Expiring contract," in combination with the repeal of Section 8(b)(2) fourteen years earlier, establish Congress' intent that the ongoing New Construction and Substantial Rehabilitation projects "be treated as 'existing housing' under Section 8(b)(1)." HUD Reply at 11-12.

As an initial matter, definitions that appear in the statute, while they inform the statute's operative provisions, themselves do not prescribe agency action. In 75 pages of briefing to this Court HUD has referred to the MAHRA's actual HAP contract renewal provision, §524, only once. *See* HUD MJAR at 12 n.7. Even there HUD discussed the version of §524 that was

---

[6] HUD has not explained why, even under its theory, New Construction and Substantial Rehabilitation projects, which were chosen by HUD and established by HUD with HUD-enabled financing, and supported solely by HUD for decades, would not continue to be HUD's responsibility under Section 8(b)(1)'s second sentence for the same reasons that LMSA and PD projects were. Also, it is worth noting that HUD's own website still cites Section 8(b)(2), as it existed before repeal, as the "legal authority" for the New Construction and Substantial Rehabilitation projects, and, sixteen years after MAHRA, does not reflect the supposed migration of this authority to Section 8(b)(1). *See* AR 1801 ("Legal Authority").

329116.1

enacted in 1997, not the current version as amended in 1999.[7] Rather than discuss the operative MAHRA provision that contains Congress' directions regarding renewals, HUD uses the definitions to argue what MAHRA "authorized" and "clarified" (HUD Reply at 10), and "provide[d]" and "did" (*id.* at 11). To understand what MAHRA requires with respect to renewals of Section 8 project-based HAP contracts, one must examine MAHRA's only operative renewal provision, §524, "Renewal of expiring project-based section 8 contracts."

Moreover, much of MAHRA concerns the restructuring of HUD-insured Multifamily Housing mortgages, rather than the renewal of HAP contracts. Only §524 deals exclusively with renewals of expiring HAP contracts. Indeed, every current provision of MAHRA, except for §524, has been repealed effective October 1, 2015. MAHRA §579(a). Thus, the findings, purposes, and definitions HUD has relied on here are set to expire, and only §524 will remain effective.[8] Reliance on such preliminary matter to explain Congress' intent as to §524, then, simply is not appropriate when Congress has provided that section will continue independently.[9]

---

[7] In its MJAR, HUD quoted the initial enactment of §524(a)(1), which used the more tepid "the Secretary *may*" renew expiring HAP contracts. HUD MJAR at 12. AHSC pointed out in its MJAR that in 1999 Congress changed the language to the prescriptive "the Secretary *shall*," a point HUD does not rejoin in its Reply. *See* AHSC MJAR at 11 n.10 (citing Pub. L. No. 106-74, Tit. IV, Subtit. C, §531 (Oct. 20, 1999)). This change was made before the first P-B ACC was awarded. *See* AR 1704 (noting that the use of PBCAs began in 2000).

[8] HUD relies on and emphasizes the finding stated at MAHRA §511(11)(C) concerning "reforms" as evidencing an intent that HUD transfer and share certain contract administration functions and responsibilities. HUD Reply at 14. This "finding" is not self-effectuating. Further, it is inconsistent with HUD's view that the P-B ACCs are true ACCs, and are no different than those in the tenant-based program because this transfer and sharing is "to and with capable State, local *and other entities*." In HUD's view, the HAP Contract Administration "ACCs" arise under Section 8(b)(1), and thus must be with PHAs, and not "other entities."

[9] Indeed, apparently even the House Oversight Committee responsible for HUD did not realize that, as HUD would have it, Congress mandated years ago that PBCA work had to be done by PHAs funded by cooperative agreements. In its *amicus* brief, NCSHA quotes a House Report from 2010 stating that the Committee "strongly believes" that PHAs should have a preference in

329116.1

> b.    The operative language of MAHRA does nothing more than authorize the Secretary to renew expiring HAP contracts

The MAHRA provision that actually authorizes HAP contract renewals is §524. *See* AR 2267; HUD Reply at 18. The critical language is the first sentence of subparagraph (a) of that section which provides that "the Secretary shall, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts, use amounts available for the renewal of assistance under section 8 of such Act to provide such assistance for the project." Although this is the actual authorizing language of the statute that HUD claims transforms the structure of renewed HAP contracts, it provides only that, upon the request of a project owner, HUD must renew the HAP contract using Section 8 funds. Small wonder that HUD has chosen not to discuss the language of this central provision.

