BID PROTEST

No. 12-852C (Consolidated)
(Honorable Thomas C. Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CMS CONTRACT MANAGEMENT SERVICES, et. al.,
Plaintiffs,

v.

THE UNITED STATES OF AMERICA,
Defendant.

**PLAINTIFFS CMS CONTRACT MANAGEMENT SERVICES' AND THE HOUSING AUTHORITY OF THE CITY OF BREMERTON'S SUPPLEMENTAL BRIEF ADDRESSING FOUR ISSUES RAISED BY THE COURT**

COLM P. NELSON, WSBA #36735
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington  98101-3299
(206) 447-4400
Attorney of Record for Plaintiffs CMS
Contract Management Services and The
Housing Authority of the City of Bremerton

51281164.9

# Table of Contents

*Page*

I.    ISSUES RAISED BY THE COURT ..................................................................................1

      1.    Were the Court to determine that Section 8(b)(2) of the Housing and Community Development Act of 1974 ("1974 Act"), while now expired, continues to be grandfathered into the Housing Act of 1937 and to govern HUD's administration of the project-based rental assistance at issue, does the second sentence of Section 8(b)(2) give HUD the authority to administer the assistance through cooperative agreements with PHAs? ..................................................................................1

      2.    To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract?  Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. § 880.505(c)? .............5

      3.    If HUD is required to provide the renewal assistance at issue through HAP contracts with project owners, such that any contracts it enters into with other entities for the provision of contract administration services related to the HAP contracts are procurement contracts subject to the Competition in Contract Act ("CICA"), may HUD legally limit competition for these contracts to PHAs?  If so, what is the specific legal basis for such a limitation? ............................................8

      4.    All parties appear to agree that prior to the expiration of HUD's "(b)(2)" authority, HUD entered into various ACCs with PHAs pursuant to the second sentence of that subsection. On page 8 (footnote 7) of its opening brief, Plaintiffs AHSC et al. states that the contracts associated with these projects are not at issue in the instant matter, because "the HAP contract administration would not be HUD's to contract out."  However, the 1999 RFP expressly noted that approximately 4,200 HAP contracts for project-based Section 8 housing were at that time being administered by various PHAs, but that "[w]hen HUD renews the[se] expired project-based HAP contracts … HUD generally expects to transfer contract administration of the renewed HAP Contracts to the Contract Administrator (CA) it selects through this RFP for the service area where the property is located." AR 428. .......................................................................................8

## **TABLE OF AUTHORITIES**

**Page(s)**

### **STATUTES**

41 U.S.C. § 107 ...................................................................................................................8

Housing and Community Development Act of 1974 ("HCDA"), Pub. L. No. 93-383, 88
    Stat. 633 (1974) ..............................................................................................................1

Housing and Urban-Rural Recovery Act of 1983 ("HURRA"), Pub. L. No. 98-181, 97
    Stat. 1153 (1983) ............................................................................................................2

Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"),
    111 Stat. 1384, § 511(a)(8) (1997) .................................................................................2
    § 511(b)(1) ......................................................................................................................2
    §§ 513-520 ......................................................................................................................3
    § 513(a)(2)(A) .................................................................................................................3
    § 524 ............................................................................................................................2, 5
    § 524(a)(2) ......................................................................................................................2

Pub. L. No. 106-74, 113 Stat. 1047, § 531 (1999) ..........................................................2, 5

### **REGULATIONS**

24 C.F.R. § 402.1 .............................................................................................................3-4

24 C.F.R. § 880 ....................................................................................................................4

24 C.F.R. § 880.101(a) ........................................................................................................1

24 C.F.R. § 880.201 .........................................................................................................3, 6

24 C.F.R. § 880.505(a) ....................................................................................................1, 5

24 C.F.R. § 880.505(c) ....................................................................................................5, 6

24 C.F.R. § 881 ....................................................................................................................4

24 C.F.R. § 881.503 .............................................................................................................5

24 C.F.R. § 883 ....................................................................................................................4

24 C.F.R. § 884.119 .............................................................................................................5

24 C.F.R. § 1273.103(x) ..................................................................................................5, 7

48 C.F.R. § 6.101(b) ............................................................................................................8

48 C.F.R. § 11.002(a)(1)(ii) .................................................................................................8

## I.     ISSUES RAISED BY THE COURT

1. Were the Court to determine that Section 8(b)(2) of the Housing and Community Development Act of 1974 ("1974 Act"), while now expired, continues to be grandfathered into the Housing Act of 1937 and to govern HUD's administration of the project-based rental assistance at issue, does the second sentence of Section 8(b)(2) give HUD the authority to administer the assistance through cooperative agreements with PHAs?

