# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Bid Protest)

|  |  |  |
|---|---|---|
| CMS CONTRACT MANAGEMENT SERVICES ET AL., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 12-852C (and consolidated cases) |
| v. | ) ) | Judge Thomas C. Wheeler |
| THE UNITED STATES, | ) ) ) | |
| Defendant. | ) ) | |

**SUPPLEMENTAL BRIEF OF *AMICUS CURIAE*
THE NATIONAL COUNCIL OF STATE HOUSING AGENCIES**

Kevin P. Mullen, Esq.
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
Tel (202) 639-6024
Fax (202) 661-4827
kmullen@jenner.com

Attorney of Record for *Amicus Curiae*
National Council of State Housing Agencies

Of Counsel:
Charles L. Capito III, Esq.
JENNER & BLOCK, LLP

Dated: March 15, 2013

# **TABLE OF CONTENTS**

I. Were the Court to determine that Section 8(b)(2) of the Housing and Community Development Act of 1974 ("1974 Act"), while now expired, continues to be grandfathered into the Housing Act of 1937 and to govern HUD's administration of the project-based rental assistance at issue, does the second sentence of Section 8(b)(2) give HUD the authority to administer the assistance through cooperative agreements with PHAs?...................................1

II. To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract? Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. § 880.505(c)? ...............................................................................................................................4

    A. Plaintiffs' Premise Is Contrary to Section 8 of the Housing Act of 1937............................6

    B. Plaintiffs' Premise Relies on a Flawed Interpretation of MAHRA. ....................................6

    C. Plaintiffs' Premise Relies on Selected Portions of HUD's Regulations, and Ignores Other Provisions, Including 24 C.F.R. § 880.505(c). ..............................................8

    D. Plaintiffs' Premise Affords No Deference to HUD's Interpretation and Implementation of the Housing Act of 1937. ......................................................................9

III. If HUD is required to provide the renewal assistance at issue through HAP contracts with project owners, such that any contracts it enters into with other entities for the provision of contract administration services related to the HAP contracts are procurement contracts subject to the Competition in Contract Act ("CICA"), may HUD legally limit competition for these contracts to PHAs?  If so, what is the specific legal basis for such a limitation?...........10

# **TABLE OF AUTHORITIES**

**CASE LAW**

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837, 844 (1984) ……………………………………………………………………9

**STATUTES AND REGULATIONS**

31 U.S.C. § 6305(2) ………………………………………………………………………………4

41 U.S.C. § 3301(a) ……………………………………………………….…..……………...10

41 U.S.C. § 3304(a) ………………………………………………………………….…….…..10

41 U.S.C. § 3304(a)(5) ……………………………………………………………….…….…..10

41 U.S.C. § 3304(a)(7) ……………………………………………………………….…….…..11

42 U.S.C. § 1437 ……….……………………………………………………………….……..10

42 U.S.C. § 1437a ……………………………………………………………….…..……...… 11, 12

42 U.S.C. § 1437f(b)(1) (2010) …………………………………………………………….…..1, 2

42 U.S.C. § 1437f(b)(2) (1982)……………………………………………………….….… 1, 2

24 C.F.R. § 880.505 ……………………………………………………………………….…....8

24 C.F.R. § 880.505(a) ……………………………………………………………………….…5

24 C.F.R. § 881.503 ……………………………………………………………………….…....5

**LEGISLATIVE MATERIALS**

Rental Housing Revitalization Act of 2010,
    H.R. 6468, 110th Cong. (2010) …………………………………….…..………………..12

H.R. Rep. No. 111-564 (2010) ……………………………………………………….………..11

Multifamily Assisted Housing Reform and Affordability Act of 1997,
    Pub. L. 105-65, 111 Stat. 1344 (1997) …………………………….…..…..……… *passim*

Pub. L. 106-74, § 531, 113 Stat. 1047 (1999) …………………………………………………7

S. REP. NO. 106-161 (1999) ……………………………………….…..…………….………11

*Amicus Curiae*, the National Council of State Housing Agencies ("NCSHA"), submits this supplemental brief in response to the Court's March 5, 2013 order. NCSHA has not addressed Question No. 4, which the Court directed to HUD exclusively.

