BID PROTEST

No. 12-852, -853, -862, -864, -869C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CMS CONTRACT MANAGEMENT
SERVICES, et al.,

Plaintiffs,

v.

THE UNITED STATES.

Defendant.

GOVERNMENT'S RESPONSE TO REQUEST
FOR SUPPLEMENTAL BRIEIFNG

<table>
<tr><td></td><td>STUART F. DELERY<br>Deputy Principal Assistant Attorney General</td></tr>
<tr><td></td><td>JEANNE E. DAVIDSON<br>Director</td></tr>
<tr><td></td><td>KIRK T. MANHARDT<br>Assistant Director</td></tr>
<tr><td>OF COUNSEL:</td><td>DOUGLAS K. MICKLE<br>Senior Trial Counsel</td></tr>
<tr><td>JOSEPH A. PIXLEY<br>Trial Attorney<br>Civil Division<br>Commercial Litigation Branch<br>United States Department of Justice</td><td>Civil Division<br>Commercial Litigation Branch<br>United States Department of Justice<br>PO Box 480<br>Ben Franklin Station<br>Washington, DC 20044<br>Tel:  (202) 307-0383</td></tr>
<tr><td>DORIE FINNERMAN<br>KATHIE SOROKA<br>Office of General Counsel<br>U.S. Department of Housing and<br>  Urban Development<br>Washington, D.C.</td><td>Fax:  (202) 353-7988<br><br>Attorneys for Defendant</td></tr>
</table>

March 15, 2013

## **TABLE OF CONTENTS**

**PAGE**

Question 1: .................................................................................................................. 1

Government's Response .............................................................................................. 1

Question 2 ................................................................................................................... 3

Government's Response .............................................................................................. 3

Question 3 ................................................................................................................... 8

Government's Response .............................................................................................. 8

Question 4 ................................................................................................................... 9

Government's Response .............................................................................................. 9

CONCLUSION ......................................................................................................... 11

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

Heinzelman v. HHS,
   681 F.3d 1374 (Fed. Cir. 2012) ............................................................................................. 11

## FEDERAL STATUTES AND REGULATIONS

31 U.S.C. § 6303 .................................................................................................................... 8

31 U.S.C. § 6305 ................................................................................................................. 7, 8

42 U.S.C. § 1437 .................................................................................................................... 3

42 U.S.C. § 1437f .................................................................................................................. 6

24 C.F.R. § 402.3 ................................................................................................................... 5

24 C.F.R. § 880.203(c)(6) ...................................................................................................... 3

24 C.F.R. § 880.505(c) ................................................................................................... 3, 4, 5

39 Fed. Reg. 45169, 45174, § 1273.103 ............................................................................... 4

40 Fed. Reg. 18682, 18683, ¶ 15 (Apr. 29, 1975) .............................................................. 5

41 Fed. Reg. 17468, 17477 (Apr. 26, 1976) ........................................................................ 3

44 Fed. Reg. 33804, 33822 (June 12, 1979) ........................................................................ 5

Housing and Urban-Rural Recovery Act of 1983,
   Pub. L. 98-181, §209(b)(1), 97 Stat. 1153, 1183 (1983) ............................................... 1

The Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA),
   Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384 (1997), ......................................... 2

MAHRA,
   Pub. L. 107-116,115 Stat. 2220, 2226 (Jan. 10, 2002) ............................................... 11

MAHRA,
   Pub. L. 110-5, 121 Stat. 8, 53 (Feb. 15, 2007) ......................................................... 11

MAHRA,
   Pub. L. 112-55, 125 Stat. 552, 702 (Nov. 18, 2011) ................................................... 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | | |
|---|---|---|
| CMS CONTRACT MANAGEMENT SERVICES, et al., | ) ) | |
| | ) | Nos.   12-852C |
| Plaintiffs, | ) | 12-853C |
| | ) | 12-862C |
| v. | ) | 12-864C |
| | ) | 12-869C |
| THE UNITED STATES. | ) | |
| | ) | **Judge Wheeler** |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO REQUEST
## FOR SUPPLEMENTAL BRIEFING

Pursuant to the Court's March 5, 2013, Request For Supplemental Briefing (Docket # 83),

defendant, the United States, respectfully submits this response.  The Government responds to the

Court's four questions as follows:

### Question 1:

Were the Court to determine that Section 8(b)(2) of the Housing and Community
Development Act of 1974 (1974 Act), while now expired, continues to be
grandfathered into the Housing Act of 1937 (1937 Act) and to govern HUD's
administration of the project-based rental assistance at issue, does the second
sentence of Section 8(b)(2) give HUD the authority to administer the assistance
through cooperative agreements with PHAs?

