## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

| | |
|---|---|
| **CMS CONTRACT MANAGEMENT, et al.** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Nos. 12-852, 853, 862, 864, 869** |
| ) | **Judge Thomas C. Wheeler** |
| **THE UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## PLAINTIFF THE JEFFERSON COUNTY ASSISTED HOUSING CORPORATION'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S REQUEST FOR SUPPLEMENTAL BRIEFING

Robert K. Tompkins
**PATTON BOGGS, LLP**
2550 M Street, NW
Washington, D.C.  20037
Telephone:  (202) 457-6000
Facsimile:  (202) 457-6315
*Counsel for Plaintiff The Jefferson County Assisted Housing Corporation*

Of Counsel:
Elizabeth M. Gill
Trevor Tullius
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037

## <u>TABLE OF CONTENTS</u>

ARGUMENT.................................................................................................................. 1

QUESTION 1............................................................................................................... 2

QUESTION 2............................................................................................................... 4

QUESTION 3............................................................................................................... 6

QUESTION 4............................................................................................................... 8

## TABLE OF AUTHORITIES

**Cases**

ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392 (2005) ...................................................... 7

Savantage Fin. Servs. v. United States, 86 Fed. Cl. 700 (Fed. Cl. 2009) ...................................... 7

Witt & Assoc. v. United States, 62 Fed. Cl. 657 (2004) ................................................................ 7

**Statutes**

Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6305. ............................................. 4

Multifamily Assisted Housing Reform and Affordability Act of 1997,
Pub. L. No. 105-65, Title V, § 524, 111 Stat. 1344 (1997)
(codified at 42 U.S.C. § 1437f note)("MAHRA") ............................................................. 4, 5, 10

The Competition in Contracting Act, 41 U.S.C. § 3301 ............................................................. 6, 7

**Other Authorities**

24 C.F.R. 880.201 .......................................................................................................................... 2

24 C.F.R. 880.505 ................................................................................................................... *passim*

48 C.F.R. § 11.002(a)(1)(i) ............................................................................................................ 7

**ARGUMENT**

In accordance with the Court's March 5, 2013 Order, Plaintiff, The Jefferson County

Assisted Housing Corporation ("JeffCo"), submits this Post-Hearing Supplemental Brief.

As a preliminary matter, we note the HAP contracts covered under the PBCA program are

almost all now in the "Renewal" phase.  As discussed extensively the Protesters' briefs, the authority

for these Renewals stems from the Multifamily Assisted Housing Reform and Affordability Act of

1997 ("MAHRA").  MAHRA does not purport to change the underlying statutory authority

pursuant to which the HAP contracts were awarded and it does not purport to change the character

of the HAP contracts themselves.  It simply clarifies the U.S. Department of Housing and Urban

Development's ("HUD") authority to renew the existing housing assistance payment ("HAP")

contracts.  Consistent with this, HUD has relied explicitly on MAHRA as the Renewal authority.

This is memorialized in its contemporaneous documentation related to the Renewal process.  *See e.g.*

AR 2013-AR 2022.  Other than in this litigation, HUD has never suggested that MAHRA or the

Renewal process resulted in a conversion of the underlying assistance contracts.

> **Question 1**:  **Were the Court to determine that Section 8(b)(2) of the Housing
> and Community Development Act of 1974 ("1974 Act"), while now expired,
> continues to be grandfathered into the Housing Act of 1937 and to govern
> HUD's administration of the project-based rental assistance at issue, does the
> second sentence of Section 8(b)(2) give HUD the authority to administer the
> assistance through cooperative agreements with PHAs?**
>
> **Answer**: *The second sentence of Section (b)(2) permitted HUD to use ACCs
> with PHAs to provide and administer assistance to Owners and likely
> permitted the use of an assistance agreement, however HUD has not used the
> approach called for in the second sentence of Section (b)(2) in the PBCA
> contracting initiative at issue here.*

As the Court's questions note, Section (b)(2) of 42 U.S.C. 1437f, as it existed prior to 1983,

contains two distinct sentences representing two distinct approaches to New Construction and

Substantial Rehabilitation project based rental assistance ("PBRA").  The first sentence provides for

HUD to contract directly with and make direct payments to Owners (either private owners or PHA owners) and for HUD to administer the assistance. The vast majority of PBRA projects have been awarded under this authority as evidenced by the 1999 RFP which notes that HUD had entered and administered more than 20,000 such HAP contracts with Owners. AR 428.

