**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| CMS CONTRACT MANAGEMENT SERVICES, *et al*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 12-852C (and consolidated cases) |
| v. | ) ) | |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF NATIONAL HOUSING COMPLIANCE'S**
**POST-HEARING SUPPLEMENTAL BRIEF**

In accordance with the Court's March 5, 2013 Order, Plaintiff, National Housing Compliance ("NHC"), submits this Post-Hearing Supplemental Brief, which addresses the issues raised by the Court as follows.

1. <u>Court's Question</u>: Were the Court to determine that Section 8(b)(2) of the Housing and Community Development Act of 1974 ("1974 Act"), while now expired, continues to be grandfathered into the Housing Act of 1937 and to govern HUD's administration of the project-based rental assistance at issue, does the second sentence of Section 8(b)(2) give HUD the authority to administer the assistance through cooperative agreements with PHAs?

   <u>Short Answer</u>: Although the second sentence of Section 8(b)(2) provides the

United States Department of Housing and Urban Development ("HUD") with the authority to

provide assistance to Public Housing Agencies ("PHA") for PHA/Owner Projects via Traditional

Annual Contributions Contracts ("ACC"), which can be labeled as cooperative agreements

because they provide assistance to the PHAs and owners, the second sentence of Section 8(b)(2)

does not provide HUD with the authority to enter into cooperative agreements with PHAs for the

Performance-Based Contract Administration ("PBCA") services it is seeking to obtain through

Performance-Based ACCs ("PB ACC") pursuant to the 2012 Notice of Funding Availability ("NOFA").

      <u>Detailed Response</u>: The statutory provision referenced by the Court, Section 8(b)(2), contains two sentences which grant authority.  The first sentence of Section 8(b)(2) states, in part, that "the Secretary is authorized to make assistance payments pursuant to contracts with owners or prospective owners who agree to construct or substantially rehabilitate housing . . . ," and provides authority for the United States Department of Housing and Urban Development ("HUD") to provide assistance directly to the qualifying property owners.  42 U.S.C. § 1437f(b)(2) (1975).  Under the New Construction and Substantial Rehabilitation Program, projects entered into under the authority granted in this first sentence are Private-Owner/HUD projects.  24 C.F.R. § 880.201.

      The second sentence of Section 8(b)(2) states that "[t]he Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to such owners or prospective owners," and provides authority for HUD to provide assistance to the PHAs.  42 U.S.C. § 1437f(b)(2) (1975).  Under the New Construction and Substantial Rehabilitation Program, projects entered into under the authority granted in this second sentence are Private-Owner/PHA projects.  24 C.F.R. § 880.201.

      For Private-Owner/PHA projects, the PHA found a suitable owner.  The PHA then entered into a Traditional ACC with HUD, pursuant to which HUD provided assistance to the PHA.  The PHA independently entered into a Housing Assistance Payment ("HAP") contract with the private owner.  AR 2677.  Under a Traditional ACC, the PHA serves as a Traditional Contract Administrator ("TCA"), which involves a more expanded scope of responsibilities.  AR

1929.  The principal purpose of the Traditional ACC was to provide assistance to the PHAs and owners, and therefore, could be labeled a cooperative agreement.  AR 2669-70.

As stated above, although the second sentence of Section 8(b)(2) provides HUD with authority to provide assistance to PHAs via a Traditional ACC, which can be labeled a cooperative agreement because it provides assistance to the PHA and the PHA is responsible for administering the project, it does not provide HUD with the authority to enter into cooperative agreements with PHAs for the PBCA services it is seeking to obtain through PB ACCs pursuant to the 2012 NOFA.  This is because the PB ACC does not include or involve any payment of assistance to the PHA; instead, it pays the Performance-Based Contract Administrators a fee in return for the performance of services.  In addition, unlike the TCAs, which have entered into HAP contracts directly with the private owners, the Performance-Based Contract Administrators are assigned by HUD the HAP contracts for which HUD is responsible and to which HUD remains a party.

2.  <u>Court's Question</u>: To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract? Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. § 880.505(c)?

<u>Short Answer</u>: Plaintiffs' arguments are not dependent on the premise that HUD is locked in, for perpetuity, to the authority initially granted by either the first sentence or the second sentence of Section 8(b)(2) with respect to a particular assistance contract.  With regard to 24 C.F.R. § 880.505(c), although a conversion of a Private-Owner/HUD project to a Private-Owner/PHA project may be theoretically possible under this regulation, nothing in the record

indicates that HUD has ever converted, or attempted to convert, the projects at issue under the 2012 NOFA from Private-Owner/HUD projects to Private-Owner/PHA projects.

