IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Bid Protest

| | | |
|---|---|---|
| CMS CONTRACT MANAGEMENT SERVICES, et al. | ) ) ) ) ) ) ) ) ) ) ) ) | Case Nos.  12-852C 12-853C 12-862C 12-864C 12-869C |
| Plaintiffs. | | |
| v. | | Judge Thomas C. Wheeler |
| THE UNITED STATES, | | |
| Defendants. | | |

**PLAINTIFFS AHSC, NTHDC AND CAHI'S SUPPLEMENTAL BRIEF**

**ROGERS JOSEPH O'DONNELL**

Neil H. O'Donnell (Counsel of Record)
Dennis J. Callahan
Jeffery M. Chiow

311 California Street, 10th Floor
San Francisco, CA 94104
Tele:  415-956-2828
Fax:  415-956-6457
Email:  nodonnell@rjo.com

Attorneys for AHSC, NTHDC and CAHI

March 15, 2013

329995.1

# TABLE OF CONTENTS

Page

QUESTION 1 ................................................................................................................... 1

QUESTION 2 ................................................................................................................... 3

QUESTION 3 ................................................................................................................... 8

QUESTION 4 ................................................................................................................... 9

329995.1

## TABLE OF AUTHORITIES

Page

**CASES**

*CHE Consulting, Inc. v. United States,*
   74 Fed. Cl. 742 (2006) ..................................................................................................8

*Savantage Fin. Servs. v. United States,*
   86 Fed. Cl. 700 (Fed. Cl. 2009), *aff'd,* 595 F.3d 1282 (Fed. Cir. 2010)...............................8

*Scientific Industries, Inc.,*
   B-208307, 83-1 CPD ¶ 361 ..........................................................................................8

**STATUTES**

41 U.S.C. § 3306(A)(2).................................................................................................8

Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No.
   105-65, Title V, § 524, 111 Stat. 1344 (1997) (codified at 42 U.S.C. § 1437f note) .passim

Housing and Community Development Act of 1974 , Pub. L. No. 93-9383, §201(a),
   88 Stat. 633, 662 (1974) (the "1974 Act")................................................................passim

**OTHER AUTHORITIES**

GAO, Principles of Federal Appropriation Law ("GAO Redbook"), 06-382SP,
   Washington, D.C. (2006) at 10-17 ...............................................................................5

24 C.F.R. §5.403 .........................................................................................................6

24 C.F.R. §880.201 ......................................................................................................6

24 C.F.R. §880.505(a) ..................................................................................................7

24 C.F.R. §880.505(c)...........................................................................................passim

24 C.F.R. §880.507(b) ..................................................................................................6

24 C.F.R. §880.507(c)(1)...............................................................................................7

24 C.F.R. §881.503 .......................................................................................................1

24 C.F.R. §886.120(a)...................................................................................................7

24 C.F.R. §886.319 .......................................................................................................7

24 C.F.R. §891.580........................................................................................................7

329995.1

Plaintiffs Assisted Housing Services Corporation ("AHSC"), North Tampa Housing Development Corporation ("NTHDC") and California Affordable Housing Initiatives, Inc. ("CAHI") submit these responses to the Court's questions of March 5, 2013.

**Question 1:**   **Were the Court to determine that Section 8(b)(2) of the Housing and Community Development Act of 1974 ("1974 Act"), while now expired, continues to be grandfathered into the Housing Act of 1937 and to govern HUD's administration of the project-based rental assistance at issue, does the second sentence of Section 8(b)(2) give HUD the authority to administer the assistance through cooperative agreements with PHAs?**

The second sentence of Section (8)(b)(2) of the 1974 Act, when combined with MAHRA, continues to give HUD the authority to administer assistance through cooperative agreements with PHAs to the extent that such PHA/owner projects were established prior to 1983. Without something more, however, since the repeal of Section 8(b)(2), it does not, either by itself, or in combination with MAHRA, permit HUD to establish new cooperative agreements with PHAs for Section 8 projects which HUD established on its own through HAP contracts directly with owners.