MAHRA recognizes that renewal can occur for contracts for project based assistance under "the new construction or substantial rehabilitation program under section 8(b)(2) [of the Housing Act] (as in effect before October 1, 1983)," as well as under every other Section 8 project-based program. MAHRA §§512(12); 512(11) and 512(2)(B)(i). MAHRA does not transform Section 8(b)(2) projects into Section 8(b)(1) projects. Instead, MAHRA is agnostic about which project-based program the renewed HAP contract is part of, and nothing in the renewal language of §524 changes the program under which the contract exists.

Given HUD's argument that MAHRA reflects Congress' intent to shift responsibility for these renewed HAP contracts to PHAs, it is noteworthy that this central renewal language

---

the rebidding of P-B ACCs. NCSHA Br. at 8 (citing H.R. Rep. No. 111-564, at 145 (2010)). No such statement of preference would have been necessary if all of the NOFA portfolio projects had long since been transferred into "existing housing" under Section 8(b)(1).

329116.1

provides that it is *the Secretary* who shall renew these contracts.[10]  The remainder of §524 describes powers and obligations of *"the Secretary"* over a dozen times.  Never once does this renewal provision ever suggest that PHAs have a role in the renewals or administering the renewed contracts.  In fact, the only mention of state and local entities in the many paragraphs of §524 is in a provision limiting the effect of their rent control laws.  *See* MAHRA §524(f)(1).

Thus, under §524 of MAHRA, among other obligations, HUD sets the renewal terms and conditions it believes are appropriate (§524(a)(1)), HUD determines when renewal is prohibited (§524(a)(2)), and HUD must set renewal rents in various ways (§524(a)(4)(A)(v); §524(a)(4)(C)(i)-(ii); §524(a)(4)(D)(iii); §524(a)(5); §524(b)(1)(A)).  Indeed, even after renewal, "the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary."  MAHRA §524(c)(1).[11]

Finally, HUD's MAHRA "transformation" argument provides no support for a claim that Congress intended that projects from other Section 8 programs like LMSA and PD also in the NOFA portfolio had to be reassigned to PHAs.  These programs were already authorized under Section 8(b)(1).  *See* AR 1801 ("Legal Authority").  For these projects, therefore, the PBCA initiative could not have been a response to any new statutory mandate brought about by renewal

---

[10] This provision is mirrored in HUD's MAHRA renewal regulations. 24 C.F.R. §402.1 (stating that the purpose of Part 402 is to "set[] out the terms and conditions under which *HUD* will renew project-based assistance contracts under the authority provided in section 524 of MAHRA") (emphasis added).

[11] The Government is simply wrong, then, in its contention that no statutory provision obligated HUD to keep its responsibility for HAP contract administration. *See* HUD Reply at 12. Many MAHRA §524 HAP contract renewal provisions obligate HUD to retain ultimate control over the HAP contracts here.  HUD is also wrong in its contention that 24 C.F.R. §880.505(c) "permits HUD to assign HAP contracts to PHAs." *See* HUD Reply at 18; *see also id.* at 12. This provision is for the "conversion" of projects from one type of project to another, such as a conversion from a private-owner/HUD project into a private-owner/PHA project. Under 24 C.F.R. §880.505(c)(1), the owner, the PHA, and HUD must all agree to the conversion.