No, the second sentence of Section 8(b)(2) has never given HUD authority to use cooperative agreements when hiring PHAs to administer HAP Contracts between HUD and Owners. The Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA") merely extended the housing assistance framework originally established under Section 8(b)(2); therefore, HUD remains without authority to hire administrators under cooperative agreements.

The first sentence of Section 8(b)(2) authorized HUD to administer assistance directly to private owners and PHA owners (collectively "Owner/HUD Projects"). Pub. L. No. 93-383, 88 Stat. 633, 663 (1974); 24 C.F.R. § 880.101(a) ("The assistance may be provided to public housing agency owners or to private owners . . . ."). The assistance was delivered through HAP Contracts between HUD and the Owner. The second sentence of Section 8(b)(2) authorized HUD to provide assistance to PHAs under Traditional ACCs for the PHAs to fund their own HAP Contracts with private owners ("Owner/PHA Projects"). Pub. L. No. 93-383, 88 Stat. 633, 663 (1974); 24 C.F.R. § 880.101(a). Thus, only when PHAs executed their own HAP Contracts with Owners would the second sentence of Section 8(b)(2) authorize HUD to use cooperative agreements or grants. The purpose of these cooperative agreements or grants was not for HUD to administer assistance, but rather to provide assistance to fund the HAP Contract between the PHA and Owner, which the PHA would then administer. 24 C.F.R. § 880.505(a).

Section 8(b)(2) authority to execute new HAP Contracts was repealed under the Housing and Urban-Rural Recovery Act of 1983.  Pub. L. No. 98-181, 97 Stat. 1153, 1183 (1983).  In 1997, Congress recognized that without "*new* budget authority" to renew expiring HAP Contracts "many of the FHA-insured multifamily housing projects that are assisted with project-based assistance are likely to default."  111 Stat. 1384, 1386, § 511(a)(8) (1997) (emphasis added).  To avoid the defaults and "to preserve low-income rental housing affordability and availability," Congress created new authority to renew expiring HAP Contracts under Section 524 of MAHRA titled "Section 8 Contract Renewal Authority."  111 Stat. 1384, 1387, § 511(b)(1); 111 Stat. 1384, 1408, § 524 (1997) (emphasis added), *amended by* Pub. L. No. 106-74, 113 Stat. 1047, 1109-1116, § 531 (1999).

Under MAHRA, HUD continues to play a central role in administering HAP Contracts.  Section 524 is replete with examples of "the Secretary's" obligations.  These include the duty, upon an owner's request, to "renew an expiring contract in accordance with terms and conditions prescribed by the Secretary," 111 Stat. 1384, 1408, § 524(a)(2) (emphasis added), *amended by* Pub. L. No. 106-74, 113 Stat. 1047, 1109-1116, § 531 (1999).[1]  MAHRA does not, however, envision a fundamental shift in *who* administers the HAP Contract renewals.  MAHRA's plain language and legislative history, as well as the administrative record, do not reflect any Congressional intent, for instance, to transfer contract administration functions from HUD to PHAs, as the Government has suggested.

---

[1] Subsequent amendments to Sec. 524 reinforce Congress' emphasis that HUD play a central role in administering its HAP contracts.  *See* Pub. L. No. 106-74, 113 Stat. 1047, 1109-1116, § 531 (1999).  The amendments further confirm that in most instances, upon the request of the owner, HUD shall renew the HAP Contract.

2

51281164.9

For over thirty years before MAHRA, HUD distributed billions of dollars in assistance through thousands of HAP Contracts for Owner/HUD projects across the nation. This assistance and these HAP Contracts were administered exclusively by HUD, the Contract Administrator of its own HAP Contracts. 24 C.F.R. § 880.201 ("Contract Administrator. The entity which enters into the Contract with the owner *and* is responsible for monitoring performance by the owner. The contract administrator is a PHA in the case of private-owner/PHA projects, and HUD in private-owner/HUD and PHA-owner/HUD projects.") (emphasis added).