I.  **Were the Court to determine that Section 8(b)(2) of the Housing and Community Development Act of 1974 ("1974 Act"), while now expired, continues to be grandfathered into the Housing Act of 1937 and to govern HUD's administration of the project-based rental assistance at issue, does the second sentence of Section 8(b)(2) give HUD the authority to administer the assistance through cooperative agreements with PHAs?**

Yes. Section 8(b)(2) was implemented in 1974 to authorize the administration of project-based assistance for newly constructed or substantially renovated projects. Prior to its repeal in 1983, the second sentence of Section 8(b)(2) provided that: "The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to such owners or prospective owners." 42 U.S.C. § 1437f(b)(2) (1982). This provision authorized HUD to administer assistance for newly-constructed and substantially-rehabilitated ("NCSR") projects by entering into annual contribution contracts ("ACCs") with PHAs, that would, in turn, contract with the property owners using HAP contracts for the transfer and administration of the "assistance payments."

The crux of the Court's question, of course, is whether the second sentence of Section 8(b)(2) gives HUD the present authority to award the ACCs to the PHAs as <u>cooperative agreements</u> (as opposed to procurement contracts). The answer to this question depends on whether the projects at issue retained their character as NCSR, even though the relevant construction or rehabilitation occurred 30 to 40 years ago, or whether it was more reasonable for HUD to classify them as "[o]ther existing housing programs" under the current version of Section 8(b)(1). *See* 42 U.S.C. § 1437f(b)(1) (2010). Under either scenario, however, HUD has the authority to award ACCs to PHAs as cooperative agreements. Both provisions include

identical authorizing language that permits HUD "to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to" owners. *Compare* 42 U.S.C. § 1437f(b)(1) (2010) (defining owners as "owners of existing dwelling units"); *and* 42 U.S.C. § 1437f(b)(2) (1982) (defining owners as those "who agree to construct or substantially rehabilitate housing"). Thus, the only distinction is whether HUD's authority to enter into cooperative agreements for these projects arises under the second sentence of the repealed Section 8(b)(2) or whether the authority arises under the existing Section 8(b)(1).

Plaintiffs concede that the ACCs traditionally used by HUD to administer its Section 8 housing programs are cooperative agreements and that, as such, the ACCs provide assistance to the PHAs. *See, e.g.*, CMS Reply Br. at 2 ("The principal purpose of this traditional ACC was to provide assistance to PHAs and owners, and could be labeled a cooperative agreement."); NHC Reply Br. at 6-7 (distinguishing performance-based ACCs from "other" ACCs). Indeed, at oral argument, counsel for Plaintiff AHSC, NTHDC and CAHI expressed this concession with regard to past ACCs executed pursuant to the second sentence of Section 8(b)(2) in particular. *See* Oral Argument Transcript, Feb. 19, 2013 ("Tr.") at 31-32 ("8(b)(2) also permitted PHAs to identify projects. That's the second sentence of 8(b)(2). PHAs to identify projects, for them then to get grants in effect to support those.") (emphasis added).[1] Thus, Plaintiffs cannot reasonably argue that HUD is not authorized to award ACCs as cooperative agreements under the second sentence of Section 8(b)(2). As a result, the protests are dependent on Plaintiffs' ability to persuade the

---

[1] Plaintiffs' counsel downplayed HUD's authority to provide assistance to PHAs under Section 8(b)(2) by pointing out that only a "small minority" of NCSR projects were being administered by PHAs. Tr. at 31-32. Notwithstanding the number of affected projects that PHAs administered prior to 1983, however, Plaintiffs do not dispute that ACCs issued under the second sentence of Section 8(b)(2) constitute assistance to the PHAs.

2

Court that the differences between every other ACC ever issued by HUD and the ACCs that HUD proposes to award to PHAs under the NOFA are so profound that HUD is <u>required</u> to award the ACCs for the first time ever as procurement contracts subject to the Competition in Contracting Act ("CICA"). *See* Tr. at 53.

The Court's emphasis on the second sentence of the repealed Section 8(b)(2) also is important because it rebuts Plaintiffs' argument that HUD, and HUD alone, is <u>required</u> to enter into contracts with the owners of NCSR projects and that HUD, and HUD alone, is <u>required</u> to make the assistance payments to the owners of NCSR projects. Plaintiffs depend on this argument to support their contention that the ACCs solicited by the NOFA must be procurement contracts rather than cooperative agreements. However, under the second sentence of Section 8(b)(2), just as under the first sentence of the current Section 8(b)(1), if HUD exercises its authority to enter into ACCs with PHAs for the administration of NCSR project assistance, the PHA, not HUD, is the party that enters into a (HAP) contract with the owner for the purpose of making "assistance payments" to the owners. *See* NCSHA Br. at 8-11.