### Government's Response:

As an initial matter, HUD reiterates its disagreement with the premise that Section

8(b)(2) was grandfathered into the 1937 Act.[1]  Rather, after the repeal of Section 8(b)(2) in 1983,

---

[1] Section 8(b)(2) remained in effect only "with respect to funds obligated" prior to January 1,
1984.  Housing and Urban-Rural Recovery Act of 1983, Pub. L. 98-181, §209(b)(1), 97 Stat.
1153, 1183 (1983).  Prior to January 1, 1984, no funds were obligated for a project beyond the
term of the original HAP contract.

statutory authority to enter into new rental assistance agreements survived only in Section

8(b)(1) of the 1937 Act. The Multifamily Assisted Housing Reform and Affordability Act of

1997 (MAHRA), Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1384 (1997), 42 U.S.C. § 1437f

note, provided HUD authority to renew Section 8 assistance to projects with expiring project-

based assistance. *See id.*, § 512(12) (definition of "renewal"). The Renewal contracts are "new"

contracts for existing projects, not "extensions" of HAP contracts. Therefore, HUD interprets its

authority under the 1937 Act, as directed by MAHRA, to refer to Sections 2 and 8(b)(1), 42

U.S.C. §§ 1437, 1437f(b)(1), and to provide the authority for HUD to treat the annual

contributions contracts (ACCs) as cooperative agreements.

Nevertheless, were the Court to determine that Section 8(b)(2) has been "grandfathered"

into the 1937 Act, HUD believes that the second sentence of former Section 8(b)(2) provides

HUD with the authority to enter into cooperative agreements with PHAs. The second sentence

of 8(b)(2) allows HUD to enter into annual contributions contracts with PHAs pursuant to which

PHAs shall enter into assistance contract with owners. As noted more fully in response to

Question 4, in implementation of this authority, PHAs have administered Section 8(b)(2) project-

based rental assistance through what all parties agree are cooperative agreements in the form of

annual contribution contracts since the inception of the Section 8 project-based assistance

program. *See, e.g.,* CMS Reply Br. (Docket # 74) at 2 ("traditional ACCs are cooperative

agreements").[2]

---

[2] AHSC argues that PHAs in Private-Owner/PHA projects are funded with "true ACCs" because
they include both HAP funds and an administrative fee, and they have "authority and discretion,"
whereas the ACCs at issue are not "true ACCs" because the PHA is only a conduit for the HAP
funds. AHSC Cross-Motion Br. (Docket #29) at 35. This argument is not supported by citation
to either the "true ACC" or the ACC at issue here as evidence of this alleged distinction. The
Government addressed the alleged distinctions in its Reply Brief (Docket # 47) at 19-23. Simply

HUD's authority fundamentally derives from the mandate of Section 2 of the 1937 Act to assist States and political subdivisions of States in providing decent, safe, and affordable housing to low-income families.  42 U.S.C. § 1437.  This authority is supplemented by Congressional findings, reflected in MAHRA, that the portfolio of Section 8 assisted multifamily housing projects could best be served by reforms that "transfer and share" contract administration functions with capable State, local, and other entities.  MAHRA, § 511(a)(11)(C).  This language cannot reasonably be construed as a mandate that HUD "procure" these services.

### Question 2:

To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract? Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. § 880.505(c)?

### Government's Response:

Protestors' arguments are dependent upon the mistaken claim that HUD must act in perpetuity under the authority of former Section 8(b)(2).

The language of former Section 8(b)(2) is not ambiguous.  It does not mandate that either HUD or a PHA enter into a HAP contract, and it does not mandate that either HUD or a PHA administer the HAP contract.  In fact, the determination of which "Governmental entity" served as contract administrator – either HUD or a PHA – was originally determined by the project owner.  24 C.F.R. § 880.203(c)(6), 41 Fed. Reg. 17468, 17477 (Apr. 26, 1976) (A "Notification of Funding Availability" would solicit proposals from either "private Owners or PHA-Owners

---

put, an ACC is an ACC.  One is not a cooperative agreement and another a procurement contract, as protestors would have it.  All are cooperative agreements.