The second sentence of Section (b)(2) provided HUD an alternative approach – to enter into annual contribution contracts ("ACCs") with PHAs pursuant to which such entities may enter into HAP contracts with owners. While precise statistics are not in the record, it appears that approximately 4,200 projects were administered through this secondary approach, as evidenced through the 1999 RFP. AR 428.

The two alternatives provide for fundamentally different approaches to the administration of the PBRA program. In the "First Sentence" scenario, which represents the vast majority of cases, HUD entered the HAP contracts directly with the Owner, HUD made the assistance payments directly to the Owner, and – until 1999 -- HUD administered the HAP contracts with HUD's own employees. HUD's regulations defined projects under this approach as being "Private-Owner/HUD Projects." 24 C.F.R. 880.201.

In the "Second Sentence" scenario, which HUD used in a relatively limited number of cases, HUD relied on PHAs to prepare and submit proposals to HUD, typically with a project owner, although in some cases the PHA itself owned the project. If HUD accepted the project it would enter an ACC with the PHA and the PHA would then directly enter a HAP contract with the Owner. The ACC between HUD and the PHA would bundle together both the HAP funding and the Administrative Fee for the PHA. HUD's regulations defined projects under this approach as being "Private-Owner/PHA Projects." 24 C.F.R. 880.201. These arrangements also fall under the heading of a Traditional ACC contract with the PHA serving as a "Traditional Contract Administrator" ("TCA"), as discussed in our prior briefing, and are fundamentally distinct from the

PBCA contracts at issue in this case.  *See e.g.* JeffCo Cross-Motion for Judgment and Response to Defendant's Motion to Dismiss at pp. 16-19.

The distinctions between the two approaches go beyond the mere definitions set out in the regulations governing New Construction (24 C.F.R. Part 880) and Substantial Rehabilitation (24 C.F.R. Part 881).  In particular 880.505(a) provides that for the "First Sentence" projects, or "Private-Owner/HUD Projects," HUD is primarily responsible for contract administration, and that for "Second Sentence" projects or "Private-Owner/PHA Projects," the PHA is generally responsible for contract administration.

Again, the First Sentence of Section (b)(2) vests the contract administration authority solely in HUD; there is no mention of PHAs or any language to suggest authority for an assistance agreement.  That said, HUD does have the inherent authority to contract out to a service provider to meet its obligations.  However, there is no authority provided in the First Sentence to use an assistance relationship in Private-Owner/HUD Projects.[1]  Second Sentence projects, or Private-Owner/PHA Projects, proceed very differently, and HUD uses a Traditional Contract Administrator with the PHA, which then provides the assistance to the Owner.

We believe it is beyond dispute that the PBCA contracts are not "Second Sentence" or "Private-Owner/PHA Projects" and that the PBCA contract is distinct from the Traditional ACC contract.  While the status of the Traditional ACC contract arising arise under the Second Sentence is not directly before this court, we believe the Traditional ACC construct and the language of the Second Sentence could be construed as creating authority to use an assistance instrument.

Given the limited involvement of HUD in providing and administering the assistance in a Private-Owner/PHA Project we believe there is likely not sufficient substantial involvement by

---

[1] A discussed in our briefs, HUD has the inherent authority to contract out for services using a procurement contract.  *See* JeffCo Cross-Motion for Judgment and Response to Defendant's Motion to Dismiss at p. 2.

HUD to qualify the arrangements as a cooperative agreement under the Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6305.  That said, the question of whether there is "substantial involvement" is only addressed after one determines: A) that there is authority to use an assistance arrangement; and B) that the principal purpose of the instrument is to transfer a thing of value and not for the agency to acquire services for its own benefit or use.  31 U.S.C. §§6303-6305.  The Court's question relates to the first issue: whether the Second Sentence of 1437f(b)(2) provided HUD with statutory authority to use an assistance agreement when it used the Private-Owner/PHA approach.  JeffCo's answer is: it likely does.