Detailed Response: As discussed above, the first sentence of Section 8(b)(2) gives HUD the authority to provide assistance directly to private owners (Private-Owner/HUD projects), and the second sentence gives HUD the authority to provide assistance to a PHA via a Traditional ACC, pursuant to which the PHA independently enters into a contract with the private owner (Private-Owner/PHA projects).  Under either of these scenarios, "[t]he PHA or HUD may contract with another entity for the performance of some or all of its contract administration functions."  24 C.F.R. § 880.505(a).

When Congress created the New Construction and Substantial Rehabilitation Program, it placed the primary responsibility for program administration in the Secretary of HUD.  In keeping with Congressional intent, the majority of projects entered into by HUD for the Section 8(b)(2) program were under the authority granted in sentence one.  Gov't MJAR, p. 11; AR 428.  However, as permitted by the statute, HUD also used the authority in sentence two of Section 8(b)(2), although to a much lesser degree.

In 1997, Congress enacted the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA"), which provided HUD with an independent basis for renewing the expiring HAP contracts.  111 Stat 1344, 1408 § 524 (1997).  Plaintiffs' position is that MAHRA did not change the underlying nature of the original HAP contracts – it simply provided HUD with the authority to renew them.  Thus, MAHRA did not cause a transfer of HUD's authority from Private-Owner/HUD projects (sentence one of Section 8(b)(2)) to Private-Owner/PHA projects (sentence two of Section 8(b)(2)).  This type of conversion, if actually possible in practice, would require changing the current HUD/PBCA structure to the structure

described above – i.e, a Traditional ACC that involves providing a subsidy directly to the PHA, pursuant to which the PHA has the responsibility for entering into the HAP contract with the private owner and thus bears the overall responsibility of administering the project.  Here, per HUD's own admission, the scope of responsibilities of a Performance-Based Contract Administrators is more limited than a PHAs which performed as TCAs under the second sentence authority.  AR 1929.  Nothing in the administrative record, or HUD's history in implementing this program, evidences that HUD has attempted to convert the Private-Owner/HUD projects to Private-Owner/PHA projects.[1]  HUD has no programmatic reason or incentive to do so.

To the contrary, the record reflects a shift from HUD in the opposite direction, which is reflected by its statement in the 1999 RFP of its intention, upon renewing 4,200 expired project-based HAP contracts being administered by various PHAs, "to transfer contract administration of the renewed HAP Contracts to the Contract Administrator (CA) it selects through this RFP . . . ."  AR 428.  HUD could not transfer contract administration for the 4,200 HAP contracts prior to the renewal, because they were for Private-Owner/PHA projects under the second sentence of Section 8(b)(2) and thus were under the TCA's sole authority/discretion in this regard.  *See* Exhibit A (HUD Memorandum, Feb. 7, 2007).  This is what Plaintiffs AHSC *et al.* meant in the opening brief, page 8 (footnote 7), when stating that the contracts associated

---

[1] The regulation referenced by the Court, 24 C.F.R. § 880.505(c) (Conversion of Projects from one Ownership/Contractual arrangement to another), provides that "[a]ny project may be converted from one ownership/contractual arrangement to another (for example, from a private-owner/HUD to a private-owner/PHA project) if: (1) The owner, the PHA and HUD agree, (2) HUD determines that conversion would be in the best interest of the project, and (3) In the case of conversion from a private-owner/HUD to a private-owner/PHA project, contract authority is available to cover the PHA fee for administering the Contract.  There is nothing in the record that demonstrates that HUD has used this regulation to convert a Private-Owner/HUD project to a Private-Owner-PHA project.

with these projects are not at issue in the instant matter, because "the HAP contract administration would not be BUD's to contract out."  That HUD, not the TCA, planned to renew the expiring HAP contracts is consistent with the requirement in MAHRA that HUD renew expiring Section 8 project-based HAP contracts.  MAHRA § 524(a); *see also* 24 C.F.R. § 402.1 ("HUD will renew project-based assistance contracts under the authority provided in section 524 of MAHRA."); § 402.4(a) ("*Initial Renewal.* (1) HUD may renew any expiring Section 8 project-based contract . . . ."); 71 Fed. Reg. 2112 (Jan. 12, 2006) (explaining that "MAHRA require[s] HUD, at the request of the owner, to renew an expiring Section 8 contract, with two exceptions.").