Until 1983, the first sentence of Section 8(b)(2) authorized HUD to enter into HAP contracts with owners who agreed to construct or substantially rehabilitate housing for at least partial occupancy by lower-income families. The second sentence of that Section also permitted HUD to enter into annual contributions contracts (ACCs) with PHAs that themselves made HAP contracts with such owners. The relevant regulations for New Construction at 24 C.F.R. Part 880 were issued in 1974 and were adopted for Substantial Rehabilitation at 24 C.F.R. §881.503. They permitted the parties to agree to convert a PHA/owner project to a HUD/owner project or vice versa (24 C.F.R. §880.505(c)) although it is not apparent from the administrative record that any such conversions took place before

1

1983.   The 1983 repeal of Section 8(b)(2) ended both the first and second sentence authority

to establish any new projects while providing that HUD was to honor contracts for projects

that were already in place.

Fourteen years later, in 1997, Congress passed MAHRA in part as a response

to the initial wave of expirations of contracts that had been entered into under Section

8(b)(2).   As discussed in our earlier briefing and at oral argument, AHSC views MAHRA as

accomplishing an essential but relatively modest task.   It simply permitted the Secretary to

renew expiring contracts using funds that were appropriated for that purpose but it did not

change the underlying character of any projects.[1]   See MAHRA §524(a)(1).   Nothing about

MAHRA remade Section 8(b)(2) contracts into Section 8(b)(1) contracts.   Similarly its

straightforward renewal provision did not transform HUD's own projects entered into

directly with owners under the first sentence of 8(b)(2) into PHA selected and administered

projects under the second sentence of that section.

It is in this context that AHSC understands the Court's reference to the

grandfathering of the pre-1983 Section 8(b)(2) into the 1974 Act.   Because the HAP

contracts under first sentence 8(b)(2) projects and the ACCs with PHAs under second

sentence 8(b)(2) projects were renewed not transformed, they were still categorized and

administered consistent with their origins under 8(b)(2).   MAHRA (§512(2)(B)(1)) and the

Act itself (42 U.S.C. §1437f(d)(2)(B)(i) and (ii)) recognized 8(b)(2) projects as a continuing

category of housing under the Act.   And there were no new regulations established for these

renewed programs.   Instead they continued to be governed by the same set of regulations

---

[1] Since MAHRA was passed, Congress has typically appropriated funds for Section 8
housing primarily for renewal of contracts under existing projects rather than for any
particular programs.   See AR 18092 (FY 1997) and AR 1533 (FY 2013).

initially established for New Construction and Substantial Rehabilitation programs in 1974

when those were active programs under Section 8(b)(2) to which new projects could be

added.  But nothing in that ongoing recognition of the origins of these projects in the

administration of these projects changes that Section 8(b)(2) itself was repealed in 1983,

ending the ability to establish new contracts under it.  And it does not change that, while

MAHRA permitted the renewal of the agreements funding these projects, it did not authorize

altering the nature of the projects themselves years after they were established.

        For reasons discussed in the response to Question 2, in order to resolve this

case the Court need not reach the question of whether the grandfathering of Section 8(b)(2)

might mean something more.  Specifically the question as to whether the second sentence of

Section 8(b)(2) might, despite its repeal, continue to provide authority for establishing new

cooperative agreements for HUD/owner projects converted to PHA/owner projects under 24

C.F.R. §880.505(c) is unnecessary to resolution of this matter since the record does not

support that any such conversion has occurred.

**Question 2:**  **To what extent are the Plaintiffs' arguments dependent upon the premise that, having originally entered into HAP contracts pursuant to the first sentence of Section 8(b)(2), HUD is required to continue to act pursuant to this specific authority (as opposed to the authority granted under the second sentence of the same subsection) into perpetuity with respect to a particular assistance contract?  Relatedly, how do the Plaintiffs interpret or explain 24 C.F.R. §880.505(c)?**

        AHSC, NTHDC and CAHI's position in this litigation is not dependent upon

the premise that HUD is required to continue to act in perpetuity pursuant to the authority of

the first sentence of Section 8(b)(2) for HUD/owner projects.  The HUD/owner projects that

account for the vast majority of the Section 8(b)(2) contracts in the NOFA portfolio were

entered into under the authority of the first sentence of section 8(b)(2).  Nothing has

3

happened since, in the nature of either a statutory enactment or an action by HUD pursuant to a duly promulgated regulation, that has converted these projects from first sentence to second sentence 8(b)(2) projects and, therefore, there is no authorization for the use of new cooperative agreements to fund them. As a result, a determination as to whether HUD might be able to convert these contracts sometime in the future is not necessary for the Court to resolve this litigation in favor of the plaintiffs.