329116.1

of these contracts – they had always had always been part of 8(b)(1).  Instead, the PBCA

initiative was nothing more than HUD's exercise of the authority given, in the same words as in

the New Construction and Substantial Rehabilitation regulations, to contract out administrative

functions to another entity.  24 C.F.R. §886.120(a) (LMSA) and 24 C.F.R. §886.319 (PD).[12]

> ## 2. HUD's Argument for Transformation by Implication Is Undermined by Congress' Readiness to Make Its Intentions Clear Elsewhere in this Same Statutory Structure

HUD's claim that the language of §524 reflects some well-disguised Congressional intent

to effect major changes in the project-based programs is particularly unlikely given Congress'

clear direction when making similar types of changes elsewhere in these statutes. For example,

in QHWRA, when Congress moved the "certificate" portion of the tenant-based rental assistance

program from Section 8(b)(1) and merged it with the similar "voucher" portion of tenant-based

rental assistance in Section 8(o), Congress did so with clear, specific language.[13]

Elsewhere in MAHRA Congress was similarly clear itself when it required that

cooperative agreements be used.  MAHRA §513(a)(2)(A) provides that the "portfolio

---

[12] The Government's attempt to justify its continued reliance on the Quality Housing and Work Responsibility Act of 1998 ("QHWRA") does not help HUD's statutory position. *See* HUD Reply at 14-15.  AHSC previously has shown that QHWRA did not meaningfully amend the Housing Act's Declaration of Policy in a way that "reinforce[d] the 1937 Act's policy to vest program administration primarily in PHA's." AHSC MJAR at 47-48 (showing that the language bolded by HUD (HUD MJAR at 14) had existed for decades before QHWRA).  Undaunted, HUD now bolds different language in Section 1437(a)(1)(C).  HUD Reply at 14.  But this newly emphasized language added only a preference for PHAs that perform well.  *See* HUD Reply at 14-15.  Those words cannot possibly bear the burden of indicating a Congressional mandate to use cooperative agreements with PHAs where they had not be employed before.  QHWRA, therefore, does not explain HUD's 1999 RFP first seeking PBCAs.

[13] *See* AR 2754, QHWRA, Pub. L. No. 105-276, §545, 112 Stat. 2596 (1998) (merging the tenant-based "Certificate" program from Section 8(b)(1) and the tenant-based "Voucher" program from Section 8(o) into Section 8(o)); AR 2755, QHWRA §550(a)(2) (striking "Rental Certificates And" from the heading of Section 8(b) that had read "Rental Certificates and Other Existing Housing Programs"); AR 2758.

restructuring agreements" contemplated by §513 "shall be a cooperative agreement to establish the obligations and requirements between the Secretary and the participating administrative entity." It is not plausible that elsewhere in the same statute Congress would have mandated the use of cooperative agreements with PHAs, without explicitly so stating, particularly given HUD's long-time responsibility for the programs in question.

### 3. HUD's Reliance on *360Training.com* Depends on a Statutory Mandate to Transfer Responsibility for HAP Contracts to PHAs

HUD makes a curious attempt to transform this Court's recent decision in *360Training.com, Inc. v. United States*, ("*360Training.com*") 104 Fed. Cl. 575, 579 (2012), into support for its view that the principal purpose of its agreements with the PBCAs is to support PHAs. HUD Reply at 27-28. HUD's position depends again on a supposed statutory mandate to transfer the responsibility for project-based contracts to PHAs. With that claimed "statutory mandate," HUD treats the P-B ACC as the transfer of assistance to an intended beneficiary. *Id.* at 28 ("[t]he statutory mandate is to transfer funds and responsibility to PHAs to administer HAP contracts"). But that statutory mandate does not exist.

Without that statutory cover, the P-B ACCs can be recognized for what they are. HUD is purchasing services from intermediaries to administer HAP contracts for which HUD retains the ultimate responsibility. Those contracts are with the owners of projects HUD selected to promote low income housing. That the intermediaries from whom HUD purchases those services are PHAs that in other circumstances receive grants from HUD for their own Section 8 programs does not mean that the principal purpose of the limited P-B ACCs at issue here is to provide the PHAs with financial assistance.