If Congress had intended for PHAs to administer all HAP Contracts, including the many thousands that were at the time being administered by HUD, one would expect some expression of this intent in either MAHRA or its legislative history. Sections 513 through 520 of MAHRA, for instance, provide a framework for the restructuring of troubled, project-based, FHA-insured projects. 111 Stat. 1384, 1389-1405. These provisions give HUD new authority to retain "participating administrative entities" under a "cooperative agreement" to facilitate the restructurings. 111 Stat. 1384, 1390, § 513(a)(2)(A). MAHRA, in contrast, does not create new authority for HUD to retain "administrators" under a "cooperative agreement" to assist HUD in administering HUD's portfolio of HAP Contracts. Although Congress had the opportunity to require HUD to transfer HAP Contract administration functions to PHAs using cooperative agreements, it chose not to. Congress instead chose to preserve the *status quo* by giving HUD new authority to continue providing assistance through the existing channels under HAP Contract renewals. This is why MAHRA designates numerous, critical renewal and administration functions for HUD to perform, consistent with its pre-MAHRA role. 24 C.F.R.

3

§ 402.1 ("HUD will renew project-based assistance contracts under the authority provided in section 524 of MAHRA.").

HUD has recognized that MAHRA preserved and extended the character of and framework for Section 8 assistance. HUD's materials and handbooks, updated regulations, and website continue to distinguish HAP Contracts (including renewals) by the subprograms under which they were originally created, principally New Construction, Substantial Rehabilitation, State Housing Agencies, Loan Management Set Aside, and Property Disposition.[2] If MAHRA had fundamentally altered the landscape and framework for Project-Based Housing Assistance, HUD's governing materials and regulations would have been adjusted accordingly. Under the new renewal authority, the regulations have essentially remained unchanged consistent with MAHRA's command that HUD continue to administer assistance and renew HAP Contracts.

HUD, of course, has also always recognized that MAHRA preserved HUD's central role in the Project-Based Housing Assistance Program. HUD's understanding of this role was demonstrated when HUD unilaterally rolled approximately 4,200 PHA-administered HAP Contracts into its PBCA portfolio for HUD to administer, albeit with the assistance of administrators.

It is under MAHRA, therefore, that HUD has the authority and obligation to administer assistance for Owner/HUD Projects, just as it had under the first sentence of Section 8(b)(2). HUD has no authority, however, either under MAHRA or Section 8(b)(2), to hire administrators

---

[2] *See e.g.*, AR 2499-500, "Multifamily Housing – Section 8 Background Information – HUD"; AR 1736-7, Catalog of Federal Domestic Assistance*, Regulations, Guidelines, and Literature (140)* (2012) (citing "24 C.F.R. 880 - Section 8 Housing Assistance Payments Program for New Construction; 24 C.F.R. 881 - Section 8 Housing Assistance Payments Program for Substantial Rehabilitation; 24 C.F.R. 883 - Section Housing Assistance State Housing Agencies.").

using cooperative agreements to assist HUD in administering its own HAP Contracts. HUD must administer its HAP Contracts itself or hire other "entities" under "505(a)" to administer these contracts on HUD's behalf. 24 C.F.R. § 880.505(a) ("The PHA or HUD may contract with another entity for the performance of some or all of its contract administration functions."); *See also* 24 C.F.R. § 881.503, 24 C.F.R. § 884.119. When HUD chooses to contract with another entity to perform this work, it must use a procurement contract because it has no authority under Section 8(b)(2) or MAHRA to use a cooperative agreement in that case.

    2.    To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract? Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. § 880.505(c)?

MAHRA envisions "renewal" of the existing HAP Contracts and, therefore, an uninterrupted continuation of the existing contractual relationships. 111 Stat. 1384, 1408, § 524 (1997), *amended by* Pub. L. No. 106-74, 113 Stat. 1047, 1109-1116, § 531 (1999). Having originally entered into HAP Contracts pursuant to the first sentence of Section 8(b)(2), HUD will continue renewing such contracts pursuant to MAHRA.

Under original New Construction and Substantial Rehabilitation regulations, a Contract Administrator's obligation to continue administering assistance did not continue in perpetuity. The obligation ended when the contract was terminated or expired or when the project underwent a "conversion." A project could be converted from an Owner/HUD project to an Owner/PHA Project and vice-versa, under specific "conversion" procedures.[3]  24 C.F.R. § 1273.103(x); 24 C.F.R.

---

[3] AR 2637.

51281164.9

§ 880.505(c). The conversion process was only available for New Construction and Substantial Rehabilitation projects. Three elements must be met before an Owner/HUD Project could be converted into an Owner/PHA Project: (1) the owner, the PHA, and HUD must each agree to the conversion; (2) HUD must determine that a conversion is in the best interest of the project; and (3) contract authority must be available to cover the PHA fee for administering the Contract. 24 C.F.R. § 880.505(c).