This is precisely what HUD has done with the ACCs under the NOFA. HUD has proposed to enter into ACCs with PHAs "to <u>administer</u> project-based Section 8 Contracts as a [Performance-Based Contract Administrator]," as expressly authorized under the second sentence of Section 8(b)(2). *See* Performance-Based Annual Contribution Contract ("Model ACC"), Feb. 24, 2012, at 7 (emphasis added) (a*vailable at* http://portal.hud.gov/ hudportal/HUD?src=/program_offices/housing/mfh/ PBCA%20NOFA). The principal purpose of the ACC, as reflected under Section 8 and the ACC itself, is to effectuate the payment of assistance to the owners. Contrary to Plaintiff JeffCo's representation at oral argument (Tr. at 105-06), the ACC provides that "HUD will make housing assistance payments <u>to the PHA</u> for

3

Covered Units in accordance with HUD requirements." *Id.* at 10 (emphasis added). Those amounts, in turn, "shall be sufficient for timely payment <u>by PHA to owners under HAP contracts</u>." *Id.* (emphasis added).

This contractual arrangement demonstrates that a cooperative agreement is not only authorized under Section 8, but proper under the Federal Grant and Cooperative Agreement Act of 1977. Plaintiffs expend considerable effort characterizing the PHAs' tasks under the ACCs as ministerial and identifying HUD as the primary recipient of the services. *See, e.g.*, AHSC *et al.* Reply Br. at 17; CMS Reply Br. at 2; JeffCo Reply Br. at 3; NHC Reply Br. at 1-6. Setting aside the fact that Plaintiffs' characterization of the ACCs is misleading (*see* Gov. Resp. Br. at 19-23; NCSHA Br. at 8-11), it also is a distraction. Regardless of how the individual tasks stack up against tasks in past ACCs, the principal purpose of the ACCs under the NOFA is "to make housing assistance payments" to owners. *See* Model ACC at 7. That HUD has considerable control over the payment and retains an oversight role for the underlying project is not surprising and is a hallmark of cooperative agreements. *See* 31 U.S.C. § 6305(2).

**II.     To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract? Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. § 880.505(c)?**

The critical premise underlying nearly every facet of Plaintiffs' arguments is the assertion that HUD is required to administer the assistance payments directly with the owners of NCSR projects into perpetuity. In the parlance used in HUD's regulations, Plaintiffs base their case on the premise that because the Agency originally administered the majority of the NCSR projects as "private-owner/HUD projects," all projects within the current NOFA portfolio retain this characterization and cannot ever, absent explicit congressional authorization, take the form of

4

"private-owner/PHA projects." *See* 24 C.F.R. § 880.505(a).  Without this premise, Plaintiffs cannot credibly claim that HUD is precluded from issuing ACCs to PHAs as cooperative agreements to administer the assistance payments to the owners of NCSR projects.  In fact, Plaintiffs acknowledge that HUD would have discretion over whether to use a cooperative agreement or a procurement contract to administer non-NCSR projects.  Tr. at 51-52.

It would be impracticable to synthesize Plaintiffs' positions reflected in their briefs, as their positions are varied and have evolved throughout the case.  Instead, NCSHA draws from the statutory and regulatory arguments presented at oral argument on behalf of all Plaintiffs by counsel for AHSC, NTHDC, and CAHI.  There, Plaintiffs noted that for the majority of NCSR projects originally entered into under Section 8(b)(2), "HUD acted directly with owners" pursuant to the first sentence of Section 8(b)(2).  Tr. at 31.  Plaintiffs pay little attention to the approximately 4,200 HAP contracts originally administered by PHAs.  According to Plaintiffs, when Congress passed the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA") to address all expiring project-based assistance, it provided that "the new construction and substantial rehabilitation projects [would] remain[] as they always had been projects which had been selected by HUD."  Tr. at 35.

Plaintiffs contend that, "[u]nless there's been a transformation by MAHRA into 8(b)(1) where there is an authorization, the Secretary has no authorization to use cooperative agreements for these new construction and substantial rehabilitation" projects.  *Id.* at 43.  In other words, Plaintiffs argue that Congress mandated private-owner/HUD projects remain as such following the renewal of the assistance under Section 8.  Based on this premise, Plaintiffs conclude that HUD now "must use a procurement method at least for the new construction and substantial rehabilitation contracts, which are the majority of the NOFA portfolio."  Tr. at 51.