3

for direct contracting with HUD or by PHAs on behalf of Owners with whom the PHA proposes to contract pursuant to an Annual Contributions Contract with HUD"). The language used in Section 8(b)(2) is permissive ("is authorized" and "may also") and not mandatory (for example, "shall" or "must"). As such, former Section 8(b)(2) did not obligate HUD to enter into HAP contracts, and nothing in the text of former Section 8(b)(2) states or even suggests that HUD was ever obligated to remain as the contract administrator into perpetuity,

Furthermore, the governing regulation, at 24 C.F.R. § 880.505(c), permits transfer of the administration of Section 8 project-based HAP contracts to a PHA. Subsection 880.505(c) is clear: "Any project may be converted" from one arrangement where HUD is the contract administrator to one where a PHA is the contract administrator. By executing the Renewal Contracts at issue in the NOFA, the owner, the PHA, and HUD expressly agree that the PHA will act as contract administrator. AR 2268, 2270, 2271, 2278. Thus, the governing regulation and the HAP Renewal Contract itself show that HUD can, and does, transfer responsibility of HAP contract administration to PHAs.

There has never been any challenge to the legality of this regulation or an assertion that is inconsistent with the 1937 Act, and it has been operative since the program was enacted in 1974. *See Part 1273-Section 8 HAP Program-New Construction*, 39 Fed. Reg. 45169, 45174, § 1273.103(x) and (y) ("Conversion of private-owner project to private-owner/PHA project" and "Conversion of private-owner/PHA project to private-owner project," respectively) (Dec. 30, 1974). Although the meaning of "conversion" in the regulation is not ambiguous, HUD, in a different context (addressing the prohibition on PHAs to be both contract administrator and responsible for maintenance and management of the project), expressly defined this term: "The regulations pursuant to 880.124(b) permit the conversion of a Private-Owner/PHA Project to a

4

Private-Owner Project (*i.e.*, the transfer of the responsibility of administering the Contract from the PHA to HUD*.)*" *Part 880-Section 8 HAP Program-New Construction*, 40 Fed. Reg. 18682, 18683, ¶ 15 (Apr. 29, 1975) (among other things, renumbering all parts).[3]

Given the applicability of section 880.505(c), the Court may still ask whether HUD is authorized to transfer the responsibility of administering the HAP contract to a PHA via a cooperative agreement or whether it must use a procurement contract.[4]  While HUD relies upon all of its arguments made previously in this proceeding, focusing only upon the statute in its entirety and the statutory history (as the Court has requested) provides no evidence of a Congressional intent to treat the administration of project-based HAP contracts originally authorized under the first sentence of former Section 8(b)(2) differently from all other HAP contracts.

Because HUD is not, and never has been, obligated to act as the contract administrator for the projects at issue, contract administration services are not, and cannot reasonably be

---

[3]  Subsection (c) of section 880.505 also rebuts the claim of protestors that section 880.505(a) obligates HUD to remain as contract administrator, presumably either in perpetuity or until HUD repeals subsection (a). *See, e.g.,* AHSC Reply Br. (Docket # 77) at 13-15; NHC Reply Br. (Docket # 78) at 6-7; JeffCo Reply Br. (Docket # 79) at 14-16.  Protestors also wrongly argue that 880.505(a) controls, as this argument ignores the express terms of the Renewal Contract that are to the contrary and 24 C.F.R. § 402.3, which permits contract terms to take precedence over regulations and requirements. *See, e.g.,* NHC Reply Br. (Docket # 70) at 15-16.  AHSC argues that section 402.3 only permits the contract to trump subsequently enacted regulations and requirements, AHSC Reply Br. (Docket #77) at 14, but there is no language in section 402.3 that supports this timing restriction.

[4]  In their supplemental briefs protestors may seize on the requirement for a conversion that "contract authority [be] available to cover the PHA fee." 24 C.F.R. § 880.505(c)(3).  However, one cannot conclude that reference to "contract authority" means a procurement contract.  This language was added to the regulation in 1979, several decades before anyone suggested that an annual contribution contract under the 1937 Act was a procurement contract. *See* 44 Fed. Reg. 33804, 33822 (June 12, 1979).

construed as being, for HUD's benefit. It is also undisputed that, pursuant to the second sentence of former Section 8(b)(2), HUD is authorized to administer assistance through cooperative agreements/ACCs with PHAs. The primary purpose of the ACC is to help the PHAs provide a public service in a manner that treats all project owners and all eligible families in a fair and consistent manner. A cooperative agreement is the appropriate instrument to implement the second sentence of Section 8(b)(2).