> **Question 2**: To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract? Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. § 880.505(c)?
>
> **Answer**:  *No conversion is taking place here and it is unclear whether HUD could enter into a new cooperative agreement under the Second Sentence of (b)(2) through a conversion or otherwise.*

As made clear by the terms of the Second Sentence, and as discussed at length in Protesters' prior briefs, the terms of the Traditional ACC contracts and underlying HAP contracts are fundamentally distinct from the PBCA HAP contracts and the PBCA contracts themselves, which are the instruments at issue in this case.  *See e.g.* AR 1929.  While HUD most often proceeded under the First Sentence of (b)(2) – the Private-Owner/HUD approach – HUD adopted regulations which suggests that, at least in theory, it had the authority to convert a project from one project type to another, namely 24 C.F.R. 880-505(c).   However, once HUD settled on an approach for administering the Project – either under the First Sentence or the Second Sentence – making a switch would not be easy and it would not be a mere formality.  The two approaches, both as set forth in the statutory language and in the regulations HUD prescribed, are fundamentally different

and established far different roles and responsibilities for the parties.  HUD used a substantially different set of legal agreements for Private-Owner/HUD Projects than it did for Private-Owner/PHA Projects.  The funding for the agreements, including among other things the PHA's administrative fee, were substantially different, and the relationship with the owner was substantially different for HUD and the PHA.

Therefore, not surprisingly, all three parties had to agree to the change for a conversion to take place.  24 C.F.R. 880.505(c).  In addition, funding had to be available to cover the associated administrative fees.  *Id.*  Finally, HUD had to make a determination that a conversion was in the best interest of the project.  *Id.*  Put another way, a conversion would not simply be a change in nomenclature; it would be a fundamental change in the relationships and the way assistance was provided and administered.  The fact that HUD promulgated regulations containing a specific process for conversion points up the fact the two approaches are fundamentally different.

We note that Section 505(c) is not specifically called for in the language of 42 U.S.C. 1437f (b)(2).  It does not appear to have been used often.  In fact there's no evidence in the record showing it was used at all.  It is not discussed in any of the HUD guidance particularly that related to the Renewal of HAP Contracts.  *See e.g.,* AR2009 – AR2022.  While the language of Section 505(c) remains a part of 24 C.F.R. Part 880 as it stands today, the substance of Section 505(c) has not been amended since 1979.  When Section 505(c) was promulgated and last amended, Section (b)(2) had not yet been repealed.  There is no question that, at that time (i.e., 1979), HUD had the express authority to bring on new New Construction and Substantial Rehabilitation projects, and had a clear choice under an existing statutory provision as to whether to administer a contract itself or enter into an ACC with a PHA to provide and administer the assistance.  Now, with the repeal of section (b)(2), the two alternatives it provided are not necessarily on equal footing.

It is questionable whether HUD now has the authority to enter a <u>new</u> cooperative agreement using the Second Sentence of Section (b)(2) as the authority to do so.   However, HUD does have the inherent authority to enter into procurement contracts for services to perform those functions it would otherwise be required to perform itself.  To this end, Plaintiffs' arguments are not dependent on HUD being explicitly required to continue to act pursuant to the First Sentence of (b)(2). However, in effect HUD likely is required to do so because it appears the authority to enter <u>new</u> cooperative agreements no longer exists.  This implicitly limits HUD to a single choice: continuing to treat the HAP contracts as Private-Owner/HUD contracts, which is exactly what it has done.

In any event, HUD has never purported to "convert" projects in the PBCA program and certainly has not gone in the direction of turning Private-Owner/HUD Projects into Private-Owner/PHA contracts, at least not in the context of the PBCA program.  The current NOFA and PBCA contract attached to it merely continue the Private-Owner/HUD approach.

> **Question 3**: **If HUD is required to provide the renewal assistance at issue through HAP contracts with project owners, such that any contracts it enters into with other entities for the provision of contract administration services related to the HAP contracts are procurement contracts subject to the Competition in Contract Act ("CICA"), may HUD legally limit competition for these contracts to PHAs?  If so, what is the specific legal basis for such a limitation?**

> **Answer**:  *Yes.  Under CICA, HUD may legally limit competition for the contract administration services to PHAs.*

The record demonstrates that the principal purpose of the PBCA contracts is for HUD to acquire the services of a PHA for the direct benefit or use of the Government and, therefore, the contracts are procurement contracts to which the Competition in Contracting Act ("CICA") is applicable.[2]  The purpose of CICA is to promote and obtain full and open competition in federal procurements.  *See generally* 41 U.S.C. § 3301 et seq.  CICA and its implementing regulations require

---

[2] HUD admits that in preparing the NOFA, it did not consider the requirements of CICA or the Federal Acquisition Regulation.