Ultimately, regardless of 24 C.F.R. § 880.505(c), there is nothing in the administrative record or HUD's history to indicate that it has done so or that it has any reason to do so because it would be contrary to its admittedly successful outsourcing program.  Instead, HUD created the PBCA program, in which HUD has contracted out some of its contract administration services in accordance with 24 C.F.R. § 880.505(a).

3. <u>Court's Question</u>: If HUD is required to provide the renewal assistance at issue through HAP contracts with project owners, such that any contracts it enters into with other entities for the provision of contract administration services related to the HAP contracts are procurement contracts subject to the Competition in Contract Act ("CICA"), may HUD legally limit competition for these contracts to PHAs? If so, what is the specific legal basis for such a limitation?

<u>Short Answer</u>: Yes, if HUD is required to use procurement contracts subject to CICA to acquire the contract administration services, HUD may legally limit the competition for these contracts to PHAs. [2]

---

[2] We note, however, consistent with the position taken by NHC in its previous briefs, that NHC does not believe that the record provides a basis for justification for any further restriction of the competition solely to in-state PHAs.

Detailed Response: CICA, as implemented by the Federal Acquisition Regulation ("FAR"), requires that contracting officers use competitive procedures "that are best suited to the circumstances of the contract action and consistent with the need to fulfill the Government's requirements efficiently." 48 C.F.R. § 6.101(b). Restrictive provisions are permissible, but only "to the extent necessary to satisfy the needs of the agency or as authorized by law." 48 C.F.R. § 11.002(a)(1)(ii); *Savantage Fin. Servs. v. United States*, 86 Fed. Cl. 700, 704 (Fed. Cl. 2009), *aff'd*, 595 F.3d 1282 (Fed. Cir. 2010). "The determination of an agency's minimum needs 'is a matter within the broad discretion of agency officials . . . and is not for this court to second guess.'" *CHE Consulting, Inc. v. United States*, 74 Fed. Cl. 742, 747 (2006) (finding reasonable the agency's limitation of the competition to the Original Equipment Manufacturers and disagreeing that this limitation discriminated against a class of vendors)(*quoting Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004)). The court will not overturn an agency's determination unless there is no rational basis for the agency's decision. *Savantage*, 86 Fed. Cl. at 704.

The history of the PBCA program and the specialized knowledge and experience of the PHAs provides HUD with sufficient justification to limit the competition for these contracts to PHAs. In this regard, a reasonable determination by HUD does not require concrete evidence that only PHAs can perform the work. *See Savantage*, 595 F.3d at 1286 (*quoting CHE Consulting*, 552 F.3d at 1355) ("[A]n agency 'has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review . . . [as CICA does not require the agency] to supply a historical record of failures to substantiate a risk.'").

4. <u>Court's Question</u>: All parties appear to agree that prior to the expiration of HUD's "(b)(2)" authority, HUD entered into various ACCs with PHAs pursuant to the second sentence of that subsection. On page 8 (footnote 7) of its opening brief, Plaintiffs AHSC et al. states that the contracts associated with these projects are not at issue in the instant matter, because "the HAP contract administration would not be HUD's to contract out." However, the 1999 RFP expressly noted that approximately 4,200 HAP contracts for project-based Section 8 housing were at that time being administered by various PHAs, but that "[w]hen HUD renews the[se] expired project-based HAP contracts … HUD generally expects to transfer contract administration of the renewed HAP Contracts to the Contract Administrator (CA) it selects through this RFP for the service area where the property is located." AR 428.

The Court therefore requests HUD, in particular, to clarify the current status of these rental assistance contracts, and whether or not they are in the portfolio of contracts covered by the 2012 NOFA.

<u>Response</u>: As discussed above in NHC's response to Question 2, it is NHC's

understanding that these contracts, upon renewal, have been, and continue to be, transferred to

the PBCA portfolio.

Respectfully submitted,

/s/ Michael R. Golden
Michael R. Golden
PEPPER HAMILTON LLP
600 14th Street, N.W., Suite 500
Washington, DC  20005-2004
Telephone: (202) 220-1244
Direct facsimile: (800) 616-5742
E-mail: goldenm@pepperlaw.com
*Counsel for National Housing Compliance*

*Of counsel*:
Michael A. Hordell
Heather Kilgore Weiner
Samuel W. Jack
PEPPER HAMILTON LLP

Dated: March 15, 2013