As to the absence of statutory enactment effecting a conversion, in the answer to Question #1 above, these plaintiffs have already explained that MAHRA did nothing more than authorize the Secretary to renew existing Section 8 project-based contracts using funds appropriated for that purpose. That renewal occurred whether the contracts in question were HUD's HAP contracts with owners under the first sentence of Section 8(b)(2) or its ACCs with PHAs under the second sentence of that section. The language of MAHRA §524(a)(1) provided an independent basis for renewal of the contracts without purporting to make any change in the nature of the underlying projects.

As to the possibility of an effect from an action by HUD pursuant to regulation, the Court has asked about 24 C.F.R. §880.505(c), the regulation permitting conversions of contracts of New Construction and Substantial Rehabilitation projects. The substance of this provision has not been amended since these regulations were promulgated in 1974. Before the repeal of Section 8(b)(2) in 1983, the ability to make such conversions was consistent with the existence of HUD's ongoing authority under both the first sentence and second sentence of Section 8(b)(2). Since that repeal, the continued existence of this regulation seems consistent with the inherent authority of HUD to enter into contracts using appropriated funds without separate statutory authorization. Thus the regulation could

4

authorize converting the PHA/owner projects, in which HUD provides assistance through
ACCs to PHAs, into HUD/owner projects, in which HUD provides the assistance through
HAP contracts directly with the owners.

Whether the amended 505(c) still holds out the possibility of converting a
HUD/owner project with a HAP contract to a PHA/owner requiring a new cooperative
agreement with a PHA is more problematic. An agency requires specific statutory
authorization in order to use grants or cooperative agreements. *See* GAO, Principles of
Federal Appropriation Law ("GAO Redbook"), 06-382SP, Washington, D.C. (2006) at 10-
17. It is not clear what authority HUD would have to enter into new cooperative agreements
with PHAs for projects that had been previously funded by contracts between HUD and
owners given that Section 8(b)(2) has been repealed and that MAHRA authorized only the
renewal of existing cooperative agreements, not the creation of new ones for projects that did
not have them before.

In any case, however, the Court is not presented with that issue in this case.
Even if one were to accept that there is the theoretical possibility that a project could be
converted from a HUD/owner project to a PHA/owner project, the NOFA portfolio at issue
here is not made up of converted projects. Section 505(c) has very specific requirements for
such a conversion. Although each of these plaintiffs has served as a PBCA for many years,
none is aware of any situation in which HUD has suggested that it is carrying out a
"conversion" of any project under this regulatory provision. HUD's conduct through the
history of this dispute at both the GAO and in this Court effectively concedes that point.
During nearly two years of litigation, from HUD's unsuccessful motion to dismiss the bid
protests under the 2011 Invitation for Applications until its MJAR Reply, HUD never

mentioned 24 C.F.R. §880.505(c). Even when HUD first referred to this provision in its

Reply, the Agency did not affirmatively argue that it had converted the projects, only that

plaintiffs had overlooked its ability to do so. HUD Reply at 12, 20. HUD does not point to

anything in the record that supports that such a conversion occurred because there is nothing

there that so indicates.

In fact, there are numerous factors that confirm that the NOFA portfolio does

not contain HUD projects that have been converted to PHA projects. Conversion to private-

owner/PHA projects would require the use of "true ACCs," pursuant to which HUD transfers

the rental assistance and the administrative fee to the PHA. *See* 24 C.F.R. §880.201

(definition of "private-owner/PHA project"); 24 C.F.R. §5.403 (definition of "ACC"). The

NOFA solicits much more limited agreements which transfer only the administrative fee.