12

C.   **The HAP Renewal Contracts Do Not Relieve HUD Of Its Primary Responsibility For Section 8 Project-Based Contracts**

In claiming that it no longer has responsibility for the contracts in the NOFA portfolio, HUD relies heavily on the terms of its standard form HAP renewal contracts. But contract terms cannot override HUD's express regulatory responsibility for these contracts. *Gold Line Refining, Ltd. v. United States,* 54 Fed. Cl. 285, 295 (2002). And in any case, the terms of the contracts indicate that, while HUD has contracted out many functions to the "Contract Administrator," it maintains direct, ultimate responsibility for these programs and the contracts under them.

1.   **Contract Terms Cannot Override Regulations**

AHSC has observed that 24 C.F.R. §880.505(a) assigns to HUD primary responsibility for the private-owner/HUD project-based HAP contracts.[14] HUD responds, asserting that the New Construction "regulations have no application to Renewal HAP contracts." HUD Reply at 18. HUD then cites a MAHRA regulation to contend that the terms of the renewal contracts trump contrary authority. HUD is wrong on both accounts.

That the New Construction regulations still govern such projects is evident in many ways. The regulations continue to be regularly updated. *See, e.g.,* 24 C.F.R. §880.503 (last amended in 2010). The HUD Occupancy Handbook, which the P-B ACC repeatedly cites as a reference (AR 144, AR 151), states that 24 C.F.R. Part 880 still governs (AR 1712). And there are no regulations for general project-based "existing housing," the category HUD contends now contains the Section 8(b)(2) projects. HUD Reply at 11-12; *see* AR 1712.[15]

---

[14] 24 C.F.R. §880.505(a) pertains solely to New Construction projects, but this regulations in the other Section 8 project-based programs are to the same effect. *See supra* note 17.

[15] After the failed 2011 attempt to re-solicit PBCAs, HUD for the first time included the PBCA awards in the Catalog of Federal Domestic Assistance ("CFDA"). AR 1836; *see* AHSC MJAR at 17. Even in this CFDA entry, HUD lists among the governing regulations those of the New

329116.1

HUD attempts to preempt the applicability of 24 C.F.R. §880.505(a) by selective quotation of MAHRA regulation 24 C.F.R. §402.3.  *See* HUD Reply at 18.  This regulation reads in full, with HUD's omitted language underlined:

> **Contract provisions.** The renewal HAP contract shall be construed and administered in accordance with <u>all statutory requirements, and with all HUD regulations and other requirements, including</u> changes in HUD regulations and other requirements during the term of the renewal HAP contract, unless the contract provides otherwise.

HUD suggests that the phrase "unless the contract provides otherwise" means that the HAP Renewal Contracts that name the PBCA as the contract administrator override the designation of HUD as the party responsible for contract administration in "private owner/HUD" projects under 24 C.F.R. §§880.201 and 505(a).  HUD Reply at 18.  The plain language of the full provision simply means that the renewal contracts will be interpreted and administered to comply with applicable statutes, regulations, and official HUD guidelines, including changes to these authorities promulgated during the term of the renewal contracts, unless the contract provides that changes after the contract is entered will not apply.[16]

The New Construction regulations have always assigned to HUD contract administration responsibility for private owner/HUD projects (24 C.F.R. §§880.201 and 880.505(a)), and HUD's form HAP Renewal Contract cannot override this duly promulgated regulation.  *Gold Line Refining, Ltd.,* 54 Fed. Cl. at 295.[17]

---

Construction and Substantial Rehabilitation programs, 24 C.F.R. Parts 880 and 881, respectively, not some set of new regulations for projects with restructured contracts.  AR 1838.

[16] This proper reading is confirmed by the HAP Renewal Contract §9, which mirrors the language of §402.3, removes "unless the contract provides otherwise," and in its place exempts from enforcement changes in authorities during the term of the Renewal Contract.  AR 2275.

[17] The same is true of the regulations for the other Section 8 programs with contracts in the NOFA portfolio.  *See, e.g.,* 24 C.F.R. §§881.201 and .503 (Substantial Rehabilitation); 24 C.F.R.