Based on information provided by HUD to date, none of the Owner/HUD Projects have been converted into Owner/PHA Projects. Owners, PHAs, and HUD, for instance, have never consented to converting the Owner/HUD projects into Owner/PHA projects. *See* 24 C.F.R. § 880.505(c). HUD has also never undergone the necessary processes of determining that such a conversion would be in the "best interest of the project." *See* 24 C.F.R. § 880.505(c).

The PBACCs themselves also confirm that conversions have not occurred. As CMS has already briefed extensively, ACCs and PBACCs are very different. While a conversion transfers essentially all administration authority (and responsibility) from HUD to the PHA, a PBACC merely outsources *some* of HUD's administrative responsibilities. Under a PBACC, HUD remains the underlying responsible party, signs the HAP Contracts, and continues to perform some Contract Administrator functions, including the obligation to "monitor performance by the owner." 24 C.F.R. § 880.201. A Traditional ACC provides a fee as well as assistance whereas PBACCs only provide a fee – the actual assistance is directed to the owner through the underlying HAP Contracts. A Traditional ACC fee is considered part of the assistance and must

be used for housing and administration purposes.[4]  A PBACC fee, in contrast, has built-in incentives and disincentives with no restrictions on how the fee can be used after administration costs are covered.[5]

While HUD could have, at some point, conducted conversions in theory, in practice HUD provides no evidence that it has ever converted Owner/HUD Projects into Owner/PHA Projects.[6] Consequently, HUD's obligation to renew HAP Contract continues, subject to the limitations created by Congress under MAHRA (such as the availability of appropriated funds and owner performance).  Congress, of course, would prefer that HUD continue providing this housing assistance indefinitely.  Its primary concern is that HUD "may not be committed to maintaining its Section 8 project-based housing stock," which is the primary purpose of MAHRA.[7]

---

[4] AR 2670, Appendix III, US Department of Housing and Urban Development Section 8 Housing Assistance Payments Program Master Section 8 Annual Contributions Contract #, 0.2(b)(2)-(3); *See also* 0.2(e) (requiring the return of excess funds).

[5] AR 982, Questions and Answers dated May 11, 2012, #119.

[6] It seems possible that "505(c)" conversions from Owner/PHA Projects to Owner/HUD Projects remain authorized in light of MAHRA's command that "the Secretary" renew HAP Contracts.  Whether conversions from Owner/HUD Projects to Owner/PHA Projects remain viable after the repeal of Section (b)(2) and the enactment of MAHRA seems more problematic, albeit not an issue before the Court.  The conversion process was created under the original New Construction and Substantial Rehabilitation Regulations, 24 C.F.R. § 1273.103(x) (AR 2637), and was not updated to address later statutory changes which, in the case of MAHRA, appear to place a heavier emphasis on HUD renewing HAP Contracts rather than PHAs.  Conversions of Owner/HUD Projects to Owner/PHA Projects require a third element that Owner/PHA-to-Owner/HUD conversions do not - that "contract authority must be available to cover the PHA fee for administering the Contract." Although not fully explored, it is questionable, for instance, whether such "contract authority" currently exists.

[7] AR 828, U.S. Government Accountability Office Report to Congressional Committees, PROJECT-BASED RENTAL ASSISTANCE:  HUD Should Update Its Policies and Procedures to Keep Pace with the Changing Housing Market, April 2007.

3.  If HUD is required to provide the renewal assistance at issue through HAP contracts with project owners, such that any contracts it enters into with other entities for the provision of contract administration services related to the HAP contracts are procurement contracts subject to the Competition in Contract Act ("CICA"), may HUD legally limit competition for these contracts to PHAs? If so, what is the specific legal basis for such a limitation?

HUD has no statutory authority independent of CICA to restrict competition. Its own regulations anticipate any "entity" performing administrator services. Under CICA, however, HUD could limit competition for the contracts to "responsible sources," which would include many PHAs like CMS that have a successful track record of administering ongoing contracts. CICA's requirement for full and open competition is fulfilled when "all responsible sources are permitted to submit sealed bids or competitive proposals."[8]

CICA requires that contracting officers use competitive procedures "best suited to the circumstances of the contract action and consistent with the need to fulfill the Government's requirements efficiently." 48 C.F.R. § 6.101(b). Those officers may use restrictive provisions only "to the extent necessary to satisfy the needs of the agency or as authorized by law." 48 C.F.R. § 11.002(a)(1)(ii). While CMS will not argue that HUD could *never* restrict competition to PHAs, based on the record before the Court, HUD has not demonstrated that such a restriction on competition would withstand scrutiny under CICA.