5

As the Court suggests, Plaintiffs base this premise on HUD's use of the first sentence of Section 8(b)(2) to contract directly with the majority of NCSR project owners 30 to 40 years ago. *See* Tr. at 43 ("Under 8(b)(2), there was no authorization for the Secretary to use cooperative agreements in these <u>direct relationships with the owners</u> of the contracts on the projects that HUD itself selected.") (emphasis added).  As explained below, however, Plaintiffs also rely in large part on an improper interpretation of MAHRA (*see* Tr. at 37) and an overly narrow reading of HUD's regulations (*see* Tr. at 44) to support its premise.  Plaintiffs' premise is fundamentally flawed because it is at odds with the Housing Act of 1937 as amended, HUD's regulations, the principal purpose of the ACCs under the NOFA, and it completely disregards the firmly-established deference that HUD is afforded in construing and implementing its own statute.

### A. Plaintiffs' Premise Is Contrary to Section 8 of the Housing Act of 1937.

As addressed above, whether the Court uses the current authorizing language under 8(b)(1) or "grandfathers" in the second sentence of 8(b)(2), Section 8 of the Housing Act of 1937 authorizes the provision of assistance via ACCs in the form of cooperative agreements with PHAs.  Again, even Plaintiffs concede that when HUD exercised the authority under the second sentence of 8(b)(2), it was providing "grants" to PHAs to administer the assistance payments to the NCSR projects.  Tr. at 31.  Thus, Plaintiffs are incorrect to assert that HUD has no authorization under Section 8 to use cooperative agreements for NCSR projects.  *Id.* at 43

### B. Plaintiffs' Premise Relies on a Flawed Interpretation of MAHRA.

Plaintiffs assert that when Congress enacted MAHRA in 1997, it required HUD to renew the expiring HAP contracts directly with the project owners.  To make their point, however, Plaintiffs rely on language in MAHRA that Congress later repealed.  For example, CMS based its argument that "[t]he purpose of MAHRA is to vest new authority in HUD to renew its HAP Contracts" on a sentence in § 524(a)(2) of the 1997 MAHRA legislation, which provided that

6

upon the request of the owner, "the Secretary shall <u>renew an expiring contract</u> in accordance with the terms and conditions prescribed by the Secretary."  CMS Reply Br. at 7-10 (citing Pub. L. 105-65, 111 Stat. 1344, 1408 (1997)) (emphasis added).

In 1999, Congress repealed and replaced this language with a provision that now reads:

> <u>[U]pon termination or expiration</u> of a contract for project-based assistance under section 8 for a multifamily housing project . . . , <u>the Secretary shall</u>, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts, <u>use amounts available for the renewal of assistance</u> under section 8 of such Act to provide such assistance for the project.

Pub. L. No. 106-74, § 531, 113 Stat. 1047, 1109 (1999) (emphasis added).    At oral argument, Plaintiffs had to rely on cross-references to appropriations legislation to argue that Section 524 somehow requires HUD, and HUD alone, to eschew the use of PHAs as contract administrators and renew the expiring HAP contracts directly with owners.  *See, e.g.*, Tr. at 99.

When read properly and in its current form, however, Section 524 of MAHRA does not require that HUD itself renew the existing contracts. The first sentence of Section 524(a)(1) provides that, upon termination or expiration of a project-based assistance contract, HUD shall at the request of the owner and to the extent of available appropriations, use amounts available for the "renewal of assistance" to the project.  While this language requires HUD to use available funding to renew the assistance, it does <u>not</u> require HUD to do so:  (i) by its entering into a HAP contract with the owner; (ii) by renewing the assistance on the same terms as before; or (iii) by using the same contractual instruments.  Instead, the language allows HUD to renew the Section 8 assistance by other means, such as through the use of ACC contracts with PHAs.  This is made clear by the second sentence of 524(a)(1) which states that the assistance shall be provided "under a contract having such terms and conditions <u>as the Secretary considers appropriate</u>."