Consideration of MAHRA further demonstrates that protestors' arguments for perpetual effect of former Section 8(b)(2) are wrong. AHSC has argued that section 524 of MAHRA "obligate[s] HUD to retain ultimate control over the HAP contracts here."[5] AHSC Reply Br. (Docket # 77) at 10, n. 11. Jefferson County alleges that "the plain language of MAHRA unequivocally" obligates HUD "to extend HAP contracts with owners who request it." JeffCo Reply Br. (Docket # 79) at 5; *see also* CMS Reply Br. (Docket # 74) at 7-9 (under MAHRA, HUD is obligated "to renew expiring contracts").

The precise language in section 524 shows why the protestors' arguments are strained and HUD's interpretation of how MARHA fits in with the rest of the 1937 Act is reasonable and due deference. Section 524(a)(1) of MAHRA, provides:

> the Secretary shall, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts, use amounts available for the renewal of assistance under section 8 of such Act [this section] [*i.e.,* 42 U.S.C. § 1437f] to provide such assistance for the project. The assistance shall be provided under a contract having such terms and conditions as the Secretary considers appropriate, subject to the requirements of this section.

---

[5] This sweeping assertion also seems at odds with its earlier assertion that "[t]he operative language of MAHRA does nothing more than authorize the Secretary to renew expiring contracts." AHSC Reply Br. (Docket # 77) at 9.

Thus, the plain language of Section 524 only obligates HUD to "use amounts available for the renewal of assistance," which "assistance shall be provided under a contract having such terms and conditions as the Secretary considers appropriate."[6] HUD satisfies this mandate by obligating funds to be paid pursuant to the terms and conditions of a Renewal Contract under Section 8, to which a PHA may be a party.[7] Nothing in this language requires HUD to enter into Renewal Contracts or administer Renewal Contracts.

In fact, AHSC describes HUD's obligations: (1) to "set the renewal terms and conditions it believes are appropriate," (2) to "determine when renewal is prohibited," (3) to "set renewal rents in various ways," and (4) to "annually adjust the rents" using a factor established by the Secretary. AHSC Reply Br. (Docket # 77) at 10; *see also* CMS Reply Br. (Docket # 74) at 9. More noteworthy is what AHSC omits from its list of HUD's obligations under the statute – that HUD has any obligation to enter into or administer HAP contracts, let alone to do so in perpetuity. At bottom, the "obligations" AHSC lists reflect nothing more than Congress's intent for HUD to have substantial involvement in the administration of the program, the type of involvement that Congress mandates an agency undertake when the agency utilizes a cooperative agreement. 31 U.S.C. § 6305(2).

---

[6] Relying upon the definitions of "expiring contract" and "renewal," it is also clear that HUD is not "extending" HAP contracts, as Jefferson County contends. The HAP Contract "expires" "under the terms of the contract," and it is "replaced" with a "new" contract. *See* MAHRA, § 512; *see also* Gov't Reply Br. (Docket # 47) at 9-11.

[7] HUD complied with its Congressional mandate to "set the renewal terms and conditions it believes are appropriate." Those terms and conditions are set forth in Renewal Contracts, the form of which is prescribed by HUD, to which the PHAs, including the protestors, are parties, and the Renewal Contracts authorize PHAs to act as contract administrators. AR 2264-77.

**Question 3:**

If HUD is required to provide the renewal assistance at issue through HAP contracts with project owners, such that any contracts it enters into with other entities for the provision of contract administration services related to the HAP contracts are procurement contracts subject to the Competition in Contract Act ("CICA"), may HUD legally limit competition for these contracts to PHAs? If so, what is the specific legal basis for such a limitation?

**Government's Response:**

HUD does not see a way to reconcile the 1937 Act with the requirements of the Competition in Contract Act (CICA). The considerations HUD set forth in the November 19, 2011 memorandum from the Federal Housing Commissioner to the HUD Secretary (AR 1), and the October 19, 2011 letter from HUD to the Government Accountability Office (GAO) (AR 6), forcefully demonstrate that fact. If the Court concludes that the ACCs at issue are procurement contracts and that HUD cannot use cooperative agreements as a funding vehicle, then presumably the Court will have found that the principal purpose of the ACC was to acquire services for the direct benefit of HUD. *See* 31 U.S.C. § 6303. The Court also would have made the corollary finding that the principal purpose of the ACC was not to assist PHAs to address the shortage of housing affordable to low-income families. *See* 31 U.S.C. § 6305. These conclusions are at odds with HUD's interpretation of the 1937 Act, and HUD does not see how the 1937 Act's references to PHAs are relevant in light of these findings.