that contracting officers "use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement."  41 U.S.C. § 3301(a)(2); *see also* 48 C.F.R. § 6.101(b).  CICA is not inflexible and does permit a federal agency to limit competition in certain specified situations.  *See generally* 41 U.S.C. §§ 3303, 3304.  An agency may exclude particular sources, exclude contractors based on size, and use noncompetitive procedures when appropriate. *Id.*  However, regulation and precedent only permit such limitations on competition "to the extent necessary to satisfy the needs of the agency or as authorized by law."  48 C.F.R. § 11.002(a)(1)(i); *Savantage Fin. Servs. v. United States,* 86 Fed. Cl. 700, 704 (Fed. Cl. 2009), *aff'd,* 595 F.3d 1282 (Fed. Cir. 2010).

The determination of an agency's needs is a matter of broad discretion of the agency. *See Witt & Assoc. v. United States*, 62 Fed. Cl. 657, 662 (2004).  If HUD requires a certain type of entity to serve as contract administrators, it has the discretion to make this determination even if it would have the effect of limiting competition.  In *ABF Freight Sys.*, the court noted that even where the structuring of the solicitation into bundled regional areas may have the effect of eliminating some bidders who are not large enough to perform regional contracts, such a structure was not shown to be in violation of law or lacking a rational basis.  *See ABF Freight Sys., Inc. v. United States*, 55 Fed. Cl. 392, 409 (2005).  The court noted that "the law is well-settled that the determination of the agency's procurement needs and the best method for accommodating them are matters primarily with the agency's discretion".  *Id.*

A solicitation for contract administration services must have a rational relationship with HUD's minimum needs, must not be unduly restrictive and should be written in a non-restrictive manner as possible in order to enhance competition and invite innovation.  *ABF Freight Sys., Inc.* at 395.  The administrative record and the history of HUD's procurement of contract administration services via the PBCA contracts provide HUD with the requisite rationale to limit the competition

to PHAs.  The PHAs provide specific experience and expertise for the contract administration services and HUD has acknowledged this fact.  *See* AR 490 ("Current and potential applicants have experienced personnel and readily available resources to perform the service.")  Moreover, the procurements for the PBCA contracts in 1999 and 2011 demonstrate that even when limited to PHAs, there is sufficient competition.  In the 53 jurisdictions included in the 2011 process, 42 had at least two bidders competing for the contract.  AR 220.  Limiting the competition to PHAs is not unduly restrictive, satisfies HUD's minimum needs for knowledgeable and specialized administrators for the PBCA contracts and still enhances competition as PHAs can submit offers in multiple jurisdictions.  A solicitation that limits offerors to one type of competitor is not per se improper.  CICA permits and precedent supports that if there is a rational basis for HUD to limit competition for PBCA contracts to PHAs, then such a limitation will withstand scrutiny.

**Question 4:** **All parties appear to agree that prior to the expiration of HUD's "(b)(2)" authority, HUD entered into various ACCs with PHAs pursuant to the second sentence of that subsection. On page 8 (footnote 7) of its opening brief, Plaintiffs AHSC et al. states that the contracts associated with these projects are not at issue in the instant matter, because "the HAP contract administration would not be HUD's to contract out." However, the 1999 RFP expressly noted that approximately 4,200 HAP contracts for project-based Section 8 housing were at that time being administered by various PHAs, but that "[w]hen HUD renews the[se] expired project-based HAP contracts … HUD generally expects to transfer contract administration of the renewed HAP Contracts to the Contract Administrator (CA) it selects through this RFP for the service area where the property is located." AR 428.**

**The Court therefore requests HUD, in particular, to clarify the current status of these rental assistance contracts, and whether or not they are in the portfolio of contracts covered by the 2012 NOFA.**

**Answer:** ***HUD's treatment of the 4,200 Private-Owner/PHA contracts identified in the 1999 RFP is consistent with the fact that HUD has primary responsibility for the PBRA projects.***

As the Court notes, HUD's 1999 RFP announced that, upon HUD's renewal of the 4,200 Private-Owner/PHA Projects it expected to "transfer" contract administration for those projects to the PBCA contractor, making them in effect Private-Owner/HUD Projects.  AR 428.  That process

is still on-going, as evidenced by HUD's own statistics.  S*ee e.g.*,  Defendant's Reply Brief, p. 7, fn 5.