Further, while under PHA/owner contracts the PHAs served as Traditional Contract

Administrators (TCAs) for those projects the PHAs helped establish to meet housing needs

in their localities (24 C.F.R. §880.201 (definition of "private owner/PHA projects)), the

NOFA seeks only Performance Based Contract Administrators (PBCAs) to service all HAP

contracts in the state. As the Court is well aware, HUD itself explained that "the scope of

responsibilities of a [PBCA] is more limited than that of a Traditional Contract

Administrator." AR 1704.

The different rules governing the authority to default further demonstrate

HUD's control over the NOFA projects. Regarding PHA defaults in private-owner/PHA

projects, HUD may take over contract administration only upon the "substantial default" of

the PHA. 24 C.F.R. §880.507(b). Under the NOFA, HUD may add or subtract projects from

a PBCA's assigned projects at will. *See* AR 126 (P-B ACC stating that HUD may add or

6

withdraw HAP Contracts by giving notice to the PBCA). Likewise, concerning owner default, in private-owner/PHA projects the PHA determines whether the owner is in default, and only notifies HUD of that determination. 24 C.F.R. §880.507(c)(1). Under the P-B ACC, HUD must approve the termination of a HAP contract due to an owner's default. AR 153.

In short, nothing in the record supports a conclusion that HUD converted the HUD/owner New Construction and Substantial Rehabilitation contracts into PHA/owner projects either by the NOFA itself or at some other point. Thus, the Court need not reach the question of what effect, if any, such a conversion, if attempted under 24 C.F.R. §880.505(c), might have. Instead, these Plaintiffs submit that the PBCA initiative, including the latest NOFA, is an action by HUD under another subsection of that same regulatory provision, its authority to contract out the Agency's HAP contract administration responsibilities under §880.505(a). And for that activity only a procurement contract is authorized.

Finally, it should be noted that even if the New Construction and Substantial Rehabilitation private-owner/HUD projects theoretically could be converted to private-owner/PHA projects under 24 C.F.R. §880.505(c), the regulations that govern projects in the NOFA portfolio that exist under other Section 8 authority do not provide for such conversions. *See* HUD MJAR p. 5, n. 4 (listing the Section 8 programs). The regulations controlling the LMSA (24 C.F.R. §886.120(a)), PD (24 C.F.R. §886.319), and Section 202/8 programs (24 C.F.R. §891.580) all make HUD responsible for administering the HAP contracts. And unlike the New Construction and Substantial Rehabilitation programs, none of these other program regulations contemplate the use of true ACCs, much less allow the conversion of projects to a contractual arrangement that would require a true ACC. Thus,

7

even if the Agency wanted to "convert" these NOFA portfolio projects to make them PHA

projects, HUD lacks regulatory authority to do so.

**Question 3:   If HUD is required to provide the renewal assistance at issue through
HAP contracts with project owners, such that any contracts it enters into with other
entities for the provision of contract administration services related to the HAP
contracts are procurement contracts subject to the Competition in Contract Act
("CICA"), may HUD legally limit competition for these contracts to PHAs?  If so, what
is the specific legal basis for such a limitation?**

HUD may limit the competition for these performance-based service contracts

to PHAs by virtue of the discretion agencies enjoy under CICA.

CICA allows an agency to fashion a solicitation in a way that has the effect of

reducing competition.  Restrictive requirements, are permitted to the extent necessary to

satisfy an agency's legitimate needs.  41 U.S.C. §3306(A)(2); *Savantage Fin. Servs. v. United

States*, 86 Fed. Cl. 700, 704 (Fed. Cl. 2009), *aff'd*, 595 F.3d 1282 (Fed. Cir. 2010).  "The

determination of an agency's minimum needs 'is a matter within the broad discretion of

agency officials . . . and is not for this court to second guess.'"  *CHE Consulting, Inc. v.

United States*, 74 Fed. Cl. 742, 747 (2006).  The agency's determination will be upheld

unless it had no rational basis.  *Savantage*, 86 Fed. Cl. at 704.