329116.1

2.     **The Terms of HUD's Form Renewal Contract Are Consistent with HUD's Retention of Ultimate Responsibility for the Projects**

Even if a contract could alter the regulations' assignment to HUD of responsibility for contract administration, the terms of the HAP renewal contracts did not signal such a change here. *See* HUD Reply at 15-16. HUD's form HAP Renewal Contract shows that HUD has retained plenary control over the properties in the NOFA portfolio. The HAP payment amounts are an obligation of HUD, not the PBCA (§2(b)(c), AR 2268-69),[18] HUD remains a party to the Renewal Contract (§4(a)(2), AR 2270), HUD can default the PBCA for substantial breach (§11, AR 2276),[19] HUD is a signatory to the Renewal Contract (AR 2278), and the contract's instructions direct how the PBCA is to fill in the form's blanks. AR 2281-82.[20]

---

§884.119(a) (New Construction for Rural Rental Housing); 24 C.F.R. §886.120(a) (LMSA); 24 C.F.R. §886.319 (PD); 24 C.F.R. §891.880 (Supportive Housing for the Elderly). Each of these regulations assigns responsibility for contract administration to HUD. The only exception is State Agency program under 24 C.F.R. Part 883. In this program State agencies, not HUD, develop the projects and are responsible for their supervision. 24 C.F.R. §883.106(b). In telling contrast to HUD-centric programs, the regulations for these projects provide that "the State Agency is responsible for administration of the Contract subject to periodic review and audit by HUD." 24 C.F.R. §883.606(a). Accordingly, none of these contracts are in the NOFA portfolio.

[18] After criticizing AHSC for noting that under the renewal contracts HUD remains solely obligated to the project owners for the HAP payments (HUD Reply at 15 n.12), HUD itself acknowledges that the Agency is indeed so obligated. HUD Reply at 16.

[19] HUD wrongly argues that a "PHA default" provision has been included in every project-based HAP contract since program inception. HUD Reply at 16. HUD cites a form private-owner/**PHA** HAP contract for this incorrect proposition. *See* 40 Fed. Reg. 18902, -938 (Apr. 30, 1975) (Appx. V). The private-owner/**HUD** HAP contract, which does not discuss PHAs in any way that is relevant here, actually confirms AHSC's point that, before the PBCA initiative, PHAs had virtually no role in the private-owner/HUD projects. *See id.* at 18928 (Appx. III). Certainly, such private-owner/**HUD** HAP contracts had no "PHA default" provision.

[20] Under the form Renewal Contracts, although the original contracts expire, they are immediately "renewed." It bears noting that "Renewal" would be an odd term for Congress to use to signal such a break from the past, instead of, say, "restructuring" or "replacement."

329116.1

### 3.     *Normandy Apartments* Is of No Assistance to HUD's Argument

HUD and *Amicus* NCSHA rely heavily on *Normandy Apartments, Ltd v. United States,*

100 Fed. Cl. 247 (2011), to argue that HUD cannot be responsible for the HAP contracts because

the Agency is not a party to the renewals. *See* HUD Reply at 16-18, 22; NCSHA Br. at 11-13.

This decision, however, does not turn on whether HUD is soliciting services for its own benefit.

First while HUD is a signatory to the HAP Renewal Contracts here (AR 2278), it was not a

signatory to the contract at issue in *Normandy Apts*, 100 Fed. Cl. at 250.  More important,

however, the issue being considered was entirely different.  In *Normandy Apts*, the question was

not whether the agreement between HUD and the PBCA was a cooperative agreement or a

procurement contract.  Rather, the issue was whether the project owner could sue HUD directly

for breach of contract.  The Court found that there was no privity of contract between HUD and

the owner.  As a result, it did not have jurisdiction.  *Id.* at 254-258.

That unremarkable conclusion is the case in any situation in which a subcontractor to a

procurement contract issued by the Government attempts to proceed directly against the United

States for breach.  *Id.* at 254 (citing *Chancellor Manor v. United States,* 331 F.3d 891, 899 (Fed.