4.  All parties appear to agree that prior to the expiration of HUD's "(b)(2)" authority, HUD entered into various ACCs with PHAs pursuant to the second sentence of that subsection. On page 8 (footnote 7) of its opening brief, Plaintiffs AHSC et al. states that the contracts associated with these projects are not at issue in the instant matter, because "the HAP contract administration would not be HUD's to contract out." However, the 1999 RFP expressly noted that approximately 4,200 HAP contracts for project-based Section 8 housing were at that time being administered by various PHAs, but that "[w]hen HUD renews the[se] expired project-based HAP contracts … HUD generally expects to transfer

---

[8] 41 U.S.C. § 107.

contract administration of the renewed HAP Contracts to the Contract Administrator (CA) it selects through this RFP for the service area where the property is located." AR 428.

The Court therefore requests HUD, in particular, to clarify the current status of these rental assistance contracts, and whether or not they are in the portfolio of contracts covered by the NOFA.

CMS can confirm that, as the current performance-based contract administrator for the State of Washington, CMS administers a handful of HAP Contracts that were previously established pursuant to the second sentence of Section 8(b)(2). CMS cannot comment on the status of all 4,200 HAP Contracts; only HUD has this knowledge. CMS will say, however, that HUD's decision to roll these contracts into the PBCA portfolio only confirms that HUD is at the center of and controls the administration of the Project-Based Housing Assistance Program.

DATED this 15th day of March, 2013.

*s/Colm P. Nelson*
Colm P. Nelson, WSBA #36735
FOSTER PEPPER PLLC
1111 Third Avenue
Suite 3400
Seattle, WA 98101
Phone: 206-447-4400
Fax: 206-447-9700
Attorney of Record for Plaintiffs CMS Contract Management Services and The Housing Authority of the City of Bremerton

9

Certificate of Service

The undersigned certifies that on *Friday, March 15, 2013*, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties:

| | |
|---|---|
| **NAME:** | Gabe E. Kennon |
| **EMAIL ADDRESS:** | gkennon@cohenmohr.com |
| **REPRESENTING:** | Intervenor Plaintiff Massachusetts Housing Finance Agence |
| **NAME:** | Michael R. Golden |
| **EMAIL ADDRESS:** | goldenm@pepperlaw.com |
| **REPRESENTING:** | Consolidated Plaintiff National Housing Compliance |
| **NAME:** | Neil Hall O'Donnell |
| **EMAIL ADDRESS:** | nodonnell@rjo.com |
| **REPRESENTING:** | Consolidated Plaintiff Assisted Housing Services Corp., North Tampa Housing Development Corp., California Affordable Housing Initiatives, Inc. |
| **NAME:** | Robert K. Tompkins |
| **EMAIL ADDRESS:** | rtompkins@pattonboggs.com |
| **REPRESENTING:** | Consolidated Plaintiff Jefferson County Assisted Housing Corporation |
| **NAME:** | Richard James Vacura |
| **EMAIL ADDRESS:** | rvacura@mofo.com |
| **REPRESENTING:** | Consolidated Plaintiff Southwest Housing Compliance Corporation |
| **NAME:** | Douglas K. Mickle |
| **EMAIL ADDRESS:** | douglas.mickle@usdoj.gov |
| **REPRESENTING:** | Defendant USA |
| **NAME:** | Kevin Patrick Mullen |
| **EMAIL ADDRESS:** | kmullen@jenner.com |
| **REPRESENTING:** | Amicus - National Council of State Housing Agencies |
| **NAME:** | Timothy Sullivan |
| **EMAIL ADDRESS:** | tsullivan@thompsoncoburn.com |
| **REPRESENTING:** | Amicus – New Mexico Mortgage Finance Authority |

DATED *March 15, 2013* in Seattle, Washington.

*s/Colm P. Nelson*
Colm P. Nelson, WSBA #36735
FOSTER PEPPER PLLC
1111 Third Avenue
Suite 3400
Seattle, WA 98101
Phone:  206-447-4400
Fax:  206-447-9700
Attorney of Record for Plaintiffs CMS Contract Management Services and The Housing Authority of the City of Bremerton

51281164.9