7

That HUD may provide the Section 8 assistance through a different contractual structure also is made clear by the definition of the term "renewal" in MAHRA Section 512(12). This section defines that term to mean "the <u>replacement</u> of an expiring Federal rental contract with a <u>new contract</u> under section 8 of the United States Housing Act of 1937." (emphasis added). Again, nothing in MAHRA requires that the assistance be renewed using a particular form of contract, a particular contractual structure, or a particular sentence or authority in Section 8.  It only requires that the assistance be renewed under Section 8 generally, using a contract with terms and conditions that HUD considers appropriate.

      **C.**      **Plaintiffs' Premise Relies on Selected Portions of HUD's Regulations, and Ignores Other Provisions, Including 24 C.F.R. § 880.505(c).**

At oral argument, Plaintiffs offered two observations about HUD's regulations concerning new construction and substantially rehabilitated projects.  First, Plaintiffs identified for the Court the provision in 24 C.F.R. § 880.505(a) that "'For private owner HUD and PHA owner HUD projects HUD is responsible for administration of the contract.'"  Tr. at 44.  Second, Plaintiffs highlighted the sentence in that subsection permitting HUD and PHAs to "contract with another entity for the performance of some or all of its contract administration."  Despite the numerous other relevant provisions, Plaintiffs ignore the rest of this regulation.[2]

HUD's regulations clearly contemplate the use of PHAs as the administrators of HAP contracts with owners of NCSR projects.  Under subsection (a), the regulation provides that "[f]or private-owner/PHA projects, the PHA is primarily responsible for administration of the [HAP] contract."  At oral argument, Plaintiffs stated – without factual or legal support – that private-owner/PHA projects "aren't involved here."  Tr. at 44.  Presumably, Plaintiffs rely on

---

[2]  24 C.F.R. § 880.505 is incorporated by reference into the regulations concerning substantially-renovated projects.  *See* 24 C.F.R. § 881.503.

8

their flawed reading of MAHRA to conclude that the relevant projects always have been, and always will be, private-owner/HUD projects. As explained above, however, MAHRA does not require any particular contractual structure to renew assistance to NCSR projects. In using available funds to renew the assistance to projects faced with expiring HAP contracts, HUD may exercise its discretion under Section 8 to either provide the assistance directly to owners or provide the assistance to PHAs through ACCs (who, in turn, transfer and administer the assistance to owners under HAP contracts). Here, HUD chose the latter approach.

Finally, Plaintiffs' position concerning the perpetual status of NCSR projects as private-owner/HUD projects conflicts with subsection 880.505(c), which expressly provides for the conversion of "one ownership/contractual arrangement to another." Indeed, the example provided in the regulation – "from a private-owner/HUD to a private-owner/PHA project" – clearly covers HUD's ongoing efforts to assign contract administration of project-based HAP contracts to PHAs. Given the flexibility MAHRA provides HUD when renewing assistance to NCSR projects under Section 8, and the regulations' explicit allowance for both HUD-administered and PHA-administered HAP contracts, it is within HUD's discretion to provide the assistance to PHAs through ACCs to effectuate the assistance payments to owners.

### D. Plaintiffs' Premise Affords No Deference to HUD's Interpretation and Implementation of the Housing Act of 1937.

"[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer and the principle of deference to administrative interpretations." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). Even if Plaintiffs' interpretation of Section 8 of the Housing Act of 1937 and MAHRA were reasonable, Plaintiffs have failed to demonstrate that HUD's interpretation of the Housing Act is unreasonable. Accordingly, the Agency's provision of assistance to PHAs to

administer the NCSR projects cannot be held to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**III. If HUD is required to provide the renewal assistance at issue through HAP contracts with project owners, such that any contracts it enters into with other entities for the provision of contract administration services related to the HAP contracts are procurement contracts subject to the Competition in Contract Act ("CICA"), may HUD legally limit competition for these contracts to PHAs? If so, what is the specific legal basis for such a limitation?**

As HUD has argued during these proceedings, the Housing Act of 1937 as amended provides authority to the Agency to provide assistance using ACCs. The manner in which HUD exercises this statutory authority is, and always has been, fundamentally irreconcilable with the strictures of CICA-based procurement contracts. Where another statute authorizes unique procurement procedures, CICA's requirements are inapplicable. *See* 41 U.S.C. § 3301(a). If, however, the Court determines that ACCs are procurement contracts subject to CICA, HUD may legally limit competition for these contracts to PHAs. CICA provides a number of exceptions to the basic requirement for full and open competition. *See* 41 U.S.C. § 3304(a). The exception that is the most applicable to this case is where a statute "authorizes or requires that the procurement be made . . . from a specified source." *Id.* § 3304(a)(5). Here, Section 8(b) of the Housing Act authorizes HUD to enter into HAP contracts with owners, or enter into ACCs with PHAs that, in turn, enter into HAP contracts with owners. Further, the statutory scheme of the Housing Act as amended, including the declaration of policy at 42 U.S.C. § 1437, make it clear that the project-based Section 8 program should be administered by either HUD or PHAs. Accordingly, HUD may limit competition for these contracts to PHAs on the basis of this statutory exception.