Further, limiting the competition to PHAs would likely mean that HUD would have to administer 53 procurement contracts - one for each jurisdiction. If these 53 procurement contracts are not intended to be in accord with a statutory mandate to assist PHAs but are rather intended to be for HUD's benefit, a limitation on competition to PHAs does not seem to be in HUD's best interest, and it is certainly inconsistent with the mandates of CICA. Because there is no language in the 1937 Act that would either obligate or allow HUD to limit competition to

8

PHAs if the Court finds that ACCs are procured for HUD's direct benefit, such findings by the

Court would seem to suggest that the 1937 Act does not apply to the ACCs at issue and CICA

would require full-and-open competition.

### Question 4:

> All parties appear to agree that prior to the expiration of HUD's "(b)(2)"
> authority, HUD entered into various ACCs with PHAs pursuant to the second
> sentence of that subsection. On page 8 (footnote 7) of its opening brief, Plaintiff
> AHSC *et al.* states that the contracts associated with these projects are not at issue
> in the instant matter, because "the HAP contract administration would not be
> HUD's to contract out." However, the 1999 RFP expressly noted that
> approximately 4,200 HAP contracts for project-based Section 8 housing were at
> that time being administered by various PHAs, but that "[w]hen HUD renews
> the[se] expired project-based HAP contracts ... HUD generally expects to transfer
> contract administration of the renewed HAP Contracts to the Contract
> Administrator (CA) it selects through this RFP for the service area where the
> property is located." AR 428. The Court therefore requests HUD, in particular,
> to clarify the current status of these rental assistance contracts, and whether or not
> they are in the portfolio of contracts covered by the 2012 NOFA.

### Government's Response

Of the 4,200 HAP contracts administered by PHAs as of May 1999, 2,676 HAP contracts

have been transferred to and are administered by PBCAs,[8] including the protestors, pursuant to

ACCs awarded over a decade ago. All HAP contracts that are currently being administered by

PBCAs pursuant to that ACC constitute the current portfolio addressed by the 2012 NOFA.

1,524 HAP contracts remain with the original PHA contract administrators pending transfer upon

either the expiration of that PHA's ACC or HAP contract renewal under MAHRA.[9]

---

[8] Protestors have used the terms "performance-based contract administrator" or a "PBCA" and
"traditional contract administrators" or a "TCA." PBCAs and TCAs are PHAs. The only
distinction is that a PHA selected under the NOFA at issue is a PBCA while the PHAs who
administered the 4,200 HAP contracts are referred to as TCAs.

[9] Of the 1,524 HAP contracts not transferred into the NOFA portfolio as of January 2013, 1,101
are original HAP contracts, and 423 are Renewal Contracts.

Further, of the approximately 20,000 HAP contracts that HUD was administering in 1999, only 402 HAP contracts were being administered by HUD as of January 2013. The remainder have been transferred to and are administered by PBCAs. It has been HUD's intention since 1999 that the Section 8 project-based portfolio administered by performance-based contract administrators (PBCAs) include the entirety of the Section 8 project-based rental assistance inventory with as few exceptions as possible.[10]

These transfers of responsibility for administration of HAP contracts demonstrate that there is nothing in the 1937 Act or MAHRA that compels any entity (either HUD or a PHA) that is acting as the contract administrator to do so in perpetuity. Protestors have conceded that it is permissible for a PHA to administer project-based Section 8 rental assistance pursuant to a cooperative agreement with HUD *(i.e.,* the ACC) but only for projects in which HUD never acted as the contract administrator. Yet protestors argue that, if HUD acted as the initial contract administrator, a PHA can subsequently become a contract administrator only via an ACC awarded pursuant to a CICA process and compliant with the Federal Acquisition Regulation (FAR). When one considers the 4,200 HAP contracts administered by PHAs, protestors' argument is not only unsupported by any statutory mandate, but it also makes no sense. In their view, the PHAs administer these HAPs in accordance with undisputed cooperative agreements (ACCs), but once the ACC expires or the HAP contract is renewed under MAHRA, and the HAP contract is transferred to a different PHA, the new PHA must administer the contract in accordance with a CICA and FAR-compliant procurement contract.

---

[10]  These exceptions are generally when HUD determines that the PBCA has a conflict of interest (for example, a board member is affiliated with the management company for the project).