However, there is no suggestion in the 1999 RFP, in MAHRA or in the HUD documentation

regarding HUD's Renewal of projects that HUD's assignment of these projects to the PBCA

portfolio was being carried out pursuant to a Section 505(c) conversion.  Consistent with the

concept that the PBRA program is HUD's program, it appears that HUD has simply brought and

continues to bring all PBRA projects into the realm of HUD administered assistance, consistent

with HUD's typical approach to the PBRA program.

As a practical matter, there is nothing in the administrative record to suggest that HUD has

utilized 13 C.F.R. §880.505(c) conversions in the PBCA program.  The 20,000+ HAP contracts

covered by the PBCA program were Private-Owner/HUD Projects.  AR 428 ("HUD administers

the … 20,000 [contracts]").  HUD's maintaining primary responsibility for these HAP contracts, and

the limited role HUD prescribed for PBCAs, are consistent with the Private-Owner/HUD

approach, which has clearly been maintained throughout the PBCA program.  The projects under

the PBCA program are and remain Private-Owner/HUD, or First Sentence, projects.  With respect

to the 4,200 Private-Owner/PHA Projects there is no evidence that they were brought into the

PBCA program by means of a Section 505(c) conversion.  While HUD has devoted a substantial

amount of guidance to the "Renewal" Process, there is absolutely no mention of Section 505(c)

conversion in that guidance.[3]  Rather as previously discussed, HUD's Renewal authority is

predicated on MAHRA, which again places the HAP renewal obligation solely on HUD and does

not mention any role for PHAs.  MAHRA certainly does not provide authority for HUD to use an

assistance relationship.

---

[3] The Renewal Guide does address a different type of conversion: converting assistance to tenant or voucher based assistance to ensure tenant's are not cut off when a project ceases to be a part of the PBRA program. This type of conversion is not contemplated by 505(c), which discusses conversions from one PBRA approach to another.

This demonstrates at least two things.  First, HUD believed that MAHRA gave it independent renewal authority.  Second, HUD has always viewed the PBRA program as being HUD's and that HUD has always had the authority to enter into and renew HAP contracts directly with Owners.  As noted above, HUD's ability to contract out for the contract administration services is not dependent on any express statutory authorization, but instead arises from HUD's inherent authority to acquire services through a procurement contract.

To the extent Section 505(c) is still extant, using it would require HUD to demonstrate that the prerequisites set forth in the regulation had been met.  It would also require changing a PBRA project from Private-Owner/HUD Project to a Private-Owner/PHA Project, and entering into a new set of agreements that would fundamentally change the roles of the Parties.  At the time Section 505(c) was drafted HUD still had the authority to enter new projects.  However, it doesn't appear that any Section 505(c) conversions have ever taken place in the context of the PBCA program and nothing in the administrative record suggests that the Renewal of the HAP contracts constitutes a conversion under that regulation.  As noted above, it appears unlikely that HUD has the authority to enter into new cooperative agreements.  However, this is merely a theoretical point since HUD has never attempted to do so and certainly is not attempting to do so through the NOFA and PBCA contracts at issue in this protest.

In summary, the HAP contracts covered by the PBCA program remain Private-Owner/HUD Projects issued consistent with the authority in the First Sentence of 1437f(b)(2). That provision places the responsibility to enter and administer the project-based assistance directly on HUD and does not provide authority for the use of an assistance instrument, such as a cooperative agreement.  HUD's application of MAHRA as the renewal authority did not change the nature of the underlying HAP contracts.  Consistent with both MAHRA and the First Sentence of Section (b)(2) HUD retains primary responsibility for the PBRA program and is simply contracting

out for administrative services to support its ability to do so, which it has the inherent authority to

do using a procurement contract.


March 15, 2013                                    Respectfully submitted,

                                                  /S/Robert K. Tompkins
                                                  Robert K. Tompkins
                                                  **PATTON BOGGS, LLP**
                                                  2550 M Street, NW
                                                  Washington, D.C.  20037
                                                  Telephone:  (202) 457-6000
                                                  Facsimile:  (202) 457-6315
                                                  *Counsel for Plaintiff The Jefferson County Assisted*
                                                  *Housing Corporation*

Of Counsel:
Elizabeth M. Gill
Trevor Tullius
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2013, Plaintiff's Jefferson County Assisted Housing Corporation's, Supplemental Brief was served upon the parties below via the Court's electronic notification system.

/S/ Elizabeth Gill
Elizabeth Gill