Restricting performance to PHAs would provide HUD its desired benefits of a

public/private partnership and give HUD confidence in offerors' ability to perform these

services, while still ensuring competition.  This approach has worked well since 1999, as

demonstrated by the robust price competition under the 2011 Invitation.  AR 317-318.  A

restriction to PHAs (without a geographic qualification) would be akin to an experience

requirement that GAO has found reasonable.  *Scientific Industries, Inc.*, B-208307, 83-1

CPD ¶ 361.  Thus, under CICA, HUD could reasonably conclude that its minimum needs

require it to invite offers only from PHAs. Such a decision would be subject to review in a

future bid protest, but is not a matter before this Court.

**Question 4:   All parties appear to agree that prior to the expiration of HUD's "(b)(2)"
authority, HUD entered into various ACCs with PHAs pursuant to the second sentence
of that subsection. On page 8 (footnote 7) of its opening brief, Plaintiffs AHSC et al.
states that the contracts associated with these projects are not at issue in the instant
matter, because "the HAP contract administration would not be HUD's to contract
out." However, the 1999 RFP expressly noted that approximately 4,200 HAP contracts
for project-based Section 8 housing were at that time being administered by various
PHAs, but that "[w]hen HUD renews the[se] expired project-based HAP contracts …
HUD generally expects to transfer contract administration of the renewed HAP
Contracts to the Contract Administrator (CA) it selects through this RFP for the
service area where the property is located." AR 428**

AHSC, NTHDC and CAHI recognize that the Court addressed this question

"in particular" to HUD. HUD should be able to provide the specifics as to the exact status of

these contracts. Counsel for these plaintiffs, however, now understand something that they

did not at the time of their initial brief. Even though the PHA/owner projects are supposedly

under the control of the PHAs who entered into them and, therefore, HUD should not be free

to contract the administration of the contracts associated with them, beginning in 2007,

HUD removed contract administration from those sponsoring PHAs as the ACCs were

renewed. Specifically HUD directed as a condition of continued funding that PHAs that had

been acting as TCAs transfer "the responsibility for contract administration" for those

PHA/owner agreements "to the PBCA with jurisdiction for the geographic area where the

project is located." See Exhibit 3, Feb 7, 2007, Memorandum to TCAs from the Director,

Office of Housing Assistance Contract Administration Oversight, attached to Plaintiffs'

Motion to Supplement the Administrative Record of March 15, 2013. In 2007, that transfer

was for all PHA/owner projects on which the contracts had been renewed to that point. As

these plaintiffs expect that HUD will confirm, since 2007, the administration of further

projects has been transferred to PBCAs as their contracts have been renewed.  That, of course, is entirely inconsistent with any claim that there has been a conversion of HUD/owner projects into PHA controlled projects.  To the extent that there has been any shift in the control of Section 8 project-based projects, it has been in the opposite direction. At HUD's direction PHAs that entered into the projects and had acted as TCAs for them have lost control of those projects entirely.  Instead PHAs, selected by HUD on a statewide basis, usually not the PHA that was acting as the TCA, have been substituted to carry out the more limited PBCA role under HUD's "strict performance and reporting requirements."  AR 1704.

There could hardly be a better indication of HUD's view that project-based projects are in its direct control.  HUD believes itself free to require that even a PHA that sponsored a project give up any role in that project at HUD's direction.  This history makes it even more apparent that the NOFA's contracting out of the administration of these contracts is for HUD's benefit in carrying out what it regards as its part of the Section 8 Housing Program.

Dated:  March 15, 2013          Respectfully submitted,

                                By: _____
                                Neil H. O'Donnell (Counsel of Record)
                                Dennis J. Callahan
                                Jeffery M. Chiow

                                ROGERS JOSEPH O'DONNELL
                                311 California Street, 10th Floor
                                San Francisco, CA 94104
                                Tel:  415-956-2828
                                Fax:  415-956-6457
                                Email:  nodonnell@rjo.com
                                Attorneys for Defendants AHSC, NTHDC and CAHI