Cir. 2003)).[21]  In such procurement situations the Government is seeking goods or services for its

benefit from the prime contractor who has then contracted with other entities as part of that

effort.  *Normandy Apts* thus has no direct bearing on, but is consistent with, protesters' view here

that the P-B ACCs are procurement contracts because their principal purpose is to acquire

services for the Government's benefit.

---

[21] Notably, as NCSHA stresses, that is the rule even where the prime contractor can be viewed as
the Government's agent in contracting with the third parties.  NCSHA Br. at 12.

329116.1

**D.     The Terms of the P-B ACCs Indicate That They Are Routine Services Contracts**

HUD mischaracterizes the P-B ACCs, its agreements with PBCAs for the services in question, as cooperative agreements. First, HUD takes up the ongoing dispute as to which funds are transferred by the P-B ACCs. HUD Reply at 19-20. As GAO found, the PBCAs are merely "conduits" for the HAP payments. Thus only the administrative fees, which are the only type of funds subject to the NOFA (AR 81) and are capped at 2% of the HAP amounts (AR 109), can be considered in the "principal purpose" analysis under the FGCAA. AR 2849. In other words, the instruments at issue here transfer at least 98% less to PBCAs than the true ACCs transfer to PHAs in the tenant-based program and in the private-owner/PHA project-based program.[22]

HUD challenges the protesters to distinguish the tenant-based ACCs from the P-B ACCs here. HUD Reply at 20. Unlike a PBCA, the PHA in the tenant-based program establishes its own local policies in an administrative plan (24 C.F.R. §982.54(a)); creates a budget (§982.157) and applies for funding (§982.103); recovers myriad costs in its fee (§982.102); determines tenant eligibility (§982.201); and determines whether the tenant's chosen unit is suitable and that the rent is reasonable (§982.305(a)(1), (2), (4)). Indeed, a PHA may even decide to use up to 20% of its tenant-based assistance to operate its own project-based programs. §983.5-.6. In short, the tenant-based ACCs fund a program that is very much the local PHA's, not HUD's.

HUD next challenges AHSC's description of the Performance-Based Tasks ("PBTs") of the P-B ACC as "ministerial." HUD Reply at 21. AHSC stands by the characterization of the PBTs. *See* AHSC MJAR at 26-28. In its Occupancy Handbook HUD seems to agree: "PBCA's

---

[22] AHSC has previously set forth the PBCAs' tightly controlled claims processing function that results in their disbursing the HAP payments to owners within a day of receiving the funds from HUD. AHSC MJAR at 31-34.

329116.1

responsibilities focus on the day-to-day monitoring and servicing of section 8 Contracts …

[under] strict performance and reporting requirements as outlined in their ACC." AR 1704.

HUD also admonishes plaintiffs for a supposed failure to explain how Section 8 provides

separate "funding mechanisms" for tenant-based "assistance" and project-based

"procurement." HUD Reply at 22. HUD's critique is misplaced. AHSC has never contended

that HUD supports its own project-based properties, *i.e.,* private-owner/HUD projects, with

procurement contracts. HUD awards rental assistance funds using assistance agreements,

whether by ACCs with PHAs in the tenant-based program, or by HAP contracts in HUD's

private-owner/HUD projects, where there are no ACCs. HUD's contracting out of its contract

administration responsibilities on the private-owner/HUD projects does not fall under any

"funding mechanism" under Section 8. The so-called P-B ACCs, which are ACCs in name only,

merely reflect HUD's inherent authority to contract for services for its own use, and, therefore,

are procurement contracts. *See* GAO Redbook at 10-17.

> **E.      HUD's 2013 Budget Request Justification To Congress Confirms That P-B ACCs Should Be Procurement Contracts**

HUD's Congressional justification for its most recent budget estimate of $8.7 billion in

project-based rental assistance belies the litigation position that HUD has taken in this Court.