In addition, CICA permits an executive agency to utilize noncompetitive procedures when the head of the agency "determines that it is necessary in the public interest to use

10

procedures other than competitive procedures in the particular procurement concerned." 41 U.S.C. § 3304(a)(7).  PHAs are mission-based public agencies organized under state law and authorized to engage in or assist in the development or operation of public housing.  *See* 42 U.S.C. § 1437a(b)(6).  Based on the public nature and purpose of PHAs, HUD may reasonably find that it is in the public interest to limit competition for the ACCs contracts to PHAs.

This is clearly reflected in the 2010 report of the House Appropriations Committee, which states as follows:

> As [HUD] rebids the contracts for performance-based contract administrators, the <u>committee strongly believes that there should be a preference for public entities whose mission is oriented towards a public purpose</u>.  In an increasingly tight fiscal environment, it is difficult to fund increases in programs, so these important federal funds should be used to support the public mission of safe, affordable housing.

H.R. REP. No. 111-564, at 145 (2010) (emphasis added).  Other legislative history demonstrates that it would be in the public interest to limit the competition for ACCs to PHAs.  For example, the Senate has stated that:

> HUD also is encouraged to expand the use of State and local housing finance agencies in contracting out the administration of the section 8 project-based program.

S. REP. NO. 106-161, at 34 (1999).

As public agencies, PHAs may use their funds <u>only</u> for public purposes.  Accordingly, to the extent that the fee earned by the PHAs under the ACC exceeds the cost of providing the administrative services, PHAs may use those funds only to advance the public good.  This is not the case with nonpublic entities.  Accordingly, HUD may determine that limiting competition to PHAs, which may use the funds only for public purposes, falls under CICA's public interest exception to the use of competitive procedures.

Not only may HUD limit the competition to PHAs, but HUD also may use the same exceptions to CICA to justify limiting the competition for ACCs to <u>in-state PHAs</u> authorized to operate on a <u>statewide</u> basis.  In addition to the justifications for HUD's preference set forth in NCSHA's brief (*see* pp. 13-18), Section 8 also provides a statutory basis under CICA to limit the competition to in-state PHAs.  For tenant-based programs only, Congress included within the definition of "public housing agency" PHAs "for another area" "notwithstanding any provision of State or local law . . . [and] without regard to any otherwise applicable limitations on its area of operation."  42 U.S.C. § 1437a(b)(6)(B)(iii)(II).  In other words, for tenant-based assistance, Congress permitted HUD to look past restrictions imposed by the states.  For other types of assistance, including project-based assistance, however, Congress did not provide HUD such discretion.  *See* 42 U.S.C. § 1437a(b)(6)(A).  Notably, in 2010, HUD proposed to extend the exemption applicable to tenant-based programs to all Section 8 programs, but Congress rejected HUD's proposal.  H.R. 6468, 110th Cong. (2010) at § 7 (*available at* http://beta.congress.gov/111/bills/hr6468/ 111hr6468ih_xml.xml).  This confirms that HUD may limit PHAs eligible to administer project-based assistance to those that are authorized to operate in the relevant state.

          Respectfully submitted,

          /s/Kevin P. Mullen
          Kevin P. Mullen, Esq.
          Charles L. Capito, III, Esq.
          JENNER & BLOCK LLP
          1099 New York Avenue, NW
          Washington, D.C. 20001
          Tel (202) 639-6024
          Attorney of Record for Amicus Curiae
          National Council of State Housing Agencies

Dated:  March 15, 2013

## CERTIFICATE OF SERVICE

    I hereby certify that on this 15th day of March 2013, the National Council of State Housing Agencies' Supplement Brief was served upon the parties through the Court's electronic filing system.

                                            /s/ Kevin P. Mullen
                                            Kevin P. Mullen