10

The protestors' position is not reasonable because it treats two similarly situated PHAs completely differently. If the primary purpose of a traditional ACC between HUD and a PHA is to assist the PHA in performing a public service, a proposition that has never been disputed, then there is no rational basis to conclude that the same primary purpose is not being served by the NOFA at issue. No language in the statute supports such a distinction, and the roles the contract administrators play in either case are the same.

Furthermore, protestors' argument would require HUD's oversight of the Section 8 project-based rental assistance program to be provided, in part, through a cooperative agreement, and in another part, through a procurement contract. There is no support for this result in the governing statute, and it is inconsistent with the purpose of promoting operating efficiencies intended by MAHRA. MAHRA § 511(b)(2) ("to reform the design and operation of Federal rental housing assistance programs, administered by the Secretary, to promote greater multifamily housing project operating and cost efficiencies").[11]

## CONCLUSION

There is nothing in the 1937 Act, former Section 8(b)(2), MAHRA, or their implementing regulations that requires HUD to enter into HAP contracts with project owners. More

---

[11] It is well-established that a statute should be construed to give meaning to all its parts. *Heinzelman v. HHS*, 681 F.3d. 1374, 1377 (Fed. Cir. 2012). Contrary to this principle, AHSC contends that one must ignore the "preliminary matter" in MAHRA and examine "only" section 524. AHSC Reply Br. (Docket # 77) at 8. In support of this odd proposition, AHSC avers that all of MAHRA, except section 524, will be repealed effective October 1, 2015. *Id.* Notwithstanding the impropriety of relying upon a speculative, future event, AHSC should have at least acknowledged that MAHRA's sunset provision was included in the original enactment, with a sunset date of October 1, 2001, and that the sunset date has been extended three times. MAHRA, 105 Pub. L. 65, 111 Stat. 1344, 1423, § 579(a) (Oct. 27, 1997); Pub. L. 107-116, 115 Stat. 2220, 2226 (Jan. 10, 2002) (changing date of repeal to Oct. 1, 2006); Pub. L. 110-5, 121 Stat. 8, 53 (Feb. 15, 2007) (changing date of repeal to October 1, 2011); Pub. L. 112-55, 125 Stat. 552, 702 (Nov. 18, 2011) (date of repeal changed to October 1, 2015).

11

specifically, former Section 8(b)(2) authorized both HUD and PHAs to enter into HAP contracts. If HUD is not obligated to enter into HAP contracts, then surely it is not obligated to remain as a contract administrator into perpetuity. Further, since the inception of the Section 8 program, regulations have permitted the transfer of HAP contracts from HUD to a PHA administrator. Where HUD has not acted as the contract administrator in the past, HUD's authority to use cooperative agreements so that PHAs may administer the project-based rental assistance provided through HAP contracts has not been questioned. In1999, there were approximately 4,200 such HAP contracts administered by PHAs under ACCs with HUD. A substantial number of these contracts or their renewals are included in the NOFA at issue. Contrary to the protestors' arguments, there is no statutory or regulatory basis to treat the remainder of the project-based HAP contracts differently and to require a procurement contract merely because HUD was the initial contract administrator. Further, if the protestors' claims are granted, no legal basis to limit competition to PHAs is apparent.

For the reasons stated above, and in our previously filed papers, the United States respectfully requests that the Court deny the protests and dismiss the protestors' complaints.

Respectfully Submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director

12

OF COUNSEL:

JOSEPH A. PIXLEY
Trial Attorney
Civil Division
Commercial Litigation Branch
Commercial Litigation Branch
United States Department of Justice

DORIE FINNERMAN
Assistant General Counsel for Assisted
  Housing and Civil Rights
Office of General Counsel
U.S. Department of Housing and
  Urban Development
Washington, D.C.

KATHIE SOROKA
Special Assistant to the General Counsel
Office of General Counsel
U.S. Department of Housing and
  Urban Development
Washington, D.C.

 s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Senior Trial Counsel
Civil Division
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0383
Fax: (202) 353-7988

Attorneys for Defendant

March 15, 2013

## CERTIFICATE OF FILING

I hereby certify that on March 15, 2013, a copy of the foregoing "GOVERNMENT'S

RESPONSE TO REQUEST FOR SUPPLEMENTAL BRIEIFNG" was filed electronically.  I

understand that notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


<u>s/ Douglas K. Mickle</u>
Douglas K. Mickle

14