*See* AR 1522. First, like plaintiffs, HUD's justification distinguishes Section 8 project-based

assistance at issue in this case from Section 8 tenant-based assistance. *Id.* at A-4. Second, the

budget request states that project-based assistance is provided through contracts between HUD

and the project owners. *Id.* Third, and most important, is the justification's description of the

role of HUD, as opposed to that of PBCAs, in these programs. HUD devotes a long paragraph of

text to listing the functions that HUD Field Staff perform "to administer the [project-based rental

assistance] program." AR 1527. While HUD acknowledges that its staff has "support from

18

PBCA's," it is HUD staff that is identified as performing such functions as: "process contract renewal requests," "determine project rent levels," "conduct management and occupancy reviews," "negotiate management improvement plans," and "initiate necessary enforcement actions." *Id.* In contrast, HUD describes the PBCAs' duties in barely 1½ lines.  AR 1523. HUD then notes that the "contracts" for PBCA services promote "the Department's efforts to be more effective and efficient in the oversight and monitoring of [the project-based] program," the very reason the contemporaneous records shows HUD undertook the PBCA initiative in 1999. *Id.*

Further, in the 14-page document HUD mentions "Public Housing Authorities" and "state housing finance agencies" exactly once, explaining that they are "typically" the PBCAs.  AR 1523  The only mention of "PHAs" in general comes in describing a verification system HUD imposes on them "to reduce fraud, waste and abuse."  AR 1530-31.  None of this description is consistent with HUD's litigation position that, at Congress' direction, it has turned responsibility for these project-based programs over to the PHAs.

## II.    THE NOFA'S RESTRICTIONS ON COMPETITION ARE ILLEGAL

The Competition in Contracting Act (CICA) applies to all procurement contracts and mandates that the Government obtain full and open competition.  41 U.S.C. §3301(a)(2012). HUD maintains that the NOFA solicits cooperative agreements rather than procurement contracts and admits that, as a result, it did not follow the requirements of "CICA" and the FAR. AR 1151.[23]  Even if this Court agreed that HUD is soliciting cooperative agreements, it still has

---

[23] Although *Amicus* NCHSA supports HUD's position, 13 of its members, all state HFAs, filed protests at GAO in connection with the 2011 Invitation.  Given the limits of GAO's jurisdiction, they thus effectively conceded that the PB ACCS are procurement contracts. *See* Exh. 2 to AHSC's Motion to Amend the AR (GAO's Decision Dismissing Protests, Aug 11, 2011).

329116.1

jurisdiction to evaluate the NOFA's restrictive provisions under the Administrative Procedure Act review standard. *See 360Training.com*, 104 Fed.Cl. at 579; 28 U.S.C. §1491(b)(4).

Congress intends for HUD to promote competition in awarding cooperative agreements (FGCAA, 31 U.S.C. §6301(3)) and to reward PHAs "that perform well" while providing for "accountability" (QWHRA, §1437). Under the NOFA's restrictions, in many states the pool of eligible awardees will be one. Thus, absent some support in the record, the restrictions defy congressional intent and are unreasonable. Here, HUD refused to produce any documents at GAO to justify the NOFA's restrictive provisions. AR 1151.

*   *   *   *   *

It is neither required nor appropriate that HUD solicit PBCA services under a NOFA that does not comply with CICA and contains unjustified restrictions on competition. AHSC, NTHDC and CAHI respectfully renew their request that this Court grant their motion for judgment on the administrative record and order appropriate relief, including recovery of the costs that they incurred in preparing responses to the NOFA.

Dated: February 13, 2013                    Respectfully submitted,


By: _____
     Neil H. O'Donnell (Counsel of Record)
     Dennis J. Callahan
     Jeffery M. Chiow

     ROGERS JOSEPH O'DONNELL
     311 California Street, 10th Floor
     San Francisco, CA 94104
     Tel: 415-956-2828
     Fax: 415-956-6457
     Email:  nodonnell@rjo.com

     Attorneys for Defendants AHSC, NTHDC and
     CAHI

20